UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MELISSA KIRIACOPOULOS, CRAIG JOHNSON, BEVERLY TREVETHAN, SARAH BURNS, GERALYN DARR, STEVE FIENE, and THOMAS GRAHAM, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| GENERAL MOTORS LLC, a Delaware Limited Liability Company, | |
| Defendant. | |

**CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................1

II.  PARTIES ..........................................................................................4

    A.   Plaintiffs ...................................................................................4

        1.   Melissa Kiriacopoulos ....................................................4

        2.   Craig Johnson................................................................10

        3.   Beverly Trevethan.........................................................14

        4.   Sarah Burns ...................................................................19

        5.   Geralyn Darr ..................................................................22

        6.   Steve Fiene ....................................................................25

        7.   Thomas Graham.............................................................29

    B.   Defendant ................................................................................31

    C.   Plaintiffs' Individual and Class-Wide Bases for Suit ........................32

III. DEFINITION OF "CLASS MEMBERS" ......................................34

IV.  JURISDICTION AND VENUE ....................................................34

V.   FACTUAL ALLEGATIONS .........................................................36

    A.   GM's PCV System...................................................................36

    B.   The PCV System Freezing Defect in the Class Vehicles....................37

    C.   GM issued a series of notices recognizing the defect in the
         Class Vehicles ........................................................................41

        1.   GM February 2013 Bulletin "Oil Leak from Rear of
              Engine After Extended Driving in Cold Temperatures
              Below 0 F" .................................................................41

2.    GM January 2014 Bulletin PIP5093A .......................................42

3.    GM January 2016 Bulletin PIP5093B .......................................43

4.    GM January 2019 Bulletin PIP5093C regarding "Oil Leak from Rear of Engine After Extended Driving in Cold Temperatures Below 0 F (-18 C)"...................................44

D.    GM February 2019 Bulletin 19-NA-021 regarding "Diagnostic Tip for Oil Leak from Rear of Engine After Extended Driving in Cold Temperatures Below 0 Degrees F"...........44

E.    GM Has Known about PCV System Problems Associated with Cold Weather since the 1980s......................................................45

F.    GM has known of this dangerous defect for years based on its own internal controls and monitoring of the industry. ...................49

1.    Pre-release design, manufacturing, and testing data— as well as post-release monitoring—alerted GM to the defect. .......................................................................................50

2.    Dealership repair records and warranty claims data also support GM's knowledge of the defects...........................51

3.    Complaints made to NHTSA support GM's knowledge of the defect in the Class Vehicles.............................................52

4.    Complaints on publicly available internet forums and blogs monitored by GM support GM's knowledge of the defect in the Class Vehicles. .................................................64

5.    Acknowledgements of the pervasiveness of the defects by dealerships also supports that GM would have known early on about them........................................................64

6.    GM's own materials indicate it likely had exclusive knowledge of the defect at least as early as 1985. ...................65

G.    The PCV freezing defect poses an inherent risk to vehicle occupant safety and renders the Class Vehicles *per se* defective. ............................................................................................66

H.  GM profits from the popularity of these vehicles ...............................67

I.  GM concealed, both affirmatively and via omission, the defective nature of the PCV system ....................................69

J.  Allegations Establishing Agency Relationship Between Manufacturer GM and GM Dealerships ............................73

VI.  TOLLING OF THE STATUTE OF LIMITATIONS ....................................76

VII. CLASS ACTION ALLEGATIONS .................................................77

VIII.CAUSES OF ACTION ........................................................83

A.  Multi-State Claims. .....................................................83

COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT 15 U.S.C. § 2301, *ET. SEQ.* ........................................83

COUNT II BREACH OF CONTRACT ....................................................88

B.  Claims brought on behalf of the Massachusetts Subclass .................89

COUNT I FRAUDULENT CONCEALMENT (BASED ON MASSACHUSETTS LAW) ..............................................89

COUNT II UNJUST ENRICHMENT ..................................................94

C.  Claims brought on behalf of the Michigan Subclass .........................95

COUNT I VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT (MICH. COMP. LAWS § 445.903 *et seq.*) ...............95

COUNT II FRAUDULENT CONCEALMENT (BASED ON MICHIGAN LAW) .....................................................101

COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MICH. COMP. LAWS § 440.2314)...................105

COUNT IV UNJUST ENRICHMENT ................................................107

D.  Claims brought on behalf of the Minnesota Subclass......................108

COUNT I VIOLATIONS OF THE MINNESOTA PREVENTION OF
CONSUMER FRAUD ACT (MINN. STAT. §§ 325F.68, *ET SEQ.*
AND MINN. STAT. § 8.31, SUBD. 3A)......................................................108

COUNT II VIOLATION OF THE MINNESOTA UNIFORM
DECEPTIVE TRADE PRACTICES ACT (MINN. STAT.
§ 325D.43. *ET SEQ.)* ...................................................................................113

COUNT III FRAUDULENT CONCEALMENT (BASED ON
MINNESOTA LAW) .......................................................................................118

COUNT IV BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (MINN. STAT. §§ 336.2-314 AND
336.2A-212)....................................................................................................123

COUNT V UNJUST ENRICHMENT.................................................................124

    E.    Claims brought on behalf of the New York Subclass.......................126

COUNT I VIOLATIONS OF NEW YORK GENERAL BUSINESS
LAW § 349 (N.Y. GEN. BUS. LAW § 349) ..............................................126

COUNT II VIOLATIONS OF NEW YORK GENERAL BUSINESS
LAW § 350 (N.Y. GEN. BUS. LAW § 350) ..............................................131

COUNT III FRAUDULENT CONCEALMENT (BASED ON NEW
YORK LAW).....................................................................................................135

COUNT IV BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.Y. U.C.C. § 2-314)..........................................140

COUNT V UNJUST ENRICHMENT.................................................................141

    F.    Claims brought on behalf of the Wisconsin Subclass.......................143

COUNT I VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE
PRACTICES ACT (WIS. STAT. § 110.18, *et seq.*) .....................................143

COUNT II FRAUDULENT CONCEALMENT (BASED ON
WISCONSIN LAW)..........................................................................................148

COUNT III BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (WIS. STAT. §§ 402.314 AND 411.212)............152

011080-11/1873557 V1

COUNT IV UNJUST ENRICHMENT ................................................................154

PRAYER FOR RELIEF .........................................................................156

DEMAND FOR JURY TRIAL ...............................................................157

Plaintiffs Melissa Kiriacopoulos, Craig Johnson, Beverly Trevethan, Sarah Burns, Geralyn Darr, Steve Fiene, and Thomas Graham, individually and on behalf of all others similarly situated (the "Class"), file this Complaint against Defendant General Motors LLC. This lawsuit is based upon the investigation of counsel and upon information and belief as noted. In support thereof, Plaintiffs state as follows:

## I.      INTRODUCTION

1.      General Motors LLC ("GM") has failed to disclose to consumers a material defect in the Class Vehicles relating to the "positive crank ventilation system," which plays a key role in regulating the amount of air and gas that is pumped through an internal combustion engine.  If the PCV system becomes plugged, it can have disastrous consequences. The plugging can increase the pressure in the engine and cause the vehicle's rear main seal to rupture, which leads to sudden, catastrophic oil loss and loss of vehicle power, risking vehicle crash and occupant injury. It can also permanently damage the vehicle's engine, leading to costly repairs for engine replacement.[1]

2.      The PCV system in the Class Vehicles,[2] which all contain GM's 2.4L engine, includes PCV pipes and hoses, and includes a small, fixed orifice.  This

---

[1] Exhibit 1, GM Service Bulletin No. 14882: Special Coverage Service Bulletin: Special Coverage Adjustment – Plugged PCV Orifice in Intake Manifold - March 2015.

[2] The Class Vehicles are as follows:

orifice (depicted below) is prone to plugging and clogging, particularly in cold

weather with ice, sludge and water:



     3.     The Class Vehicles are easily identified in this case because they were

all subject to an advisory bulletin from GM.  In February 2019, GM issued a

"Diagnostic Tip" bulletin to dealers (but not to customers) about the propensity for

the PCV system to get clogged in cold weather, which can cause the oil seal to

burst during driving.  GM did not recall the vehicles to fix this problem, or extend

the car owner's warranty, but simply advised technicians to use a drill bit to clean

out the clogged orifice.  GM specifically identifies the vehicles affected by this

--------------

- Buick Lacrosse (including Hybrid, eAssist)  (MY 2010-2016).
- Buick Regal (MY 2011-2017).
- Buick Verano (MY 2012-2017).
- Chevrolet Captiva  (MY 2010-2015).
- Chevrolet Equinox (MY 2010-2017).
- Chevrolet Malibu (including ECO and eAssist, Hybrid) (MY 2013-2014).
- GMC Terrain (MY 2010-2017).

011080-11/1873557 V1

defect, and proposes the same repair tip for each vehicle, which demonstrates that the mechanics of the defect are the same across all Class Vehicles.[3]

4.    GM has known since at least 1985 of the PCV system's vulnerability to cold weather and clogging, as it has repeatedly advised dealers (but not customers) on how to attempt to address the problem.  Despite this track record, GM continues to conceal this defect from consumers at the point of sale, and continues to design, manufacture, distribute and sell hundreds of thousands of vehicles prone to this defect.

5.    In addition to being dangerous, the defect can lead to an extremely expensive repair, usually not covered by GM under warranty. For example, Plaintiff Tom Graham paid $7,083.89 out of pocket to replace his entire engine which was ruined by the defect. Plaintiff Sarah Burns was quoted $4,500 to $5,000 to fix her vehicle, including parts and labor – and has already paid hundreds of dollars to tow her vehicle due to the defect. Plaintiff Steve Fiene paid for 14 hours of labor for his vehicle repair. Plaintiff Craig Johnson was quoted $2,000 for a repair and was told it would take 10 to 14 hours of labor to repair the damage caused by the defect. He has lost use of his vehicle, as he cannot afford to have it repaired.

---

[3] Exhibit 22, GM Service Bulletin No. 19-NA-021, February 2019.

6.     GM's actions have needlessly left Plaintiffs and class members exposed to this hazardous defect, and vulnerable to injury and significant economic loss as a result. Plaintiffs accordingly bring this class action complaint to recover on behalf of themselves and the Class all relief to which they are entitled, including, but not limited to, recovery of the purchase price of their vehicles, compensation for overpayment and diminution in value of their vehicles, out-of-pocket and incidental expenses, disgorgement of GM's unjustly derived profits, and an injunction compelling GM to replace or recall and fix the Class Vehicles.

## II.     PARTIES

### A.     Plaintiffs

#### 1.     Melissa Kiriacopoulos

7.     Plaintiff Melissa Kiriacopoulos (for the purpose of this paragraph, "Plaintiff") is and was throughout the events pleaded here a citizen of the state of Massachusetts, and domiciled in Franklin, Massachusetts. On approximately October 31, 2016, Plaintiff purchased a pre-owned 2016 GMC Terrain (for the purpose of this subsection, the "Class Vehicle") for approximately $33,158.07, plus trade-in of Plaintiff's prior vehicle, from the Colonial Buick GMC dealership, an authorized GM dealer in Watertown, Massachusetts. Plaintiff had the Class Vehicle registered in her home state of Massachusetts. At the time of purchase, the Class Vehicle had approximately 5,000 miles on it. Plaintiff still owns the vehicle.

8.     Unknown to Plaintiff at the time the Class Vehicle was purchased, it was equipped with a PCV system that was defective and did not function as advertised, or as intended by its design. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling and leasing the Class Vehicle with the PCV system defect caused Plaintiff out-of-pocket loss, and diminished value of the Class Vehicle.

9.     Plaintiff used the Class Vehicle for personal, family, and/or household uses. Prior to purchasing the Class Vehicle, Plaintiff saw and recalled GM's advertising, which includes advertising such as websites, television, radio, and print and representations regarding the safety, reliability and durability of the vehicle, and relied on these representations. Plaintiff also received and relied upon the salesperson's representations and omissions regarding the Class Vehicle's safety, reliability and durability. GM had the opportunity to disclose the defect through its advertising, in owner's manuals, in correspondence sent to Plaintiff and Class Members, through representations by GM dealerships, through vehicle brochures and other informational documents, and on GM's website. However, GM failed to disclose that the Class Vehicles possessed any defect.

10.     On approximately December 26, 2021, Plaintiff had her vehicle's oil changed at a Valvoline service center in Walpole, Massachusetts. The service

center put in five quarts of oil and performed several vehicle maintenance checks. The vehicle had approximately 77,729 miles on it at the time of this service.

11.    On approximately January 15, 2022, Plaintiff was starting her vehicle to run errands. She put her vehicle in reverse to exit her driveway, and the car's engine stalled. Plaintiff was able to successfully restart her vehicle and drove approximately two miles. However, as she approached a stop sign and began to slow to a stop, her vehicle started to shake, and the engine died again. Plaintiff again was able to restart her vehicle.

12.    The following day, Plaintiff was in her vehicle returning to her home when her vehicle began to make a sound that Plaintiff describes as a "tinging" noise. Plaintiff was close to her parents' residence at the time, so she drove the vehicle there and reversed into the garage. When Plaintiff exited the vehicle, she noticed oil had leaked as she reversed in, leaving a trail of wet oil in the driveway. She looked under the vehicle and saw a puddle of oil underneath the vehicle. She checked the dipstick for oil, and it was empty. At no time did Plaintiff's vehicle indicate that the oil level was low or empty.

13.    Plaintiff immediately put three quarts of oil into the vehicle while it was parked in her parents' garage. Within minutes, all the oil drained out of the vehicle.

14.     Plaintiff tried to reach the Valvoline service center that day but could not reach them. The following day, January 17, 2022, she contacted the Valvoline service center, and they sent out two technicians to inspect the vehicle. The Valvoline employees confirmed that oil was leaking and advised Plaintiff to follow them in her vehicle to the Valvoline service center.

15.     The Valvoline service center inspected the vehicle that afternoon. They checked the oil filter and oil plug and could not identify the source of the leak. They advised her to reach out to a mechanic and replenished the vehicle with five quarts of oil. The vehicle had approximately 78,406 miles on it at the time of the Valvoline inspection.

16.     Plaintiff immediately transferred her vehicle to a local mechanic who inspected the vehicle and identified the oil leak as stemming from a rear main seal leak. He advised Plaintiff to take the vehicle to a GM dealership, and to inquire if there was a related recall, as he had recently seen another identical issue with another customer's GMC Terrain.

17.     On approximately January 18, 2022, Plaintiff contacted GMC Vendetti Motors in Franklin, Massachusetts. She recounted the mechanic's diagnosis of the rear main seal leak. The Vendetti Motors dealership told Plaintiff that they had never heard of a problem with rear main seal leaks. The dealership quoted Plaintiff between $2,000 and $4,000 for the repair.

- 7 -

18.     That day, Plaintiff contacted another GMC dealership, Central Buick GMC of Norwood, Massachusetts for a second opinion and quote. She was verbally told by the Central Buick dealership that "yes, it's a common issue with this model" of vehicle. She was quoted between $1,500 and $2,500 for the repair.

19.     On February 10, 2022, Plaintiff had her vehicle towed to the Central Buick GMC dealership. After Plaintiff inquired about the rear main seal failure, Bill Devine at Central Buick wrote to Plaintiff on February 14 that the "rear main seal is what is causing the oil leak on your vehicle." He indicated it is a known issue that if the PCV system gets clogged, it builds too much pressure and pops the rear main seal causing an oil leak. The cost for replacing the rear main seal, cleaning out the PCV system, and replacing the valve cover was estimated at $3,500, considerably higher than the original quote.

20.     On Friday, March 4, 2022, Bill Devine at Central Buick provided additional information to Plaintiff regarding her vehicle's repair. Mr. Devine indicated that the cam cover was replaced, and that the new cam cover has a new gasket design for better sealing. He confirmed that her vehicle's PCV orifice was "completely clogged causing excessive pressure inside the engine which popped out the rear main seal causing the oil leak." The repair included completely cleaning out the PCV orifice. He indicated the problem "could" reoccur far down

the road despite the purported new design. He also confirmed that her vehicle was not covered by any warranty.

21.     At the time of the rear main seal failure, Plaintiff's Class Vehicle had approximately 78,000 miles on it. Plaintiff has lost use of her sole vehicle as a result of this catastrophic failure due to the defective PCV system. Plaintiff's final cost was $2,200.66 out of pocket to cover the expensive PCV system repair.

22.     Prior to purchasing the Class Vehicle, Plaintiff had been looking for an automobile that was safe, durable, and reliable. In contemplating her needs, including the need to purchase a vehicle fit for daily use, Plaintiff saw and recalled GM's advertising, which includes advertising such as websites, television, radio, and print and representations wherein GM claimed that the 2016 GMC Terrain – i.e. the Class Vehicle that Plaintiff would subsequently purchase – was safe, reliable, and durable. On the date that Plaintiff purchased the Class Vehicle, and in connection with her purchasing the Class Vehicle, Plaintiff reasonably relied – to her detriment – on the representations by GM that the Class Vehicle was safe, durable and reliable and free from defect. Plaintiff, absent these representations, would not have purchased the vehicle and/or would have paid less for it. Had GM made this disclosure, Plaintiff would have received this disclosure through her research, and she would not have purchased the vehicle or would have paid less for

it. Plaintiff did not receive the benefit of the bargain, but received less than what was bargained for.

**2.      Craig Johnson**

23.      Plaintiff Craig Johnson (for the purpose of this paragraph, "Plaintiff") is and was throughout the events pleaded here a citizen of the state of Minnesota, and domiciled in Virginia, Minnesota. On approximately June 21, 2021, Plaintiff purchased a pre-owned 2015 Chevrolet Equinox (for the purpose of this subsection, the "Class Vehicle") for approximately $11,503.50 from the Iron Trail Motors dealership, an authorized GM dealer in Virginia, Minnesota. Plaintiff had the Class Vehicle registered in his home state of Minnesota. At the time of purchase, the Class Vehicle had approximately 140,617 miles on it and was sold as-is. Plaintiff still owns the vehicle.

24.      Unknown to Plaintiff at the time the Class Vehicle was purchased, it was equipped with a PCV system that was defective and did not function as advertised, or as intended by its design. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling and leasing the Class Vehicle with the PCV system defect caused Plaintiff out-of-pocket loss, and diminished value of the Class Vehicle.

25.      Plaintiff used the Class Vehicle for personal, family, and/or household uses. Prior to purchasing the Class Vehicle, Plaintiff saw and recalled GM's

advertising, which includes advertising such as websites, television, radio, and print and representations regarding the safety, reliability and durability of the vehicle, and relied on these representations. Plaintiff also received and relied upon the salesperson's representations and omissions regarding the Class Vehicle's safety, reliability and durability. GM had the opportunity to disclose the defect through its advertising, in owner's manuals, in correspondence sent to Plaintiff and Class Members, through representations by GM dealerships, through vehicle brochures and other informational documents, and on GM's website. However, GM failed to disclose that the Class Vehicle possessed any defect.

26.     On approximately February 15, 2022, Plaintiff was driving his vehicle in Duluth, Minnesota, approximately 60 miles from his home. His engine started to run noisy, and several lights illuminated, including his check engine light, low engine power, and traction control/stabilizer track. Plaintiff began to feel his engine lose power and could not accelerate.

27.     Plaintiff navigated his vehicle down the road to a nearby auto parts store. He purchased approximately two quarts of oil and put both quarts in the vehicle. Plaintiff began the 60-mile journey home. When he reached town, he added more oil. The engine continued to make some noise.

28.     Plaintiff went to Iron Trail Motors to report the incident. The dealership diagnosed a rear oil seal failure and quoted approximately $1,500 labor

plus parts to repair his vehicle. He was told that about 10 to 14 hours of labor could be required to repair the vehicle. The Iron Trail dealership told him his vehicle was no longer covered by a warranty as it exceeded the maximum mileage.

29.     Plaintiff then went to another service center, A Pair of Jacks, for a second opinion. That service center also diagnosed a rear oil seal failure and said they have seen several other vehicles with this same issue. Plaintiff was quoted $2,000 for the repair.

30.     Plaintiff also spoke to Anderson Auto Service, who also made the same diagnosis and quoted $2,000 for the repair.

31.     After this incident Plaintiff continued to add oil to his vehicle as needed.

32.     Then on approximately February 28, 2022, Plaintiff was visiting his mechanic for an unrelated issue relating to his windshield wipers. As he was leaving, he placed the vehicle in reverse and the engine made a "putt-putt" sound and could barely run. The mechanic checked the vehicle, and noted that the low engine power light had illuminated, and found codes relating to the fuel pressure regulator, and one other issue relating to "over limits." The mechanic told Plaintiff that when he drained the PCV system, it was filled with water.

33.     At the time of the rear main seal failure, Plaintiff's Class Vehicle had approximately 154,000 miles on it. Plaintiff has lost use of his sole vehicle as a

result of this catastrophic failure due to the defective PCV system. Plaintiff cannot afford the $2,000 of out-of-pocket costs he was quoted to cover the expensive PCV system repair.

34.    Prior to purchasing the Class Vehicle, Plaintiff had been looking for an automobile that was safe, durable, and reliable. In contemplating his needs, including the need to purchase a vehicle fit for daily use, Plaintiff saw and recalled GM's advertising, which includes advertising such as websites, television, radio, and print and representations wherein GM claimed that the 2015 Chevrolet Equinox – i.e. the Class Vehicle that Plaintiff would subsequently purchase – was safe, reliable, and durable. On the date that Plaintiff purchased the Class Vehicle, and in connection with his purchasing the Class Vehicle, Plaintiff reasonably relied – to his detriment – on the representations by GM that the Class Vehicle was safe, durable and reliable and free from defect. Plaintiff, absent these representations, would not have purchased the vehicle and/or would have paid less for it. Had GM made this disclosure, Plaintiff would have received this disclosure through his research, and he would not have purchased the vehicle or would have paid less for it. Plaintiff did not receive the benefit of the bargain, but received less than what was bargained for.

- 13 -

### 3.     Beverly Trevethan

35.     Plaintiff Beverly Trevethan (for the purpose of this paragraph, "Plaintiff") is and was throughout the events pleaded here a citizen of the state of Michigan, and domiciled in Chassell, Michigan. On approximately February 18, 2017, Plaintiff purchased a new 2017 Chevrolet Equinox (for the purpose of this subsection, the "Class Vehicle") for approximately $28,000, from the Keweenaw Chevrolet Buick GMC dealership, an authorized GM dealer in Houghton, Michigan. Plaintiff had the Class Vehicle registered in her home state of Michigan. At the time of purchase, the Class Vehicle was accompanied by a 60,000-mile original factory warranty.[4] Plaintiff still owns the vehicle.

36.     Unknown to Plaintiff at the time the Class Vehicle was purchased, it was equipped with a PCV system that was defective and did not function as advertised, or as intended by its design. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling and leasing the Class Vehicle with the PCV system defect caused Plaintiff out-of-pocket loss, and diminished value of the Class Vehicle.

37.     Plaintiff used the Class Vehicle for personal, family, and/or household uses. Prior to purchasing the Class Vehicle, Plaintiff saw and recalled GM's

---

[4] GM's standard powertrain warranty is 5 years/60,000 miles, whichever comes first. *See* Exhibit 2, https://www.gmc.com/owners/warranty-protection-plans.

- 14 -

advertising, which includes advertising such as websites, television, radio, and print and representations regarding the safety, reliability and durability of the vehicle, and relied on these representations. Plaintiff also received and relied upon the salesperson's representations and omissions regarding the Class Vehicle's safety, reliability and durability. GM had the opportunity to disclose the defect through its advertising, in owner's manuals, in correspondence sent to Plaintiff and Class Members, through representations by GM dealerships, through vehicle brochures and other informational documents, and on GM's website. However, GM failed to disclose that the Class Vehicle possessed any defect.

38.     On approximately December 10, 2021, Plaintiff was driving her vehicle on the highway when it started to lose power and then intermittently sped back up. No warning lights illuminated. This occurred several times as Plaintiff made her way to her destination. Later that day, as Plaintiff drove home, the vehicle started losing power again and the engine started to make a strange noise. Again, no warning lights illuminated.

39.     When Plaintiff arrived home, she told her husband about the incident, and he checked the vehicle's oil level. He found the dipstick dry, and put in three quarts of oil.

40.     On January 9, 2021, Plaintiff was again driving the vehicle to an appointment and again lost power and heard the engine rattling. No warning lights

- 15 -

illuminated. Plaintiff pulled over and shut the engine off. Due to the previous incident, she had been storing extra quarts of oil in her vehicle in case it was needed. She opened up the vehicle hood and added the quart of oil, and drove straight to the nearest auto parts store.

41.     Within a few days, Plaintiff's vehicle again began to make noise on her way to work. Again, no warning lights illuminated. Immediately after work, Plaintiff took her vehicle to her mechanic. He added two additional quarts of oil and made an appointment for Plaintiff to return the vehicle to him a few days later for a diagnosis.

42.     At that appointment, the mechanic diagnosed a possible blown rear engine seal, and advised that Plaintiff take the vehicle to the Keweenaw dealership. The dealership told Plaintiff that her vehicle's PCV system may have frozen and caused the rear main seal to blow out. The dealership admitted that he has seen several 2015 and 2016 model Equinoxes come in with this issue but had not yet seen a 2017 Equinox with this issue.

43.     On approximately January 15, 2022, Plaintiff brought the vehicle back to have the repair work done. The dealership told Plaintiff that the vehicle's rear engine seal needed to be replaced. He explained that this is what happens when the PCV system freezes up – it builds up pressure, and blows the rear engine seal out. Plaintiff was quoted $2,340.21 for the repair. The vehicle had approximately

- 16 -

97,035 miles at the time of visit to Keeweenaw, and the dealership told her that her vehicle was out of warranty as it exceeded 60,000 miles.

44.     Plaintiff called around for a second opinion, to find a garage that was familiar with doing this repair. She found Goodwin Motors, who told her that at that time, they had the same year/model vehicle into the shop, a Chevrolet Equinox, with the identical issue. Goodwin Motors quoted a slightly lower price for the repair, so Plaintiff made an appointment with Goodwin for January 31, 2022 to do the repair.

45.     On approximately January 20, 2022, Plaintiff had Dave's Towing Service tow her vehicle from the dealership to Goodwin Motors. Plaintiff ended up paying approximately $1,474.07 out of pocket for repairs, which included replacement of the rear main seal. The vehicle had approximately 97,458 miles at the time of repair.

46.     When Plaintiff visited the Keweenaw dealership in January, she was told that she could file a complaint with GM. Plaintiff contacted GM customer care after these incidents, and was told she could not file a complaint because her vehicle exceeded its warranty. Plaintiff tried contacting GM on a later occasion, and was able to open a complaint with the company, reporting the incidents with her vehicle.

- 17 -

47. At the time of the rear main seal failure, Plaintiff's Class Vehicle had approximately 97,400 miles on it. Plaintiff has lost use of her sole vehicle as a result of this catastrophic failure due to the defective PCV system. Plaintiff has also paid $1,474.07 out of pocket to cover the expensive PCV system repair.

48. Prior to purchasing the Class Vehicle, Plaintiff had been looking for an automobile that was safe, durable, and reliable. In contemplating her needs, including the need to purchase a vehicle fit for daily use, Plaintiff saw and recalled GM's advertising, which includes advertising such as websites, television, radio, and print and representations wherein GM claimed that the 2017 Chevrolet Equinox – i.e. the Class Vehicle that Plaintiff would subsequently purchase – was safe, reliable, and durable. On the date that Plaintiff purchased the Class Vehicle, and in connection with her purchasing the Class Vehicle, Plaintiff reasonably relied – to her detriment – on the representations by GM that the Class Vehicle was safe, durable and reliable and free from defect. Plaintiff, absent these representations, would not have purchased the vehicle and/or would have paid less for it. Had GM made this disclosure, Plaintiff would have received this disclosure through her research, and she would not have purchased the vehicle or would have paid less for it. Plaintiff did not receive the benefit of the bargain, but received less than what was bargained for.

### 4.   Sarah Burns

49.    Plaintiff Sarah Burns (for the purpose of this paragraph, "Plaintiff") is and was throughout the events pleaded here a citizen of the state of New York, and domiciled in Clayton, New York. On approximately May 6, 2020, Plaintiff purchased a pre-owned 2017 Chevrolet Equinox (for the purpose of this subsection, the "Class Vehicle") for approximately $18,055, from the Phinney Automotive Center dealership in Clayton, New York. Plaintiff had the Class Vehicle registered in her home state of New York. At the time of purchase, the Class Vehicle had approximately 42,288 miles on it. Plaintiff still owns the vehicle.

50.    Unknown to Plaintiff at the time the Class Vehicle was purchased, it was equipped with a PCV system that was defective and did not function as advertised, or as intended by its design. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling and leasing the Class Vehicle with the PCV system defect caused Plaintiff out-of-pocket loss, and diminished value of the Class Vehicle.

51.    Plaintiff used the Class Vehicle for personal, family, and/or household uses. Prior to purchasing the Class Vehicle, Plaintiff saw and recalled GM's advertising, which includes advertising such as websites, television, radio, and print and representations regarding the safety, reliability and durability of the

- 19 -

vehicle, and relied on these representations. GM had the opportunity to disclose the defect through its advertising, in owner's manuals, in correspondence sent to Plaintiff and Class Members, through vehicle brochures and other informational documents, and on GM's website. However, GM failed to disclose that the Class Vehicle possessed any defect.

52.     In approximately mid-January, 2022, Plaintiff was driving her vehicle when it started to sputter and lose power. She was able to restart the vehicle, and subsequently took it for an oil change at C & M Auto Repair in Clayton, New York.

53.     On approximately February 9, 2022, Plaintiff was again driving the vehicle when it started to sputter and lose power. She pulled over, and was able to start the vehicle again, but it began to sputter again and lost all power. Plaintiff called Phinney Automotive in Clayton and the vehicle was towed there that day.

54.     Phinney Automotive confirmed the vehicle had lost oil and added 4 ½ quarts of oil to the vehicle. Phinney Automotive diagnosed the vehicle as leaking oil between the engine and the transmission. They quoted Plaintiff $5,000 to replace the engine with another used engine.

55.     After this incident, Plaintiff's father contacted GM. GM asked for Plaintiff to tow to Davidson Automotive, over 20 miles away, as Davidson was an "authorized repair center." Plaintiff had the vehicle towed there at Plaintiff's

expense. Plaintiff's father went to the dealership several days later and they had not looked at the vehicle.

56.    Davidson Automotive estimated that the repair would be approximately $5,000 - $8,000. Plaintiff's father contacted GM, who offered to potentially pay 10% of the repair. GM termed this a "goodwill warranty."

57.    Davidson Automotive has stated that because the vehicle has "thawed out," a definitive diagnosis relating to the PCV system cannot be made. Davidson Automotive recently estimated that Plaintiff's out-of-pocket expenses for the repair would be approximately $4,500 to $5,000, including parts and labor. The repair has been delayed while necessary parts are ordered. Plaintiff has also paid an estimated $300-$400 in towing fees.

58.    At the time of the rear main seal failure, Plaintiff's Class Vehicle had approximately 95,000 miles on it. Plaintiff has lost use of her sole vehicle as a result of this catastrophic failure due to the defective PCV system. Plaintiff has also been told it may cost thousands of dollars out of pocket to cover the expensive PCV system repair.

59.    Prior to purchasing the Class Vehicle, Plaintiff had been looking for an automobile that was safe, durable, and reliable. In contemplating her needs, including the need to purchase a vehicle fit for daily use, Plaintiff saw and recalled GM's advertising, which includes advertising such as websites, television, radio,

and print and representations wherein GM claimed that the 2017 Chevrolet

Equinox – i.e. the Class Vehicle that Plaintiff would subsequently purchase – was

safe, reliable, and durable. On the date that Plaintiff purchased the Class Vehicle,

and in connection with her purchasing the Class Vehicle, Plaintiff reasonably

relied – to her detriment – on the representations by GM that the Class Vehicle was

safe, durable and reliable and free from defect. Plaintiff, absent these

representations, would not have purchased the vehicle and/or would have paid less

for it. Had GM made this disclosure, Plaintiff would have received this disclosure

through her research, and she would not have purchased the vehicle or would have

paid less for it. Plaintiff did not receive the benefit of the bargain, but received less

than what was bargained for.

### 5.    Geralyn Darr

60.    Plaintiff Geralyn Darr (for the purpose of this paragraph, "Plaintiff")

is and was throughout the events pleaded here a citizen of the state of Wisconsin,

and domiciled in Little Suamico, Wisconsin. On approximately October 19, 2019,

Plaintiff purchased a certified pre-owned 2017 Chevrolet Equinox (for the purpose

of this subsection, the "Class Vehicle") for the approximate financed amount of

$15,087.27 from the Broadway Automotive dealership, an authorized GM dealer in

Green Bay, Wisconsin. Plaintiff had the Class Vehicle registered in her home state

of Wisconsin. At the time of purchase, the Class Vehicle had approximately 38,090 miles on it. Plaintiff still owns the vehicle.

61.    Unknown to Plaintiff at the time the Class Vehicle was purchased, it was equipped with a PCV system that was defective and did not function as advertised, or as intended by its design. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling and leasing the Class Vehicle with the PCV system defect caused Plaintiff out-of-pocket loss, and diminished value of the Class Vehicle.

62.    Plaintiff used the Class Vehicle for personal, family, and/or household uses. Prior to purchasing the Class Vehicle, Plaintiff saw and recalled GM's advertising, which includes advertising such as websites, television, radio, and print and representations regarding the safety, reliability and durability of the vehicle, and relied on these representations. Plaintiff also received and relied upon the salesperson's representations and omissions regarding the Class Vehicle's enhanced safety, reliability and durability as compared to other comparable vehicles on the American market. GM had the opportunity to disclose the defect through its advertising, in owner's manuals, in correspondence sent to Plaintiff and Class Members, through representations by GM dealerships, through vehicle brochures and other informational documents, and on GM's website. However, GM failed to disclose that the Class Vehicle possessed any defect.

- 23 -

63.     On approximately February 12, 2021, Plaintiff was driving her vehicle when her engine suddenly died, and could not restart. No warning lights illuminated. Plaintiff was left stranded in approximately negative 15-degree weather. Plaintiff was on crutches at the time, due to a previous injury.

64.     Plaintiff's vehicle was towed to the Broadway Automotive dealership. The dealership diagnosed a rear engine seal failure, and replaced the seal, gasket and other parts. Plaintiff had to pay $790.81 out of pocket for the repair. When Plaintiff's husband inquired about warranty coverage, he was told that GM would cover only the parts. The vehicle had approximately 61,000 miles on it at the time of this service – just 1,000 miles outside the standard 60,000-mile powertrain warranty.

65.     Plaintiff has observed that even since the repair, the PCV system will fill with condensation in cold weather. Due to this dangerous condition, Plaintiff's husband has to periodically clean out the condensation in the PCV system with a shop vacuum in an attempt to avoid another incident.

66.     At the time of the rear main seal failure, Plaintiff's Class Vehicle had approximately 61,000 miles on it. Plaintiff has lost use of her sole vehicle as a result of this catastrophic failure due to the defective PCV system. Plaintiff also paid $790.81 out of pocket to cover the expensive PCV system repair.

011080-11/1873557 V1

67.     Prior to purchasing the Class Vehicle, Plaintiff had been looking for an automobile that was safe, durable, and reliable. In contemplating her needs, including the need to purchase a vehicle fit for daily use, Plaintiff saw and recalled GM's advertising, which includes advertising such as websites, television, radio, and print and representations wherein GM claimed that the 2017 Chevrolet Equinox – i.e. the Class Vehicle that Plaintiff would subsequently purchase – had enhanced safety, reliability and durability compared to other comparable vehicles on the American market. On the date that Plaintiff purchased the Class Vehicle, and in connection with her purchasing the Class Vehicle, Plaintiff reasonably relied – to her detriment – on the representations by GM that the Class Vehicle was safe, durable and reliable and free from defect. Plaintiff, absent these representations, would not have purchased the vehicle and/or would have paid less for it. Had GM made this disclosure, Plaintiff would have received this disclosure through her research, and she would not have purchased the vehicle or would have paid less for it. Plaintiff did not receive the benefit of the bargain, but received less than what was bargained for.

### 6.     Steve Fiene

68.     Plaintiff Steve Fiene (for the purpose of this paragraph, "Plaintiff") is and was throughout the events pleaded here a citizen of the state of Wisconsin, and domiciled in Montreal, Wisconsin. On approximately November 17, 2017, Plaintiff

- 25 -

purchased a pre-owned 2016 GMC Terrain (for the purpose of this subsection, the

"Class Vehicle") for approximately $21,131.95 from the Lahti Towing and Sales

dealership in Ironwood, Michigan. Plaintiff had the Class Vehicle registered in his

home state of Wisconsin. At the time of purchase, the Class Vehicle had

approximately 10,140 miles on it. Plaintiff's paperwork notes the vehicle was

purchased as-is, but was covered by the balance of the factory warranty. Plaintiff

still owns the vehicle.

69.     Unknown to Plaintiff at the time the Class Vehicle was purchased, it

was equipped with a PCV system that was defective and did not function as

advertised, or as intended by its design. GM's unfair, unlawful, and deceptive

conduct in designing, manufacturing, marketing, selling and leasing the Class

Vehicle with the PCV system defect caused Plaintiff out-of-pocket loss, and

diminished value of the Class Vehicle.

70.     Plaintiff used the Class Vehicle for personal, family, and/or household

uses. Prior to purchasing the Class Vehicle, Plaintiff saw and recalled GM's

advertising, which includes advertising such as websites, television, radio, and

print and representations regarding the safety, reliability and durability of the

vehicle, and relied on these representations. GM had the opportunity to disclose the

defect through its advertising, in owner's manuals, in correspondence sent to

Plaintiff and Class Members, through vehicle brochures and other informational

- 26 -

documents, and on GM's website. However, GM failed to disclose that the Class

Vehicle possessed any defect.

71.     On approximately January 7, 2022, on a cold winter day, Plaintiff

drove his vehicle to visit a friend. His vehicle was parked on the street for several

hours. Plaintiff then started his drive home, which was a distance of about four and

a half miles. When he reached home, parked the vehicle in the garage and got out,

he noticed the vehicle had left a long stripe of oil that trailed out to the street.

72.     The next morning when Plaintiff went out to his vehicle, he noticed a

puddle of oil underneath. He checked the oil level and found it was at least one and

a half quarts low. Plaintiff added some oil he had on hand, and drove to the Lahti

Towing & Sales dealership later that day.

73.     The dealership diagnosed a popped rear main engine seal. Due to

short staffing, Plaintiff's vehicle was at the dealership for over two months, until

approximately March 17, 2022. Plaintiff paid $1,038.84 out of pocket for the

repairs, which included paying for 14 repair labor hours. The Lahti Towing &

Sales dealership told him that there was no warranty that covered the repair. The

dealership also called a different dealership, Von Holzen Chevrolet, Buick, GMC

Inc. in Ashland, to check if there were any recalls regarding the rear main seal

failure, and that dealership indicated there were none. Plaintiff also contacted

Marthaler Chevrolet Buick in Minocqua to inquire about whether there was a recall relating to this issue, and was told there were none.

74.    At the time of the rear main seal failure, Plaintiff's Class Vehicle had approximately 67,148 miles on it. Plaintiff has lost use of his vehicle as a result of this catastrophic failure due to the defective PCV system. Plaintiff has also paid $1,038.84 out of pocket to cover the rear oil seal repair.

75.    Prior to purchasing the Class Vehicle, Plaintiff had been looking for an automobile that was safe, durable, and reliable. In contemplating his needs, including the need to purchase a vehicle fit for daily use, Plaintiff saw and recalled GM's advertising, which includes advertising such as websites, television, radio, and print and representations wherein GM claimed that the 2016 GMC Terrain – i.e. the Class Vehicle that Plaintiff would subsequently purchase – had enhanced safety, reliability and durability compared to other comparable vehicles on the American market. On the date that Plaintiff purchased the Class Vehicle, and in connection with his purchasing the Class Vehicle, Plaintiff reasonably relied – to his detriment – on the representations by GM that the Class Vehicle was safe, durable and reliable and free from defect. Plaintiff, absent these representations, would not have purchased the vehicle and/or would have paid less for it. Had GM made this disclosure, Plaintiff would have received this disclosure through his research, and he would not have purchased the vehicle or would have paid less for

- 28 -

it. Plaintiff did not receive the benefit of the bargain, but received less than what was bargained for.

### 7. Thomas Graham

76. Plaintiff Thomas Graham (for the purpose of this paragraph, "Plaintiff") is and was throughout the events pleaded here a citizen of the state of Minnesota, and domiciled in Henderson, Minnesota. On approximately December 13, 2021, Plaintiff purchased a pre-owned 2013 GMC Terrain (for the purpose of this subsection, the "Class Vehicle") for approximately $9,562.43 from The Car Lot LLC, in New Prague, Minnesota. Plaintiff had the Class Vehicle registered in his home state of Minnesota. At the time of purchase, the Class Vehicle had approximately 151,906 miles on it. Plaintiff still owns the vehicle.

77. Unknown to Plaintiff at the time the Class Vehicle was purchased, it was equipped with a PCV system that was defective and did not function as advertised, or as intended by its design. GM's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling and leasing the Class Vehicle with the PCV system defect caused Plaintiff out-of-pocket loss, and diminished value of the Class Vehicle.

78. Plaintiff used the Class Vehicle for personal, family, and/or household uses. Prior to purchasing the Class Vehicle, Plaintiff saw and recalled GM's advertising, which includes advertising such as websites, television, radio, and

- 29 -

print and representations regarding the safety, reliability and durability of the vehicle, and relied on these representations. GM had the opportunity to disclose the defect through its advertising, in owner's manuals, in correspondence sent to Plaintiff and Class Members, through vehicle brochures and other informational documents, and on GM's website. However, GM failed to disclose that the Class Vehicle possessed any defect.

79.     In approximately early January, 2022, less than a month after purchase, Plaintiff was driving his vehicle near Mankato, Minnesota when it started to make an audible knocking sound. Plaintiff contacted R &R Auto Repair in Arlington, Minnesota that day and was told to bring the vehicle in the next day. The next day, Plaintiff drove to R & R Auto Repair in Arlington, Minnesota. The vehicle was diagnosed as having a frozen PCV system, causing rear main seal failure, resulting in complete loss of all vehicle oil and total engine failure. Plaintiff was quoted $4,922 to replace the engine with a factory rebuilt engine and $2,161.89 for the installation.

80.     At the time of the rear main seal failure, Plaintiff's Class Vehicle had approximately 152,000 miles on it. Plaintiff has lost use of his sole vehicle as a result of this catastrophic failure due to the defective PCV system. Plaintiff has also paid approximately $7,083.89 out of pocket to cover the expensive PCV system repair.

- 30 -

81.     Prior to purchasing the Class Vehicle, Plaintiff had been looking for an automobile that was safe, durable, and reliable. In contemplating his needs, including the need to purchase a vehicle fit for daily use, Plaintiff saw and recalled GM's advertising, which includes advertising such as websites, television, radio, and print and representations wherein GM claimed that the 2013 GMC Terrain – i.e. the Class Vehicle that Plaintiff would subsequently purchase – was safe, reliable, and durable. On the date that Plaintiff purchased the Class Vehicle, and in connection with his purchasing the Class Vehicle, Plaintiff reasonably relied – to his detriment – on the representations by GM that the Class Vehicle was safe, durable and reliable and free from defect. Plaintiff, absent these representations, would not have purchased the vehicle and/or would have paid less for it. Had GM made this disclosure, Plaintiff would have received this disclosure through his research, and he would not have purchased the vehicle or would have paid less for it. Plaintiff did not receive the benefit of the bargain, but received less than what was bargained for.

**B.     Defendant**

82.     Defendant General Motors LLC ("GM") is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. The sole member and owner of General Motors LLC is General Motors Holdings

- 31 -

LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.

83.    GM, through its various entities, including, but not limited to, Chevrolet and GMC, designs, manufactures, markets, distributes, sells and leases GM automobiles in this District and multiple other locations in the United States and worldwide. GM and/or its agents designed, manufactured, and installed the GM engine systems, including the PCV systems, in the Class Vehicles. GM also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles.

84.    GM-authorized automobile dealerships act as GM's agents in selling automobiles under the GM name and disseminating vehicle information provided by GM to customers. At all relevant times, GM's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by GM's manufacturer warranty pursuant to the contracts between GM and its authorized dealerships nationwide.

## C.    Plaintiffs' Individual and Class-Wide Bases for Suit

85.    Although Plaintiffs were considering other vehicles, Plaintiffs decided to purchase their subject Class Vehicles because they reasonably relied upon GM's claims touting the Class Vehicles as free of defect and as durable and reliable, with no reference to the PCV defect – by way of media marketing campaigns and other

forms of advertisement described further herein. These misrepresentations and omissions, in combination with the promised durability and performance throughout its useful life, and the representation and understanding that the vehicle was free of defects and fit for its intended use, induced Plaintiffs to purchase the Class Vehicles.

86.     Unbeknownst to the named Plaintiffs and Class Members, when they purchased their Class Vehicles, the GM-made Class Vehicles contained a PCV system that is inherently defective – the critical, material truth of which was never disclosed to American consumers. Consequently, their vehicles were not fit for ordinary use, or intended use, and could not deliver the advertised combination of safety, durability and reliability that Plaintiffs reasonably relied upon. Plaintiffs and each Class Member suffered concrete injury as a direct and proximate result of GM's conduct and would not have purchased the Class Vehicle and/or would have paid less for it, had GM disclosed the defective nature of the Class Vehicles. As deemed appropriate, named Plaintiffs' and each Class Member's ascertainable losses include, but are not limited to, out-of-pocket costs for repair necessitated by the defect (including catastrophic failure and replacement of component parts), payment of a higher price for the Class Vehicles compared to what they would have paid for non-defective vehicles, out-of-pocket losses suffered by overpaying for the vehicles at the time of purchase (or lease), decreased performance of the

vehicles, diminished value of the vehicles, and out-of-pocket costs. There is a substantial difference in the market value of the vehicle promised by Defendant and the market value of the vehicle received by Plaintiffs. Plaintiffs did not receive the benefit of their bargain and bring claims individually and as representatives of the Class.

87.     Each named Plaintiff and/or Class Member expected that GM, via its authorized dealers or through its advertising campaigns, would disclose material facts about the safety, durability, fuel economy, and longevity of its vehicles and the existence of any defect that will result in expensive, non-ordinary repairs and a potential safety hazard. GM failed to do so.

### III.    DEFINITION OF "CLASS MEMBERS"

88.     The Class Members consist of all individuals who purchased or leased the Class Vehicles from April 1, 2016 to the present.

### IV.    JURISDICTION AND VENUE

89.     Venue is proper in this District under 28 U.S.C. § 1391 in light of the following: (1) Defendant GM's principal place of business is in this District and GM has marketed, advertised, sold and leased the Class Vehicles within this District; and (2) many of the acts and transactions giving rise to this action occurred in this District, including, inter alia, GM's promotion, marketing, distribution, and sale of vehicles containing the defective PCV system in this

District. Further, a significant number of the Class Vehicles were registered in this District and thousands of Class Vehicles were in operation in this District. Venue is also proper under 18 U.S.C. § 1965(a) because GM is subject to personal jurisdiction in this District as alleged, *infra*, and GM has agents, i.e., GM certified dealerships, located in this District.

90.     The Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class Member is of diverse citizenship from one Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs. Subject-matter jurisdiction also arises under the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq*.

91.     This Court has personal jurisdiction over Defendant GM as GM has committed and continues to commit acts giving rise to this action within Michigan and within this judicial District. GM has established minimum contacts within the forum such that the exercise of jurisdiction over GM would not offend traditional notions of fair play and substantial justice. In conducting business within the State of Michigan, and specifically, within this judicial District, GM derives substantial revenue from its activities and its products being sold, used, imported, and/or offered for sale in Michigan and this judicial District.

- 35 -

## V.    FACTUAL ALLEGATIONS

### A.    GM's PCV System

92.    A vehicle's positive crankcase ventilation (PCV) system removes unwanted "blowby" gases from the crankcase of the vehicle's internal combustion engine.  (The crankcase is the housing for the crankshaft, and the mixture of fuel and air pass through the crankcase before entering the engine's cylinders.) The system usually consists of a valve and a vacuum in the intake manifold tube that sucks the PCV valve open.[5] By conducting away the blow-by gases, the pressure-regulating PCV valve reduces the vacuum effect in the crankcase.[6] This prevents damage to the engine seals, which could be blown out if the pressure gets too high. *Id*. If the PCV system becomes plugged, it cannot draw moisture and vapors from the crankcase. This can result in an increase in pressure that could force oil to leak through the engine seals. *Id*. Below is a diagram of a typical closed PCV system:

_____

[5] Exhibit 3, "The Basics of Positive Crankcase Ventilation (PCV)," https://www.aa1car.com/library/pcv.htm.

[6] Exhibit 4, "The Role of the Positive Crankcase Ventilation Valve (PCV)," https://www.gatestechzone.com/en/news/2021-06-positive-crankcase-ventilation.

- 36 -



## B. The PCV System Freezing Defect in the Class Vehicles

93.     In the 2.4L engine, a traditional PCV "valve" has been replaced with a small fixed orifice. As detailed below, GM has acknowledged for years that the small fixed-orifice design of the PCV system (identified by the red arrow below) can get plugged up from ice, sludge and water during operation of the vehicle in cold weather.



94. This plugging caused by condensation in cold weather can increase pressure in the crankshaft, which can blow out the rear main engine seal.[8] Rear main seal leaks are extremely dangerous, as they cause oil leaks to occur at a rapid rate, causing oil to suddenly pour out of the vehicle – resulting in a loss of vehicle power and control, engine shut down, and engine destruction.

95. Consumers have reported that the resulting sudden loss of engine power from the PCV freezing defect comes without any warning:

> 2018 MY 2017 EQUINOX ENGINE DIED IN THE MIDDLE OF THE ROAD I'M COMING TRAFFIC BOTH WAYS START A BACKUP STARTED MAKING KNOCKING NOISES NO OIL LIGHT CAME ON . . . . AFTER ALL THIS FIGHTING WITH GM MANY TIMES THEY STATED THAT ***IT WAS DUE TO THE PVC SYSTEM THAT THE REAR MAIN SEAL WAS OUT*** I HAD TO HAVE THE CAR TOWED BECAUSE I WAS OUT OF WARRANTY NO ONE WOULD HELP ME SO I

---

[7] Exhibit 1, GM Special Coverage Service Bulletin, No. 14882, March 2015.

[8] *Id.*

HAVE A THIRTY SOMETHING $33000 THAT I COULDN'T DRIVE LOST BOTH OF MY JOBS DUE TO THE 2.4 L HAVING THE SAME ISSUES AS PRIOR-YEAR EQUINOXES…. [9]

So I was driving home from work which is a 28 minute drive, when I was almost 2 miles away from home the car started to make a funny noise and it started to smell like gas inside from the vents. When I turned off a major street the car slowed completely down **without any warning on the dashboard** and luckily I was right in front of a autoshop so I hurried up and pulled in. As soon as I pulled in, the car started to get smoky in the inside so I hurry up and jump out wasn't sure if the car was going to start a fire. When I go inside the shop it was a lady with the same car as mine but just gold and she was complaining that oil was pouring out. The owner of the shop asked me what's wrong because I was a little distraught and I told him my car just slowed down and start smoking inside of the car. He said what ok ill take it right in to see what's wrong. 10 mins later he comes out with a video on his phone showing **oil leaking all around the [] engine, Trans and front of the car all the way to the muffler. He said this is common with these Equinox with the 4 cylinder engine, the rear main seal did not hold and all the oil leaked out.** I bust out crying, I didn't even make it to 3yrs yet and still owe 12,000 on the car. I keep up with oil changes and the car never said I was low on oil I checked, it showed 40%. The owner say calm down we can call the dealership to see if they have a recall. So we call they knew exactly what the problem was and ask how many miles I had and he say sorry your 2,000 miles over your warranty, I'm sorry I can't do anything for you. The owner of the shop say sorry I see this all the time with these Equinox and its ridiculous we just found out the gold one have the exact same issue. I'm writing to you because I did some research and this is a common issue with this model. I seen a lot of the rear main seal fail when the temperature

---

[9] Exhibit 5, NHTSA ID No. 11324582, May 14, 2020 (emphasis added).

drop and the water build up where the cover of the engine is and freeze inside and the seal don't hold.[10]

While driving on the highway with my child, vehicle suddenly went into reduced power mode. 5 minutes later after exiting the highway, the low oil pressure Alert came on. The vehicle was parked two minutes later then towed home. After towing it to my local certified dealership, it was determined the *pcv was clogged with ice resulting in a blown rear main seal.* There was a recall for a defect in earlier terrains for this same issue (See SB 14882). Currently GM will not cover repair costs under this specific recall despite this vehicle apparently having the same 2.4L Ecotek engine. Apparently this a known cold weather issue for this vehicle.[11]

96.     Consumers have also complained of being stranded in the cold for

hours:

The contact owns a 2017 Chevrolet Equinox. The contact stated while driving at an undisclosed speed, the oil warning light illuminated. The contact was stranded in the cold for approximately four hours. The vehicle was towed to the local dealer. The contact stated that the vehicle was not covered under warranty or TSB: PIP5093C. The vehicle was diagnosed and the contact was informed that the *rear main seal needed to be replaced*. The vehicle was not repaired. The contact stated that the warranty program should be extended. The manufacturer was contacted but, no further assistance was provided. The approximate failure mileage was 90,261.[12]

---

[10] Exhibit 6, NHTSA ID No. 11447241, January 12, 2022 (emphasis added).

[11] Exhibit 7, NHTSA ID No. 11450711, February 7, 2022 (emphasis added).

[12] Exhibit 8, NHTSA ID No. 11450781, February 7, 2022 (emphasis added).

C.     **GM issued a series of notices recognizing the defect in the Class Vehicles**

97.     GM acknowledged to dealers (but not to customers) that the PCV system in the Class Vehicles was vulnerable to cold weather, and issued a series of bulletins related to this problem.  These bulletins are summarized below.  Collectively, they demonstrate that GM knew about the defect, but did not make any substantive changes to the PCV system, or offer to cover the resulting damage under warranty.  In fact, GM continued to sell and manufacture vehicles with the defective system up through model year 2017, even as it was simultaneously tracking manifestation of the defect in the Class Vehicles.

1.     **GM February 2013 Bulletin "Oil Leak from Rear of Engine After Extended Driving in Cold Temperatures Below 0 F"**

98.     In February 2013, GM released technical service bulletin PIP5093, which acknowledged that the PCV system was prone to freezing from sludge during cold weather operation.  According to the bulletin:[13]

> Some customers may complain of an engine oil leak that appeared as they were driving the vehicle in extremely cold ambient temperatures ([g]enerally 0 F / -17 C or [c]older).  They may also comment that they heard a single 'pop' noise right before the oil leak started.  Upon inspection, the technician will find that the oil leak is coming from the rear main oil seal of the engine as shown below.  This may be the result of a frozen PCV system and excessive crankcase pressure.

99.     This bulletin impacted the following vehicles:

      MY2010-2012     Buick Lacrosse

---

[13] Exhibit 13, GM Service Bulletin No. PIP5093, February 2013.

| MY2011-2012 | Buick Regal |
| MY2010-2012 | Chevrolet Equinox |
| MY2010-2012 | GMC Terrain |

100.   GM's PIP5093 bulletin instructed its technicians to employ a stop-gap method of cleaning out the PCV system. *Id.* The bulletin noted that "in the future, the customer may want to consider changing their engine oil right before winter starts in order to prepare for colder weather." *Id.*  This bulletin was not provided to consumers, and no communication was made to vehicle owners to provide the oil change instruction. *Id.* The service bulletin also did not mention that dangerous loss of motive power could occur from the defect, nor did it offer warranty coverage for the repair beyond the standard warranty.

## 2.   GM January 2014 Bulletin PIP5093A

101.   In January 2014 GM issued updated service bulletin PIP5093A. This version of the bulletin added the following vehicles added to the list of cars impacted by PIP5093:[14]

| MY2012-14 | Buick Verano |
| MY2013-14 | Chevrolet Captiva Sport |
| MY2010-13 | Chevrolet Malibu |

102.   It also extended the impacted model years for the Lacrosse, Regal, Equinox and Terrain from 2012 to 2014.  *Id.*

---

[14] Exhibit 14, GM Service Bulletin No. PIP5093A, January 2014.

103.    As with the original bulletin, it noted "in the future, the customer may want to consider changing their engine oil right before winter starts in order to prepare for colder weather." *Id*.  This bulletin only recommended the same stop-gap measure of using a drill bit to clean out the sludge.  It also was not provided to consumers, and no communication was made to vehicle owners to provide the oil change instruction. *Id*. The service bulletin also did not mention that dangerous loss of motive power could occur from the defect, nor did it offer warranty coverage for the repair beyond the standard warranty.

### 3.    GM January 2016 Bulletin PIP5093B

104.    In January 2016 GM released PIP5093B, an updated version of service bulletin PIP5093A. This version of the bulletin made only one adjustment: it expanded the model year of the Captiva Sport to 2012-2014.[15]

105.    The bulletin yet again only recommended a stop-gap measure, did not mention the dangerous loss of motive power, did not communicate the advisability of an oil change before winter to the customer, and did not offer warranty coverage for the repair beyond the standard warranty. *Id*.

---

[15] Exhibit 17, GM Service Bulletin No. PIP5093B, dated January 22, 2016.

4.    **GM January 2019 Bulletin PIP5093C regarding "Oil Leak from Rear of Engine After Extended Driving in Cold Temperatures Below 0 F (-18 C)"**

106.   PIP 5093B was later amended in January 2019 to expand the model years for the LaCrosse (through MY2016), the Regal (through MY2017), and the Verano (through MY2017).[16]

107.   The bulletin again only recommended a stop-gap measure, did not mention the dangerous loss of motive power, did not communicate the advisability of an oil change before winter to the customer, and did not offer warranty coverage for the repair beyond the standard warranty.

D.    **GM February 2019 Bulletin 19-NA-021 regarding "Diagnostic Tip for Oil Leak from Rear of Engine After Extended Driving in Cold Temperatures Below 0 Degrees F"**

108.   The following month, GM released 19-NA-021, which GM describes as a "diagnostic tip" for the same vehicles impacted by PIP5093C (no vehicles or model years were added to the previous bulletins. In substance, this "diagnostic tip" document is the same as the prior bulletins:  It recommends the same stop-gap procedure previously recommended, which is to use a drill bit to clear the PCV orifice.[17] This document did not mention loss of motive power, did not recommended a mere stop-gap measure, did not communicate an oil change before

---

[16] Exhibit 18, GM Service Bulletin No. PIP5093C.

[17] Exhibit 22, GM Service Bulletin No. 19-NA-021, February 2019.

winter to the customer, and did not offer warranty coverage for the repair beyond the standard.

### E.   GM Has Known about PCV System Problems Associated with Cold Weather since the 1980s

109.   GM's pre-production knowledge of the harmful effects of cold weather on the PCV system in the Class Vehicles is also demonstrated by its own warnings to dealers about a range of issues related to the PCV system, including clogging, plugging, and excessive pressure in the PCV system. The bulletins below are not pertaining to the Class Vehicles, but they reveal the extent to which GM was fully aware of the conditions that cause the defect in this case.

> ### *GM June 1985 Bulletin to Dealers describes the "Recognized Condition" of condensation in imported vehicles stored in cold weather.*

110.   In June 1985, GM released a bulletin to all Chevrolet dealers describing a "recognized condition"[18] that dealerships had observed in newly imported vehicles awaiting sale on dealership lots. These vehicles had emulsified oil that had accumulated during overseas shipment. In the vehicles exposed to cold, damp climates, condensation could appear in the PCV valve and other areas, which – unlike in warmer climate vehicles– did not abate after initial vehicle mileage.

---

[18] Exhibit 9, GM Service Bulletin No. 85-98, June 5, 1985.

- 45 -

### GM January 1994 Bulletin regarding PCV ˝system freeze-up.˝

111.   In a 1994 bulletin, GM described that the "PCV system" could "freeze-up" in cold weather, specifically in the PCV system hoses. GM indicated in its bulletin that this could allow "engine oil leaks through the dipstick tube and/or rear main seal."[19] While GM's limited communication mentioned the chance of major engine failure, it did not mention that the "engine oil leaks" could be sudden and catastrophic, and could lead to engine stalling or loss of engine power while driving. *Id*. The communication does not appear to have been extended to many northern states that would typically also be considered to be cold-weather states.[20]

### GM March 2003 Bulletin regarding crankshaft rear oil seal leaks

112.   Fast-forward to March 2003, GM released a TSB to dealerships that indicated that the PCV cold weather freezing issue could cause an oil leak to occur "anywhere on the engine." The crankshaft rear oil seal was "most" susceptible to failure, due to the "larger surface area in which crankcase pressures can act upon." The PCV freezing was attributed to "frozen condensation, ice, or snow that has accumulated in the vent tube at the bottom of the generator bracket. In extreme

---

[19] Exhibit 10, GM Service Bulletin No. 37-65-18, January 28, 1994.

[20] *Id.*

cold weather, the vent tube may not be subjected to enough heat from the engine compartment to melt the ice or snow."[21]

### GM February 2005 Bulletin regarding "PCV cold freeze start up"

113.    On February 24, 2005, GM released bulletin PIP3343, which stated that oil leaks, or the dipstick becoming unseated from the dipstick tube, could be caused by "the engine PCV system" being "frozen or restricted with ice."[22]

114.    This bulletin covered three model years of GM's popular Chevrolet Silverado and GMC Sierra vehicles, including those with 4.8, 5.3 and 6.0L engines. Technicians were instructed to replace the oil fill cap with a "vented oil fill cap, part number 12573342" if the PCV system was found to be frozen.[23]

### GM March 2014 Bulletin regarding "Possible Oil Leak Due to PCV Freeze-Up"

115.    In March 2014, GM issued PIP3343D[24], which greatly expanded on the limited list of vehicles impacted by PIP3343.  It again advised dealerships of the harmful effects of cold weather on the PCV system, including sudden oil leakers.

---

[21] Exhibit 11, GM Service Bulletin No. 03-06-01-008, March 2003.

[22] Exhibit 12, GM Service Bulletin No. PIP3343, February 24, 2005.

[23] *Id*.

[24] Exhibit 15, GM Service Bulletin No. PIP3343D, March 2014.

### *GM March 2015 "Special Coverage" Bulletin Number 14882*

116.   In March 2015, GM issued Bulletin No. 14882, which noted that

certain vehicles "equipped with a 2.4L engine (LAF, LEA or LUK)" may

experience "*a frozen and/or plugged PCV (positive crankcase ventilation) system*

during cold weather operation."[25] The bulletin explained that the condition could

increase crankcase pressure leading to a rear crankshaft oil seal leak. *Id*. If the oil

leak is ignored or not noticed, an engine clatter noise may be noticeable and/or the

engine pressure warning light may illuminate. *Id*. If this condition is not corrected,

continued driving with engine noise and/or the engine oil pressure light illuminated

"*may damage the engine*." *Id*.

117.   The March 2015 Service Bulletin No. 14882 identified the following

impacted models, equipped with the 2.4L Ecotec Engine (LAF, LEA or LUK)

(*id.*):

> 2010-2013 Buick LaCrosse
> 2011-2013 Buick Regal
> 2012-2013 Buick Verano
> 2011-2013 Chevrolet Captiva
> 2010-2014 Chevrolet Equinox 2013 Chevrolet Malibu
> 2012-2013 Chevrolet Orlando
> 2010-2013 GMC Terrain.

118.    Reportedly, many were turned away for coverage because their VIN

was not included in the list of covered VINs, as this March 2015 bulletin was sent

---

[25] Exhibit 1, March 2015 GM Special Coverage Service Bulletin. No. 14882.

to just a *select grouping of owners* of certain VINs. In addition, the bulletin *failed*

*to include all model years previously identified by GM as containing the defect* in

GM's 2013 and 2014 TSBs.[26] Moreover, GM entirely failed to mention the

dangerous nature of the defect in its consumer communication, as loss of engine

power was nowhere mentioned in the letter to impacted consumers.

119. In addition, as with the earlier 2013 and 2014 TSBs outlining the issue

in the 2.4L engine, a permanent fix was not identified. GM merely outlined the

same stop-gap measure to technicians, which involved performing a crankcase

pressure check, and if required, removing the intake manifold and clearing the

PCV orifice using a small drill bit. *Id*.

Dealers were to check a vehicle's VIN to ensure coverage.[27]

## F. GM has known of this dangerous defect for years based on its own internal controls and monitoring of the industry.

120. The preceding section makes it clear that GM knew about the harmful

effects of cold weather on its PCV system, as it had to repeatedly notify dealers

(but not customers) about the issue. But GM also must have known about the

defect from a myriad of other sources as well, including pre-release testing

---

[26] For example, January 2014 Bulletin No. PIP5093A included the 2014 Buick Lacrosse, Buick Regal, Buick Verano, and Chevrolet Captiva, but these were omitted from the 2015 Special Coverage Bulletin. The Special Coverage Bulletin also included just the 2013 Chevrolet Malibu, and omitted the 2010-2012, even though they were listed as impacted vehicles in Bulletin No. PIP5093A.

[27] Exhibit 1, March 2015 GM Special Coverage Service Bulletin. No. 14882.

(including in cold weather and other conditions); post-release monitoring;

dealership repair records; warranty and post-warranty claims; complaints made to

NHTSA; complaints made on internet forums; and complaints made to GM itself.

Moreover, the defects themselves are pervasive, confirming GM's pre-production

knowledge of this defect.

121.   While GM has issued technical service bulletins regarding the issue,

and has contacted a tiny fraction of impacted consumers directly, GM's response

has been wholly inadequate and has minimized the danger. GM has yet to issue a

widespread recall for this dangerous, catastrophic defect, and never notified

Plaintiffs and class members of the defect.

### 1.   Pre-release design, manufacturing, and testing data—as well as post-release monitoring—alerted GM to the defect.

122.   It is standard practice for automobile manufacturers such as GM to

engage in extensive pre-launch testing of their vehicles. This design, engineering,

and testing data is unavailable to Plaintiffs without discovery, but upon

information and belief, analysis of this data most likely would have revealed the

defect. Moreover, vehicle manufacturers such as GM have significant and

dedicated departments that monitor many public and subscription sites to ensure

awareness of emerging safety-related issues, among others. Emerging problems

such as the PCV plugging defect would be tracked by GM. Relevant information

would be condensed and pushed to design, development, testing, service and quality departments for follow up.

123. GM routinely monitors the internet for consumer complaints, and it retains the services of third parties to do the same. GM's customer relations division regularly receives and responds to customer calls concerning product defects. GM's customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

124. GM also knew about the defect because its customer relations department, which interacts with GM-authorized service technicians in order to identify potentially widespread vehicle problems and assist in diagnosing vehicle issues, has received numerous reports that the PCV plugging defect can cause catastrophic oil loss and engine breakdown and damage without prior warning.

## 2. Dealership repair records and warranty claims data also support GM's knowledge of the defects.

125. Upon information and belief, GM regularly compiles and analyzes detailed warranty service information regarding repairs performed under warranty at its network of dealerships. Indeed, GM requires dealers to maintain detailed and meticulous records for any warranty repairs performed and routinely refuses to pay

for warranty repairs made where the nature and cause of the malfunction is insufficiently described. This warranty data would indelibly notify GM about the defect of the PCV system in cold weather.

**3.     Complaints made to NHTSA support GM's knowledge of the defect in the Class Vehicles.**

126.   In addition to the sampling of NHTSA complaints included throughout this complaint, there are numerous additional NHTSA consumer complaints publicly available regarding the PCV defect, describing customers issues with blown rear seals and engine failure due to PCV clogging. The following is a sampling of NHTSA complaints for the Class Vehicles, which go back nearly a decade:

> TL* THE CONTACT OWNS A 2010 CHEVROLET EQUINOX THE CONTACT STATED THAT WHILE DRIVING APPROXIMATELY 10 MPH AND MAKING A LEFT TURN, THE ***VEHICLE SUDDENLY STALLED***. THE VEHICLE WAS DIAGNOSED AND REPAIRED BY THE DEALER. THE CONTACT WAS INFORMED THAT THE ***PCV POSITIVE CRANKCASE VENTILATION HAD SEIZED, WHICH OVER PRESSURIZED THE ENGINE AND CAUSED THE REAR MAIN SEAL TO MALFUNCTION***. THE REAR MAIN SEAL WAS REPLACED. THE MANUFACTURER WAS NOTIFIED AND NO SOLUTION WAS OFFERED. THE FAILURE MILEAGE WAS 80,000. *TR[28]
>
> WE NOTICED A BAD FUEL SMELL IN THE CABIN OF THE VEHICLE AND HAD ***OIL LEAKING FROM IT TOOK IT TO THE DEALERSHIP AND THE REAR***

---

[28] Exhibit 26, NHTSA No. 10561051, January 22, 2014 (emphasis added).

*MAIN SEAL WAS BLOWN*. THEY DID THE REPAIR AND A WEEK LATER HAD THE SAME THING HAPPEN AGAIN. IT'S BEEN AT THE DEALERSHIP TWICE FOR THE SAME ISSUE.[29]

PURCHASED OCTOBER 2019 ONE DAY I WENT TO THE STORE AND ON THE RETURN HOME IT STARTED TO RATTLE LIKE IT WAS OUT OF OIL UPON INSPECTION OIL WAS LEAKING PROFUSLY BETWEEN THE ENGINE AND TRANSMISSION WHEN I SEARCHED THERE IS A *PROBLEM WITH THE REAR MAIN OIL SEAL GETTING BLOWN OUT WHEN THE PVC IS PLUGGED* BUT WHEN I LOOKED FOR VEHICLE RECALL THERE WAS NOTHING I COULD FIND[30]

2018 MY 2017 EQUINOX ENGINE DIED IN THE MIDDLE OF THE ROAD I'M COMING TRAFFIC BOTH WAYS START A BACKUP STARTED MAKING KNOCKING NOISES NO OIL LIGHT CAME ON JOIN US FOR THE [XXX]FRONT YARD UP TO GM IN GRAND RAPIDS WHERE I BOUGHT THE VEHICLE THEY SAID THE REAR MAIN SEAL WAS BAD LOOK AT THE [XXX] IN GMC AFTER ALL THIS FIGHTING WITH GM MANY TIMES THEY STATED THAT *IT WAS DUE TO THE PVC SYSTEM THAT THE REAR MAIN SEAL WAS OUT* I HAD TO HAVE THE CAR TOWED BECAUSE I WAS OUT OF WARRANTY NO ONE WOULD HELP ME SO I HAVE A THIRTY SOMETHING $33000 THAT I COULDN'T DRIVE LOST BOTH OF MY JOBS DUE TO THE 2.4 L HAVING THE SAME ISSUES AS PRIOR-YEAR EQUINOXES…. [31]

WE LIVE IN MN AND WENT OUT TO START OUR 2.4 EQUINOX AND IT STARTED AND THEN DIED. THIS WAS SITTING IN OUR DRIVEWAY AND WAS IN

---

[29] Exhibit 27, NHTSA No. 11185798, March 11, 2019 (emphasis added).

[30] Exhibit 28, NHTSA ID No. 11315914, March 3, 2020 (emphasis added).

[31] Exhibit 5, NHTSA ID No. 11324582, May 14, 2020 (emphasis added).

011080-11/1873557 V1

PARK WHEN IT HAPPENED. WE HAD IT TOWED TO A SHOP AND WAS TOLD THAT IT THERE WAS A ***PCV FREEZE UP WHICH CAUSED THE MAIN SEAL TO BLOW LOOSING THE OIL***. THIS CAUSED THE TIMING CHAIN TO FAIL. WE REACHED OUT TO GM AND THEY STATED THIS IS OUT OF WARRANTEE AND THAT 2017 WHERE NOT EFFECTED EVEN THOU IT IS THE SAME MOTOR AS THE OTHERS THAT ARE AFFECTED. WE REACHED OUT TO THE DEALERSHIP AND THEY SAID THE SAME THING THAT BECAUSE THE CAR HAS 80,000 MILES WE ARE OUT OF THE POWERTRAIN WARRANTEE.[32]

***REAR ENGINE SEAL BLEW AND RUINED THE MOTOR. SHOP I TOOK IT TO SAID IT'S A COMMON PROBLEM***. REGULAR MAINTENANCE HAS BEEN KEPT UP ON IT. HAVE TO REPLACE THE ENGINE NOW. I WAS GOING DOWN A MICHIGAN HIGHWAY 55MPH WHEN IT BLEW.[33]

I LIVE IN A STATE THAT HAS COLD WEATHER, DIPPING WELL BELOW FREEZING. I WENT TO GET AN OIL CHANGE WHEN MY CAR PROMPTED ME, AND MUCH TO MY SURPRISE THE ***MECHANICS FOUND A SEVERE OIL LEAK***. I WAS TOLD NOT TO DRIVE THE VEHICLE ANY LONGER AND TO HAVE IT TOWED IMMEDIATELY TO A REPAIR SHOP. I HAD IT TOWED TO THE DEALERSHIP I BOUGHT IT FROM, AND THEIR MECHANIC JUST CALLED ME. ACCORDING TO HIM, ***THE PCV HAD MOISTURE IN IT THAT FROZE, CAUSING AIR PRESSURE BUILD UP THAT BURST AND DAMAGE A MAJOR OIL VALVE. HE STATED THAT THE PCV HOLE ISN'T BIG ENOUGH TO AVOID THESE ISSUES***, AND THAT ONCE THEY REPAIR IT, THEY WILL DRILL THE HOLE TO MAKE IT BIGGER SO IT DOESN'T HAPPEN AGAIN. MY CONCERN IS, IF THESE VEHICLES ARE

---

[32] Exhibit 29, NHTSA ID No. 11385228, December 28, 2020 (emphasis added).

[33] Exhibit 30, NHTSA ID No. 11390644, January 29, 2021 (emphasis added).

- 54 -

SOLD NATIONWIDE, AND ARE SO POPULAR, WHY ARE THEY NOT THINKING OF THESE POSSIBLE ISSUES? OWNERS SHOULD NOT HAVE TO PAY OVER $2100 FOR A REPAIR DUE TO AN ISSUE IN MANUFACTURING![34]

TL* THE CONTACT OWNS A 2017 CHEVROLET EQUINOX. THE CONTACT STATED WHILE DRIVING 20 MPH, THE VEHICLE *LOSS MOTIVE POWER WITH OIL LEAKING FROM THE ENGINE*. THE VEHICLE WAS TOWED TO THE LOCAL DEALER SHELTON BUICK GMC, INC (855 S ROCHESTER RD, ROCHESTER HILLS, MI 48307, (248)266-2156) WHERE IT WAS *DIAGNOSED WITH NEEDING THE ENGINE SEAL TO BE REPLACED*. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER HAD NOT BEEN INFORMED OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 66,000.[35]

TL* THE CONTACT OWNS A 2017 CHEVROLET EQUINOX. THE CONTACT STATED THAT OIL WOULD LEAK OUT OF THE VEHICLE WHILE DRIVING AT VARIOUS SPEEDS AS THE ENGINE LIGHT WOULD ILLUMINATE. THE CONTACT ALSO STATED THAT THE VEHICLE WOULD JERK FORWARD AS THE SERVICE STABILITRAK WARNING LIGHT ILLUMINATED. ONE DAY, THE CONTACT STATED THAT AFTER ADDING OIL INTO THE VEHICLE, THE VEHICLE BEGAN TO JERK UNCONTROLLABLY AND A BLUEISH SMOKE BEGAN TO EMIT FROM THE ENGINE. DUE TO THE FAILURE, THE CONTACT HAD THE VEHICLE TOWED TO EAST HILLS CHEVROLET OF ROSLYN( 1036 NORTHERN BLVD, ROSLYN, NY 11576) WHERE AN OIL CONSUMPTION TEST WAS PERFORMED AND THEY *DISCOVERED THAT HER ENGINE SEALS NEEDED TO BE REPLACED. THE*

---

[34] Exhibit 31, NHTSA ID No. 11395616, February 10, 2021 (emphasis added).

[35] Exhibit 32, NHTSA ID No. 11395563, February 10, 2021 (emphasis added).

*MANUFACTURER WAS NOTIFIED OF THE FAILURE AND THEY OFFERED NO ASSISTANCE*. THE VEHICLE HAD YET TO BE REPAIRED. THE FAILURE MILEAGE WAS APPROXIMATELY 200.[36]

I WAS IN A MCDONALDS DRIVE THRU WHEN I NOTICED A STRONG PETROLEUM SMELL. I PULLED INTO A PARKING SPACE AND FOUND OIL GUSHING FROM THE ENGINE. I TURNED THE ENGINE OFF AND HAD IT TOWED TO MY LOCAL CHEVY DEALER. *THE DEALER FOUND THAT THE PCV SYSTEM HAD CLOGGED AND CAUSED THE CRANKCASE TO PRESSURIZE, THEREBY BLOWING THE REAL MAIN SEAL*. FORTUNATELY I WAS NOT ON THE HIGHWAY AT THE TIME OR I COULD HAVE LOST ALL THE OIL AND SUFFERED AN ENGINE SEIZURE AT HIGHWAY SPEEDS. I GOT NO INDICATION OF A PROBLEM OTHER THAN SMELL AND VISUAL EXAMINATION. THE REPAIRS WERE QUOTED AT $2320. . . .  THIS IS A DANGEROUS PROBLEM THAT GM IS AWARE OF BUT NOT ACKNOWLEDGING BY EXTENDING THE RECALL FOR THE ADDITIONAL 3 YEARS THAT THIS ENGINE WAS AVAILABLE IN THE EQUINOX.[37]

I JUST DROPPED MY KIDS OFF AT SCHOOL AND WAS HEADED HOME WHEN MY CAR STARTED STALLING, AND OIL PRESSURE LOW WARNING CAME ON. A FEW MINUTES DOWN THE ROAD, THE ENGINE POWER LIGHT CAME ON AND THE CAR TURNED OFF WHILE DRIVING. I STARTED IT AGAIN LONG ENOUGH TO ROLL INTO A PARKING LOT BESIDE ME. I'VE HAD MY CAR TOWED 3TIMES, FIRST TO A CHEVY DEALERSHIP WHO QUOTED ME A $1,400 FIX FOR A SEAL REPAIR, AFTER THEY HAD DONE A DIAGNOSTIC INSPECTION. I WAS ALSO TOLD THEY COULD ASSIST IN A TRADE IN

---

[36] Exhibit 33, NHTSA ID No. 11398477, March 1, 2021 (emphasis added).

[37] Exhibit 34, NHTSA ID No. 11398407, March 1, 2021 (emphasis added).

- 56 -

BECAUSE OF THE REPAIRS NEEDED. I WOULD FIRST NEED TO PAY FOR IT TO BE FIXED. I GOT TWO OTHER OPINIONS AT RESPECTABLE GARAGES WHO SAID IT WAS *MY REAR MAIN SEAL AND BOTH QUOTED $2,400. I HAD TO GET A LOAN TO PAY FOR REPAIRS. FOLLOWING THE FIX, THE MECHANIC TEST DROVE IT AND SAID THE BRAND NEW SEAL BLEW AGAIN*. THEY DID RESEARCH AND SAW THERE IS A MANUFACTURER MALFUNCTION WITH THE ENGINE AND TO COMPLETE THE TASKS TO RECONFIGURE MY ENGINE SO IT COULD WORK PROPERLY AND THE SAME PROBLEM NOT HAPPEN, IT WOULD BE AN ADDITIONAL $800 BUT THERE'S NO GUARANTEE IT WOULDN'T HAPPEN AGAIN. WITH MY FIRST STOP BEING THE CHEVY DEALERSHIP, I AM UPSET I'VE HAD TO PAY OVER $3,000 ON MY CAR AND NOW IT'S NOT EVEN GUARANTEED TO BE FIXED. CHEVY MECHANICS SHOULD HAVE CAUGHT THIS ISSUE WHEN I ORIGINALLY TOOK MY CAR THERE.[38]

HAD ROUTINE OIL CHANGES AND ONLY DRIVE THE CAR APPROXIMATELY 5 MILES TO AND FROM WORK DAILY. ON A VERY FRIGID WINTER DAY WHILE DRIVING HOME FROM WORK, MY CAR STARTED SHAKING, AND OIL LIGHT CAME ON, THEN THE ENGINE LIGHT AND CAR CAME TO A STOP. GOT IT TAKEN TO CHEVROLET DEALER WHO SAID THEY HAD *3 OTHER EQUINOXES IN THE SHOP THE LAST 2 DAYS OF FRIGID COLD WITH THE SAME ISSUE*. *FIX FOR A REAR MAIN SEAL REPAIR,* AFTER THEY HAD DONE A DIAGNOSTIC INSPECTION AND MULTI POINT VEHICLE INSPECTION. THIS REPAIR COST US OVER $2000. OUR MECHANIC ADVISED US TO REPORT THIS BECAUSE OF SEEING SEVERAL MODELS WITH SAME ISSUE, INCLUDING MY FATHER'S CHEVROLET EQUINOX WHO WAS IN THE SHOP 3

---

[38] Exhibit 35, NHTSA ID No. 11399297, March 5, 2021 (emphasis added).

DAYS BEFORE OURS WITH THE SAME ISSUE.
PLEASE HELP US. THANK YOU[39]

The contact owns a 2017 Chevrolet Equinox. The contact stated that while the vehicle was in for service, it was discovered that ***water was present inside the engine PCV. The contact was informed that the condition could lead to engine damage***. The contact was informed that a hole needed to be drilled into the PCV unit to allow airflow. The contact was informed that the manufacturer had issued an extended warranty coverage for the issue however, her model year vehicle was not included. The vehicle was not yet repaired. The manufacturer was notified of the failure. The failure mileage was 51,000.[40]

The contact owns a 2017 GMC Terrain. The contact stated that after his wife had parked the vehicle, the oil light appeared on the instrument panel. Upon exiting the vehicle, she discovered that oil had leaked onto the ground from underneath the vehicle. The contact was called to the scene and placed oil into the vehicle; however, the oil leaked out after restarting the vehicle. The contact then called a friend who was a mechanic and he discovered that the ***PCV valve had frozen which caused the rear main seal to fracture. The contact also discovered that oil spilled all over the bottom of the engine***. The dealer was notified of the failure and informed him that there were no recalls. The manufacturer was also notified of the failure and referred him to NHTSA. The vehicle had yet to be repaired. The failure mileage was approximately 80,000.[41]

At approximately 75000 miles the car began leaking oil. Took it in to gym certified dealer. ***Was told the pcv froze causing a pressure build up, and blew out the rear main seal. They stated this engine has this as a common occurrence.*** Searching online this appears to be true. Many

---

[39] Exhibit 36, NHTSA ID No. 11413876, April 25, 2021 (emphasis added).

[40] Exhibit 37, NHTSA ID No. 11446581, January 7, 2022 (emphasis added).

[41] Exhibit 38, NHTSA ID No. 11446854, January 10, 2022 (emphasis added).

years prior to mine were recalled. Apparently the recall needs extended.[42]

The contact owns a 2017 GMC Terrain. The contact stated while driving 30 MPH, the "Low Oil Pressure - Shut Engine Off" message was displayed. The contact was able to pull into his driveway and parked the vehicle. The vehicle was taken to an independent mechanic who diagnosed that the *rear main seal had failed*, and the failure was related to GM Technical Service Bulletin: 14882. The dealer and the manufacturer were notified of the failure and informed the contact that they could not assist because the VIN was not included in the Technical Service Bulletin. The manufacturer referred the contact to the NHTSA for assistance. The vehicle was not repaired. The failure mileage was approximately 66,000.[43]

The *rear main seal blew out due to crackcase pressure build up.*[44]

*The rear main seal broke. Causing oil to leave the reservoir and empty the engine. This was due to a frozen pvc from cold temperatures.* My vehicles engine light came on and I pulled over immediately noticing there was no oil. but there was never an indication of low oil. My vehicle is ervex with gmc every 5k miles for oil. Only 74,000 miles on a 2017 terrain. This is a manufacturers faulty equipment.[45]

The contact owns a 2017 Chevrolet Equinox. The contact stated while driving at an undisclosed speed, the oil warning light illuminated. The contact was stranded in the cold for approximately four hours. The vehicle was towed to the local dealer. The contact stated that the vehicle was not covered under warranty or TSB: PIP5093C. The vehicle was diagnosed and the contact was informed that the *rear main*

---

[42] Exhibit 39, NHTSA ID No. 11449939, January 17, 2022 (emphasis added).

[43] Exhibit 40, NHTSA ID No. 11448339, January 21, 2022 (emphasis added).

[44] Exhibit 41, NHTSA ID No. 11448647, January 24, 2022 (emphasis added).

[45] Exhibit 42, NHTSA ID No. 11448634, January 24, 2022 (emphasis added).

*seal needed to be replaced*. The vehicle was not repaired. The contact stated that the warranty program should be extended. The manufacturer was contacted but, no further assistance was provided. The approximate failure mileage was 90,261.[46]

While driving on the highway with my child, vehicle suddenly went into reduced power mode. 5 minutes later after exiting the highway, the low oil pressure Alert came on. The vehicle was parked two minutes later then towed home. After towing it to my local certified dealership, it was determined the *pcv was clogged with ice resulting in a blown rear main seal.* There was a recall for a defect in earlier terrains for this same issue (See SB 14882). Currently GM will not cover repair costs under this specific recall despite this vehicle apparently having the same 2.4L Ecotek engine. Apparently this a known cold weather issue for this vehicle.[47]

*The Rear Main Seal broke, thus causing major oil leak*. I have been doing my investigations and there are many out there like myself. This is NOT an easy fix and is very expensive! I suggest if anyone else has the same issue please report it.[48]

Available for inspection upon request. *The rear main seal is out, which is causing an oil leak. The intake manifold failed because the pcv system has a clog which has caused too much pressure to build up and caused the rear main seal to blow out.* There were no dash lights. My car was completely out of oil from the issue and I had no indicators. This issue has been check and confirmed by a GMC mechanic.[49]

---

[46] Exhibit 8, NHTSA ID No. 11450781, February 7, 2022 (emphasis added).

[47] Exhibit 7, NHTSA ID No. 11450711, February 7, 2022 (emphasis added).

[48] Exhibit 43, NHTSA ID No. 11450954, February 8, 2022 (emphasis added).

[49] Exhibit 44, NHTSA ID No. 11450934, February 8, 2022 (emphasis added).

Winter is coming....winter is here![50]

A "newer" 2015 Equinox, ^^^^ , with crankshaft rear main seal failure....... *[Id.]*

Last winter after a minus 10 degree weekend, ***my Chevy dealer had 5 "newer" Equinox's in his parking lot on Monday morning, all with crankshaft rear main seal failure***. [*Id.*]

Parents (senior citizens) got a 2016 Equinox 2wd. Hhad oil changed every 5k @ Valvoline care center. While on a short trip smelled oil, motor started to tick. Parents were close to oil change shop and pulled in. Attendant looked under car pointed out ***entire bottom of Equinox covered in oil from blown main seal and dip stick was blown up slightly from internal motor pressure. Now parents stuck with large uncovered repair***. Warranty should be higher than 60k. Side note: mechanic said many of this type motor go before 100k...:[51]

On Monday morning, 1/20/2020, 5 degrees outside on the way to work my rear seal blew on my 2016 Equinox 2.4L Eco-tec, pcv intake froze. I don't think GM fixed the problem in the older models. 89,000 miles[52]

My engine started fine in 13 degree weather. Drove about 30 miles to church 4 weeks ago. A mile before exit ramp getting off highway I noticed we had no heat. Coasting off exit ramp, ***I go to give it gas to go uphill and nothing. I***

---

[50] Exhibit 45, December 12, 2019 post by ThreeNox, https://www.terrainforum .net/threads/gm-service-bulletin-14882-blocked-pcv-valve-causing-rear-main-seal-failure.10865/page-4 (emphasis added).

[51] Exhibit 46, January 31, 2019 post by Adam T., Sebring, Ohio, https://www. carcomplaints.com/Chevrolet/Equinox/2016/engine/blown_rear_main_seal.html (emphasis added).

[52] Exhibit 47, January 22, 2020 post by John Eliuk, https://www.terrainforum .net/threads/gm-service-bulletin-14882-blocked-pcv-valve-causing-rear-main-seal-failure.10865/page-5.

*look down to see the engine had died*. I struggle to get the car to side of ramp and have to roll back alot to straighten the car out with no power to get it out of the way of traffic. My niece and I sit an hour and a half for two truck in 13 degree weather. As the tow truck guy is taking us to the only place open on Sunday, he informs me that there is *oil all under my car. With no sound or warning while driving*, I am sick to my stomach.[53]

2016 GMC Terrain just *blew a rear main seal*. Weather is cold 20-30 degrees. 76,000 miles. Is there any recalls? I know there is a bulletin. I'm sure GM won't help in any way. What kind of cost to fix it? help![54]

The contact owns a 2016 GMC Terrain. The contact stated that while driving 40 mph, there was an abnormal clicking sound coming from the engine. The vehicle was later towed from his residence to an independent mechanic, where the vehicle was diagnosed with a *blocked pcv valve which caused the rear main seal failure. The mechanic informed the contact that the clicking sound was from the oil draining at a rapid speed and that the engine needed to be replaced*. The contact then called mauer Chevrolet (1055 50th st e, inver grove heights, mn 55077) and was informed of an upcharge for the engine replacement. The contact also called the manufacturer, and was informed that the vehicle needed to be diagnosed by an authorized GMC dealer. The vehicle was not repaired. The approximate failure mileage was 70,000.[55]

2016 Chevy Equinox, all oil changes done on time, Exhaust system maintained properly, brakes, etc. Preventative

---

[53] Exhibit 48, Feb. 26, 2020 post by PammyPoo, https://www.terrainforum.net/ threads/frozen-pcv-rear-main-seal-blow-out.18778/page-4 (emphasis added).

[54] Exhibit 49, Jan. 27, 2021 post by jtall, https://www.terrainforum.net/threads/ terrain-rear-main-seal.31130/ (emphasis added).

[55] Exhibit 50, "Crankcase (pcv) problem of the 2016 GMC Terrain," failure date 2/14/21, https://www.carproblemzoo.com/gmc/terrain/crankcase-pcv-problems.php (emphasis added).

maintenance taken care of. This past week extremely cold out in New England (0 degrees or so). Driving on freeway and got off to stop for coffee. Thought the car was going to stall out at the light! Get to the gas station, seems OK, but when goes to idle, awful sound from the engine. Put in park, no issues, when driving, no issues. . . . Park it and turn it off. Oil stick is dry. Oil underneath the car. Have it towed in.

They took a look, **_found the rear main seal was blown out due to excessive pressure from a stuck/frozen PCV.. Now they're stating there's engine damage and recommend a replacement put in to the tune of $7-8 grand._** Car isn't worth that much.

Amazing that they had similar issues with 2010 - 2014 with Oil Consumption being an issue, and now it seems others are having this same issue with rear main seal failure (catastrophically!). Dealer claims they've seen it before, but nothing they can do. Seems to me they're aware (or becoming aware) of this issue. Do not buy an Equinox from the 2015-2017 years because this is how they fixed the previous issue![56]

I have 2015 2.4 liter equinox and **_pcv system froze and rear main oil seal blew 3600 dollars cost_** and they drilled a bugger hole in pcv valve said thats how gm said it would stop the problem[57]

---

[56] Exhibit 46, March 2, 2021 post by Andrew B., Enfield, CT, https://www.carcomplaints.com/Chevrolet/Equinox/2016/engine/blown_rear_main_seal.shtml (emphasis added).

[57] Exhibit 51, March 12, 2021 post by Dewalt, https://www.terrainforum.net/threads/frozen-pcv-rear-main-seal-blow-out.18778/page-5 (emphasis added).

**4.     Complaints on publicly available internet forums and blogs monitored by GM support GM's knowledge of the defect in the Class Vehicles.**

127.    There are also scores of complaints posted on consumer forums by owners of the Class Vehicles:

> The contact owns 2016 Chevrolet Equinox. The contact stated while driving 45 mph, the check engine warning light illuminated and the contact continued driving to the local dealer to be diagnosed. The vehicle was diagnosed and the contact was informed that there was ***no oil in the engine and that the pcv valve was damaged and that the engine needed to be replaced***. The vehicle was repaired. The manufacturer was made aware of the failure. The failure mileage was approximately 84,500.[58]

**5.     Acknowledgements of the pervasiveness of the defects by dealerships also supports that GM would have known early on about them.**

128.    GM's knowledge of the defects is also shown by the fact that GM dealers and technicians have admitted to Class Vehicle owners that this defect is a common problem with the Vehicles. For example:

> ***REAR ENGINE SEAL BLEW AND RUINED THE MOTOR. SHOP I TOOK IT TO SAID IT'S A COMMON PROBLEM***. REGULAR MAINTENANCE HAS BEEN KEPT UP ON IT. HAVE TO REPLACE THE ENGINE NOW. I WAS GOING DOWN A MICHIGAN HIGHWAY 55MPH WHEN IT BLEW.[59]

---

[58] Exhibit 52, "Crankcase (pcv) problem of the 2016 Chevrolet Equinox, Failure date 1/11/22, https://www.carproblemzoo.com/chevrolet/equinox/crankcase-pcv-problems.php (emphasis added).

[59] Exhibit 30, NHTSA ID No. 11390644, January 29, 2021 (emphasis added).

[Dealer repair person] comes out with a video on his phone showing ***oil leaking all around the engine, Trans and front of the car all the way to the muffler. He said this is common with these Equinox with the 4 cylinder engine, the rear main seal did not hold and all the oil leaked out***.[60]

At approximately 75000 miles the car began leaking oil. Took it in to gym certified dealer. ***Was told the pcv froze causing a pressure build up, and blew out the rear main seal. They stated this engine has this as a common occurrence.*** Searching online this appears to be true. Many years prior to mine were recalled. Apparently the recall needs extended.[61]

**6.      GM's own materials indicate it likely had exclusive knowledge of the defect at least as early as 1985.**

129.    GM's own materials confirm that it initially had exclusive knowledge of the defect since at least 1985. GM's issuance of the 1985 bulletin, and numerous technical service bulletins in the years to follow, strongly suggests that GM would have received a spate of similar complaints from consumers and/or warranty claims from dealers to precipitate the issuance of a service bulletin. GM had superior and exclusive knowledge of the defects and knew or should have known that the defects were not known or reasonably discoverable by Plaintiffs and class members before they purchased or leased the Class Vehicles.

130.    Reasonable consumers, like Plaintiffs, expect that a vehicle's engine is safe, will function in a manner that will not pose a safety hazard, and is free from

---

[60] Exhibit 6, NHTSA ID No. 11447241, January 12, 2022 (emphasis added).

[61] Exhibit 39, NHTSA ID No. 11449939, January 17, 2022 (emphasis added).

- 65 -

defects. Plaintiffs and class members further reasonably expect that GM will not

sell or lease vehicles with known safety defects, such as the PCV freezing defect,

and will disclose any such defects to its consumers when it learns of them.

Plaintiffs and class members did not expect GM to fail to PCV freezing defect to

them and to continually deny the defect by refusing to issue a recall.

**G.     The PCV freezing defect poses an inherent risk to vehicle occupant
        safety and renders the Class Vehicles *per se* defective.**

131.    The federal Safety Act and related regulations require the quarterly

submission to NHTSA of "early warning reporting" data, including claims relating

to property damage received by the automotive manufacturer, warranty claims paid

by the automotive manufacturer, consumer complaints, incidents involving injury

or death, and field reports prepared by the automotive manufacturer's employees

or representatives concerning failure, malfunction, lack or durability, or other

performance issues. 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

132.    The Safety Act further requires immediate action when a

manufacturer determines or should determine that a safety defect exists. *See United

States v. Gen. Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983). A safety

defect is defined by regulation to include any defect that creates an "unreasonable

risk of accidents occurring because of the design, construction, or performance of a

motor vehicle" or "unreasonable risk of death or injury in an accident." 49 U.S.C.

§ 30102(a)(8). Within five (5) days of learning about a safety defect, a

- 66 -

manufacturer must notify NHTSA and provide a description of the vehicles

potentially containing the defect, including "make, line, model year, [and] the

inclusive dates (month and year) of manufacture," a description of how these

vehicles differ from similar vehicle does not included in the recall, and "a

summary of all warranty claims, field or service reports, and other information"

that formed the basis of the determination that the defect was safety related. 49

U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)–(c). Then, "within a reasonable time"

after deciding that a safety issue exists, the manufacturer must notify the owners of

the defective vehicles. 49 C.F.R. §§ 577.5(a), 577.7(a). Violating these notification

requirements can result in a maximum civil penalty of $15,000,000. 49 U.S.C.

§ 30165(a)(1).

133.   Upon information and belief, GM has never reported this defect to

NHTSA, despite it being a known safety risk.

## H.    GM profits from the popularity of these vehicles

134.   GM has profited from the sales of these vehicles over the years.  For

example, GM's Chevrolet Terrain and Chevrolet Equinox are both extremely

popular crossover/mid-size five passenger sport utility vehicles. The 2010-2017

Terrains and the 2010-2017 Equinoxes come standard with the 2.4L Ecotec

engine.[62] The explosion of popularity of the vehicles has been tremendous. In May 2017, Kurt McNeil, U.S. vice president of GM Sales Operations, was quoted as saying "Just five years ago, about one in four GM sales were crossovers.[63] Today they account for almost one-third of our deliveries and we see more growth ahead." *Id.* McNeil stated that he saw these crossovers "becoming an even bigger part of the industry and GM sales over the next five years." *Id.* Retail deliveries of the Chevy Equinox rose 23 percent just between just 2016 and 2017, and sales of the GMC Terrain rose 14 percent. *Id.* U.S. sales of the Terrain for the 2014-2017 calendar years exceeded 390,000[64] and Equinox sales exceeded one million.[65]

135.   GM engaged in a full-court press to market the Class Vehicles, and to communicate to consumers the purported benefits of these vehicles. These communication efforts included, among other things: (1) press releases aimed at generating positive news articles about the vehicles' attributes; (2) comprehensive dealer training materials that taught dealers how to sell the Class Vehicles with false and misleading misrepresentations; (3) vehicle brochures disseminated at

---

[62] Exhibit 53, https://en.wikipedia.org/wiki/GMC_Terrain; Exhibit 54, https://en.wikipedia.org/wiki/Chevrolet_Equinox.

[63] Exhibit 55, May 2, 2017, "GM Crossover Sales Surge Driving Retail Share Higher," https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2017/may/0502-gmsales.html.

[64] Exhibit 53, https://en.wikipedia.org/wiki/GMC_Terrain.

[65] Exhibit 54, https://en.wikipedia.org/wiki/Chevrolet_Equinox.

dealerships and elsewhere; (4) information and interactive features on GM's websites and blogs; and (5) print and television marketing.

## I.     GM concealed, both affirmatively and via omission, the defective nature of the PCV system

136.   At least from 1985 to 2020, GM has extensively advertised the benefits of the engines located within all of the Class Vehicles. At all times relevant to this action, GM omitted and/or concealed the PCV system defect. At no point during the period relevant to this action did GM inform buyers and/or lessees of the Class Vehicles that the PCV system could freeze and lead to catastrophic oil loss and engine damage. GM represented that the Class Vehicles were durable and reliable, but this is not true.

137.   GM has consistently promoted its vehicles as safe and reliable in public statements, advertisements, and literature provided with its vehicles. GM has repeatedly proclaimed that it was a company committed to innovation, safety, and building "the best vehicles":



TO OUR STOCKHOLDERS:
Last year, I closed my letter to you by talking about how GM was changing its processes and culture in order to build the best vehicles in the world much more efficiently and profitably. This year, I want to pick up where I left off, and articulate what success looks like for you as stockholders, and for everyone else who depends on us. »

[66]

138.    In May 2014, Gay Kent, director of GM global vehicle safety, proclaimed the importance of safety within GM's company culture: "The safety of all our customers is our utmost concern."[67]

139.    GM's website in 2014 touted that "Quality and safety are at the top of the agenda at GM."[68]

140.    In 2015, Jeff Boyer, GM's vice president of Global Vehicle safety stated that "GM historically has been a leader in the development and testing of

---

[66] Exhibit 57, 2012 GM Annual Report.

[67] Exhibit 56, https://media.gm.com/media/us/en/gm/news.detail./content/Pages/news/us/en/2014/May/0514-cameras.

[68] Exhibit 25, https://www.gm.com/vision/quality_safety/gms_commitment_to safety.

safety technologies, and applying our deep knowledge and expertise to prevent

crashes from happening in the first place."[69]

141.  GM's website currently also touts the "innovation" at the heart of GM

safety, and the company's commitment to "thinking ahead on how we can facilitate

a safer driver experience…":



MEET THE PEOPLE BEHIND PERISCOPE SAFETY

"It is exciting to work at GM in the safety industry. Innovation has always been at the heart of GM, and we are always thinking ahead on how we can facilitate a safer driving experience by implementing driver assist and safety technologies such as crash avoidance and post-crash technologies."

REGINA CARTO // Vice President of Global Product Safety & Systems

[70]

142.  GM's advertisements of the Class Vehicles are well known. For

example, in 2015, GM started a new marketing campaign called "Real People. Not

Actors." The campaign included a television commercial for the 2016 Equinox that

featured 400 non-Chevrolet owners, standing in front of several Chevrolet

vehicles. People are asked to guess which of the vehicles has received the JD

Power award for "highest in initial quality" and place the award on the podium

next to that vehicle. It is then revealed that all three Chevrolet vehicles, including

---

[69] Exhibit 24, GM 2015 press release, available at https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2015/jul/0724-asta.html.

[70] Exhibit 23, https://www.gm.com/commitments/vehicle-safety.

the 2016 Equinox pictured on the right, have won this award for their respective

vehicle category.



71

143.   The spots premiered during high-profile network and cable television

programming, continuing across retail, digital and social platforms throughout the

year.[72] Paul Edwards, U.S. vice president of Chevrolet marketing at the time, stated

of the advertisements that "People are immediately surprised and enthused when

they experience our vehicles up close – the designs, technologies, and quality

levels far exceed expectations." *Id*. The long-running "Real People. Not Actors"

marketing campaign was so ubiquitous that it spawned parodies, one of which has

earned millions of views.[73]

---

[71] Exhibit 21, 2016 Chevrolet Equinox TV spot, "Awards," available at
https://www.ispot.tv/ad/AtMP/2016-chevy-equinox-awards.

[72] Exhibit 20, https://media.chevrolet.com/media/us/en/chevrolet/home.detail
.html/content/Pages/news/us/en/2015/mar/0330-chevrolet.html.

[73] Exhibit 19, https://www.huffpost.com/entry/chevy-commercial-real-people_
n_5924785ee4b094cdba58376a.

144. GM similarly touted other impacted models as safe and durable. For example, marketing materials for the 2016 GMC Terrain indicated it was a "smart choice" for consumers, brought an "exceptional level of…power…to the segment," provided a "smoother ride and improved handling" and that "superior safety features are a cornerstone attribute of the GMC Terrain."[74]

## J.  Allegations Establishing Agency Relationship Between Manufacturer GM and GM Dealerships

145. An agency relationship existed and exists between GM and GM dealerships. Upon information and belief, Manufacturer Defendant GM has impliedly or expressly acknowledged that GM-authorized dealerships are its sales agents, and the dealers have accepted that undertaking, GM has the ability to control authorized GM dealers, and GM acts as the principal in that relationship, as is shown by the following:

    i. Manufacturer GM can terminate the relationship with its dealers at will.

    ii. The relationships are indefinite.

    iii. Manufacturer GM is in the business of selling vehicles as are its dealers.

    iv. Manufacturer GM provides tools and resources for GM dealers to sell vehicles.

    v. Manufacturer GM supervises its dealers regularly.

---

[74] Exhibit 16, https://media.gmc.com/media/us/en/gmc/vehicles/terrain/2016.html.

vi.  Without Manufacturer GM, the relevant GM dealers would not exist.

vii.  Manufacturer GM requires the following of its dealers:

    1.  Reporting of sales;

    2.  Computer network connection with Manufacturer GM;

    3.  Training of dealers' sales and technical personnel;

    4.  Use of Manufacturer GM-supplied computer software;

    5.  Participation in Manufacturer GM's training programs;

    6.  Establishment and maintenance of service departments in GM dealerships;

    7.  Certification of GM pre-owned vehicles;

    8.  Reporting to Manufacturer GM with respect to the car delivery, including reporting Plaintiffs' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

    9.  Displaying Manufacturer GM logos on signs, literature, products, and brochures within GM dealerships.

viii.  Dealerships bind Manufacturer GM with respect to:

    1.  Warranty repairs on the vehicles the dealers sell; and

    2.  Issuing service contracts administered by Manufacturer GM.

ix.  Manufacturer GM further exercises control over its dealers with respect to:

    1.  Financial incentives given to GM dealer employees;

    2.  Locations of dealers;

011080-11/1873557 V1

3. Testing and certification of dealership personnel to ensure compliance with Manufacturer GM's policies and procedures; and

4. Customer satisfaction surveys, pursuant to which Manufacturer GM allocates the number of GM cars to each dealer, thereby directly controlling dealership profits.

x. GM dealers sell GM vehicles on Manufacturer GM's behalf, pursuant to a "floor plan," and Manufacturer GM does not receive payment for its cars until the dealerships sell them.

xi. Dealerships bear GM's brand names, use GM's logos in advertising and on warranty repair orders, post GM-brand signs for the public to see, and enjoy a franchise to sell Manufacturer GM's products, including the Class Vehicles.

xii. Manufacturer GM requires GM dealers to follow the rules and policies of Manufacturer GM in conducting all aspects of dealer business, including the delivery of Manufacturer GM's warranties described above, and the servicing of defective vehicles such as the Class Vehicles.

xiii. Manufacturer GM requires its dealers to post GM's brand names, logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized GM dealers and servicing outlets for Manufacturer GM cars.

xiv. Manufacturer GM requires its dealers to use service and repair forms containing Manufacturer GM's brand names and logos.

xv. Manufacturer GM requires GM dealers to perform Manufacturer GM's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by Manufacturer GM.

xvi. Manufacturer GM requires GM dealers to use parts and tools either provided by Manufacturer GM, or approved by Manufacturer GM, and to inform GM when dealers discover that unauthorized parts have been installed on one of Manufacturer GM's vehicles.

- 75 -

xvii. Manufacturer GM requires dealers' service and repair employees to be trained by GM in the methods of repair of GM-brand vehicles.

xviii. Manufacturer GM audits GM dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix. Manufacturer GM requires its dealers to provide GM with monthly statements and records pertaining, in part, to dealers' sales and servicing of Manufacturer GM's vehicles.

xx. Manufacturer GM provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines and repair procedures to be followed for chronic defects.

xxi. Manufacturer GM provides its dealers with specially trained service and repair consultants with whom dealers are required by Manufacturer GM to consult when dealers are unable to correct a vehicle defect on their own.

xxii. Manufacturer GM requires GM-brand vehicle owners to go to authorized GM dealers to obtain servicing under GM warranties.

xxiii. GM dealers are required to notify Manufacturer GM whenever a car is sold or put into warranty service.

## VI. TOLLING OF THE STATUTE OF LIMITATIONS

146. As of the date of this Complaint, GM continues to market its vehicles based on superior durability and reliability, despite its knowledge that the Class Vehicles are defective, have catastrophically failed, or can catastrophically fail.

147. Plaintiffs and Class Members did not discover and could not reasonably have discovered prior to purchase that their Class Vehicles are defective, that the durability and performance of their Class Vehicles is impaired

by this defect, and that such durability and performance is far less than GM

promised, or that, as a result of the foregoing, they overpaid for their vehicles at

the point of sale or lease, the value of their vehicles is diminished, their vehicles

were unsafe, and/or their vehicles will require costly modification to avoid a

catastrophic, even more costly failure, and that any such modifications would

impair other qualities of the Class Vehicles that formed a material part of the

bargain between the parties in the purchase of the Class Vehicles by Plaintiffs and

Class Members.

148.   With respect to Class Vehicles that experienced a catastrophic PCV

system failure, Plaintiffs and Class Members did not discover and could not

reasonably have discovered their PCV system failure. Therefore, all applicable

statutes of limitation have been tolled by operation of the discovery rule.

149.   Plaintiffs and putative Class Members had no way of knowing about

GM's wrongful and deceptive conduct with respect to their defective Class

Vehicles.

## VII.  CLASS ACTION ALLEGATIONS

150.   Plaintiffs bring this action on behalf of themselves and as a class

action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rule of

Civil Procedure on behalf of the class of persons (collectively, the "Class") who

purchased or leased one or more of the "Class Vehicles."

151.   Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of the following Class and Sub-Classes who were purchasers or lessees from April 1, 2016 to the present:

> **Nationwide Class:** All persons or entities who purchased or leased one or more of the Class Vehicles from a GM dealer.
>
> **The Massachusetts Class:** All persons or entities who are residents of Massachusetts or purchased or leased one or more of the Class Vehicles in Massachusetts.
>
> **The Michigan Class:** All persons or entities who are residents of Michigan or purchased or leased one or more of the Class Vehicles in Michigan.
>
> **The Minnesota Class:** All persons or entities who are residents of Minnesota or purchased or leased one or more of the Class Vehicles in Minnesota.
>
> **The New York Class:** All persons or entities who are residents of New York or purchased or leased one or more of the Class Vehicles in New York.
>
> **The Wisconsin Class:** All persons or entities who are residents of Wisconsin or purchased or leased one or more of the Class Vehicles in Wisconsin.

152.   Excluded from the Class are GM and its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, as well as any entity in which GM has a controlling interest. In addition, governmental entities and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff are excluded

from the Class. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

153.   Excluded from the Class are individuals who have personal injury claims resulting from the defect. Also excluded from the Class are GM and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' counsel.

154.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

155.   The Class Representatives are asserting claims that are typical of claims of their respective Classes, and they will fairly and adequately represent and protect the interests of the Classes in that they have no interests antagonistic to those of the putative Class members.

156.   The amount of damages suffered by each individual member of the Class, in light of the expense and burden of individual litigation, would make it difficult or impossible for individual Class Members to redress the wrongs done to them. Plaintiffs and other members of the Classes have all suffered harm and damages as a result of GM's unlawful and wrongful conduct. Absent a class action,

- 79 -

GM will likely not have to compensate victims for GM's wrongdoings and unlawful acts or omissions, and will continue to commit the same kinds of wrongful and unlawful acts or omissions in the future.

157. This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

158. **Numerosity under Federal Rule of Civil Procedure 23(a)(1):** The members of the Class are so numerous that individual joinder of all of its members is impracticable. Due to the nature of the trade and commerce involved, the total number of Class Plaintiffs is at least in the hundreds of thousands, and are numerous and geographically dispersed across the country. While the exact number and identities of the Class Members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, as well as by the notice Class Members will receive by virtue of this litigation so that they may self-identify. The disposition of the claims of Class Members in a single class action will provide substantial benefits to all Parties and the Court. Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

159. **Commonality and Predominance under Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):** This action involves common questions of law

and fact which predominate over any questions affecting individual Class

Members, including, without limitation:

      a.     Whether GM engaged in the conduct alleged herein;

      b.     Whether GM knew about the PCV freezing defect and if so,

how long GM knew or should have known as much;

      c.     Whether GM designed, advertised, marketed, distributed,

leased, sold, or otherwise placed the defective Class Vehicles into the stream of

commerce in the United States;

      d.     Whether the GM PCV systems that are the subject of this

complaint are defective such that they are not fit for ordinary consumer use;

      e.     Whether GM omitted material facts about the quality,

durability, and vehicle longevity of the Class Vehicles;

      f.     Whether GM designed, manufactured, marketed, and

distributed Class Vehicles with defective or otherwise inadequate PCV systems;

      g.     Whether GM's conduct violates the state consumer protection

statutes identified herein, and constitutes breach of contract or warranty and

fraudulent concealment/misrepresentation, as asserted herein;

      h.     Whether Plaintiffs and the other Class Members overpaid for

their vehicles at the point of sale; and

i.      Whether Plaintiffs and the other Class Members are entitled to

damages and other monetary relief and, if so, what amount.

160.   **Typicality under Federal Rule of Civil Procedure 23(a)(3):**

Plaintiffs' claims are typical of the other Class Members' claims because all have

been comparably injured through GM's wrongful conduct as described above.

161.   **Adequacy of Representation under Federal Rule of Civil**

**Procedure 23(a)(3):** Plaintiffs are adequate Class representatives because their

interests do not conflict with the interests of the other Class Members they seek to

represent. Additionally, Plaintiffs have retained counsel with substantial

experience in handling complex class action and multi-district litigation. Plaintiffs

and their counsel are committed to prosecuting this action vigorously on behalf of

the Class and have the financial resources to do so. The interests of the Class will

be fairly and adequately protected by Plaintiffs and their counsel.

162.   **Superiority of Class Action under Federal Rule of Civil Procedure**

**23(b)(3):** A class action is superior to any other available means for the fair and

efficient adjudication of this controversy, and no unusual difficulties are likely to

be encountered in the management of this class action. The financial detriment

suffered by Plaintiffs and the other members of the Class are relatively small

compared to the burden and expense that would be required to individually litigate

their claims against GM's wrongful conduct. Even if members of the Class could

afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII. CAUSES OF ACTION

### A. Multi-State Claims.

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. § 2301, *ET. SEQ.*

163. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

164. Plaintiffs bring this Count on behalf of all persons who are members of the Class set forth in Section (VI.) above (collectively for purposes of this Count, the "Magnuson-Moss Class").

165. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

166. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). The Plaintiffs and Class members are "consumers" under 15 U.S.C. § 2301(1) because they are persons

entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

167. GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

168. 15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

169. GM provided Plaintiffs with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, GM warranted that the Class Vehicles were fit for their ordinary purpose as safe, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

170. GM breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common defect in that they are all equipped with a PCV system which is prone to freezing. This can cause the Class Vehicles to suffer engine damage and necessitate expensive repairs, which renders

- 84 -

the Class Vehicles, when sold/leased and at all times thereafter, unmerchantable

and unfit for their ordinary use of driving in America.

171.   In its capacity as warrantor, GM had knowledge of the inherently

defective nature of the PCV systems in the Class Vehicles. Any effort by GM to

limit the implied warranties in a manner that would exclude coverage of the Class

Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit

such liability is null and void.

172.   Any limitations GM might seek to impose on its warranties are

procedurally unconscionable. There was unequal bargaining power between GM

and Plaintiffs, as, at the time of purchase and lease, Plaintiffs had no other options

for purchasing warranty coverage other than directly from GM.

173.   Any limitations GM might seek to impose on its warranties are

substantively unconscionable. GM knew that the Class Vehicles were defective,

and that the Vehicles would fail when used as intended. Moreover, GM knew the

Class Vehicles would fail after the warranties purportedly expired. GM failed to

disclose this defect to Plaintiffs. Thus, GM's enforcement of the durational

limitations on those warranties is harsh and shocks the conscience.

174.   Plaintiffs have had sufficient direct dealings with either GM or its

agents (e.g. dealerships and technical support) to establish privity of contract

between GM on the one hand, and Plaintiffs and each of the other Class Members

on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between GM and its dealers, and specifically, of GM's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

175.   Affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

176.   At the time of sale or lease of each Class Vehicle, GM knew, should have known, or was reckless in not knowing of its misrepresentations and omission concerning the Class Vehicle's inability to perform as warranted, but nonetheless failed to rectify the situation. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford GM a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

177.   Plaintiffs would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because GM is refusing to acknowledge any revocation of acceptance and return immediately

any payments made, Plaintiffs and the other Class Members have not re-accepted their Class Vehicles by retaining them.

178.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

179.   Plaintiffs, individually and on behalf of all other Magnuson-Moss Class Members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Magnuson-Moss Class Members in connection with the commencement and prosecution of this action.

180.   Plaintiffs also seek the establishment of a GM-funded program for Plaintiffs and Magnuson-Moss Class Members to recover out of pocket costs incurred in attempting to rectify and/or mitigate the effects of the PCV freezing defect in their Class Vehicles.

## COUNT II

## BREACH OF CONTRACT

181.   Plaintiffs incorporate by reference all allegations as though fully set forth herein.

182.   Plaintiffs assert this Count on behalf of themselves and the Nationwide Class.

183.   As set forth above, Plaintiffs and the putative Class have suffered from a defect that existed in the Class Vehicles at the time of purchase.

184.   GM's misrepresentations and omissions alleged herein, including, but not limited to, GM's concealment and suppression of material facts concerning the durability, performance, and quality of the Class Vehicles, and GM's affirmative misrepresentations touting the increased durability and performance qualities of the Class Vehicles, caused Plaintiffs and Class Members to make their purchases or leases of their vehicles.

185.   Absent those misrepresentations and omissions, Plaintiffs and Class Members would not have purchased or leased these vehicles, would not have purchased or leased these vehicles at the prices they paid, and/or would have purchased or leased a different vehicle that did not contain the defective PCV system. Accordingly, Plaintiffs and the other Class Members overpaid for their vehicles and did not receive the benefit of the bargain.

- 88 -

186.   Each and every sale or lease of a vehicle constitutes a contract between GM and the purchaser or lessee. GM breached these contracts by selling or leasing to Plaintiffs and Class Members defective vehicles and by misrepresenting or failing to disclose material facts concerning the durability and reliability of the Class Vehicles, as well as the presence of a defect in the Class Vehicles, and by affirmatively making misleading statements concerning the safety, durability and reliability of the Class Vehicles.

187.   As a direct and proximate result of GM's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**B.**   **Claims brought on behalf of the Massachusetts Subclass**

## COUNT I

### FRAUDULENT CONCEALMENT
### (BASED ON MASSACHUSETTS LAW)

188.   Plaintiffs incorporate by reference all allegations as though fully set forth herein.

189.   Plaintiffs bring this count individually and on behalf of the Massachusetts State Subclass, against Defendant GM.

190.   As set forth above, Plaintiffs and the putative Class have suffered from a defect that existed in the Class Vehicles at the time of purchase.

- 89 -

191.  GM intentionally concealed that the Class Vehicles are defective.

192.  As alleged above, GM further affirmatively misrepresented to Plaintiffs, in advertising and other forms of communication, including standard and uniform material provided with each Class Vehicle and on its website, that the Class Vehicles they were selling had no significant defects, that the Class Vehicles were safe, reliable, durable, and of high quality, and that the Class Vehicles would perform and operate in a safe manner.

193.  Defendant knew about the defect in the Class Vehicles when these representations were made.

194.  The Class Vehicles purchased by Plaintiffs and Class Members contained defective PCV systems.

195.  Defendant had a duty to disclose that the Class Vehicles contained a fundamental defect, as alleged herein, because Plaintiffs and Class Members relied on Defendant's material representations.

196.  As alleged herein, at all relevant times, Defendant has held out the Class Vehicles to be free from defects such as the PCV system defect. Defendant touted and continues to tout the many benefits and advantages of the Class Vehicles, but nonetheless failed to disclose important facts related to the defect. This made Defendant's other disclosures about the Class Vehicles deceptive.

197.   The truth about the defective Class Vehicles was known only to Defendant; Plaintiffs and Class Members did not know of these facts and Defendant actively concealed these facts from Plaintiffs and Class Members.

198.   Plaintiffs and Class Members reasonably relied upon Defendant's deception. They had no way of knowing that Defendant's representations were false, misleading, or incomplete. As consumers, Plaintiffs and Class Members did not, and could not, unravel Defendant's deception on their own. Rather, Defendant intended to deceive Plaintiffs and Class Members by concealing the true facts about the presence of a defect in the Class Vehicles.

199.   Defendant's false representations and omissions were material to consumers because they concerned the safety and durability of the Class Vehicles, which played a significant role in the value of the Class Vehicles.

200.   Defendant had a duty to disclose the PCV system defect with respect to the Class Vehicles, as well as the lack of a remedy, because it concerned the safety and durability of the Class Vehicles, the details of the true facts were known and/or accessible only to Defendant, because Defendant had exclusive knowledge as to such facts, and because Defendant knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members.

201.   Defendant also had a duty to disclose because it made general affirmative representations about the safety and dependability of the Class

- 91 -

Vehicles without telling consumers that the Class Vehicles had a fundamental system defect that would affect the safety, quality, and reliability of the Class Vehicles.

202. Defendant's disclosures were misleading, deceptive, and incomplete because it failed to inform consumers of the additional facts regarding the PCV system defect and recall as set forth herein. These omitted and concealed facts were material because they directly impact the safety and value of the Class Vehicles purchased by Plaintiffs and Class Members.

203. Defendant has still not made full and adequate disclosures and continues to defraud Plaintiffs and Class Members by concealing material information regarding the defect and recall of the Class Vehicles.

204. Plaintiffs and Class Members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts in that they would not have purchased or paid as much for the Class Vehicles with the PCV system defect, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class Members' actions were justified. Defendant was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class Members.

205.    Because of the concealment and/or suppression of facts, Plaintiffs and Class Members sustained damage because they own Class Vehicles that are diminished in value as a result of Defendant's concealment of the true safety and quality of the Class Vehicles. Had Plaintiffs and Class Members been aware of the PCV system defect, and Defendant's disregard for the truth, Plaintiffs and Class Members would have paid less for their Class Vehicles or would not have purchased them at all.

206.    The value of Plaintiffs' and Class Members' Class Vehicles have diminished as a result of Defendant's fraudulent concealment of the PCV system defect, which has made any reasonable consumer reluctant to purchase a Class Vehicle, let alone pay what otherwise would have been fair market value for the Class Vehicle.

207.    Accordingly, Defendant is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

208.    Defendant's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and the representations that Defendant made to them, in order to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

- 93 -

## COUNT II

## UNJUST ENRICHMENT

209.   Plaintiffs incorporate all paragraphs as though fully set forth herein.

210.   Plaintiffs bring this Count on behalf of the Massachusetts Subclass Members against GM.

211.   This claim is pleaded in the alternative to any contract-based claim brought on behalf of Plaintiffs and Massachusetts Subclass Members.

212.   As a result of its wrongful and fraudulent acts and omissions, as set forth herein, pertaining to the defects in the PCV system and the Class Vehicles and the concealment thereof, GM charged a higher price for the Class Vehicles than the Class Vehicles' true value and GM, therefore, obtained monies that rightfully belong to Plaintiffs and Massachusetts Subclass Members.

213.   GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and Massachusetts Subclass Members, who paid a higher price for their vehicles that actually had lower values.

214.   GM has received and retained unjust benefits from the Plaintiffs and Massachusetts Subclass Members, and inequity has resulted.

215.   Thus, all Plaintiffs and Massachusetts Subclass Members conferred a benefit on GM.

011080-11/1873557 V1

216.   It would be inequitable and unconscionable for GM to retain these wrongfully obtained benefits.

217.   Because GM concealed its fraud and deception, Plaintiffs and Massachusetts Subclass Members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

218.   GM knowingly accepted and retained the unjust benefits of its fraudulent conduct.

219.   As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and Massachusetts Subclass Members in an amount to be proven at trial. Plaintiffs and Massachusetts Subclass Members, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

**C.   Claims brought on behalf of the Michigan Subclass**

### COUNT I

### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT (MICH. COMP. LAWS § 445.903 *ET SEQ.*)

220.   Plaintiffs (for purposes of all Michigan Subclass Member Counts) incorporate by reference all paragraphs as though fully set forth herein.

221.   Plaintiffs bring this Count on behalf of the Michigan Subclass Members against GM.

222.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; or "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. LAWS § 445.903(1).

223.   Plaintiffs and Michigan Subclass Members are "person[s]" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d).

224.   GM is a "person" engaged in "trade or commerce" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d) and (g).

225.   In the course of Defendant's business, it willfully failed to disclose and actively concealed that the PCV system was defective, such that normal use of the Class Vehicles could cause engine damage. Particularly in light of Defendant's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be durable. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud,

- 96 -

misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission in connection with the sale of the Class Vehicles.

226.   In purchasing or leasing the Class Vehicles, Plaintiffs and the Michigan Subclass Members were deceived by Defendant's failure to disclose that normal use of the Class Vehicles could lead to catastrophic oil loss and engine damage.

227.   Plaintiffs and Michigan Subclass Members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and the Michigan Subclass Members did not, and could not, unravel Defendant's deception on their own as the Class Vehicle's PCV system is an internal part in the Class Vehicles and Plaintiffs were not aware of the defective nature of the PCV system prior to purchase or lease.

228.   Defendant's actions as set forth above occurred in the conduct of trade or commerce.

229.   Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to, and did in fact, deceive reasonable consumers.

- 97 -

230.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Michigan Subclass Members.

231.   Defendant knew or should have known that its conduct violated the Michigan law regarding unfair or deceptive acts in trade or commerce.

232.   Defendant owed Plaintiffs and Michigan Subclass Members a duty to disclose the truth about the PCV system defect because Defendant:

a.      Possessed exclusive knowledge of the design of the Class Vehicles and the tendency of the PCV system to become plugged, including warranty claims relating to plugged PCV systems and resulting oil seal leaks;

b.      Intentionally concealed the foregoing from Plaintiffs and the Michigan Subclass Members; and/or

c.      Made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Michigan Subclass Members that contradicted these representations.

233.   Due to its specific and superior knowledge that the PCV systems in the Class Vehicles can crack, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and Michigan Subclass Members' reliance on these material representations, GM had a duty to disclose to Plaintiffs

and Michigan Subclass Members that the PCV systems were defective, that Class

Vehicles do not have the expected durability over other vehicles or of their

namesake predecessor engines, that failure of the PCV system will cause damage

to Class Vehicles' engines and engine systems and could pose a safety hazard due

to unexpected loss of engine power, and that Class Members would be required to

bear the cost of the damage to their vehicles. Having volunteered to provide

information to Plaintiffs and Michigan Subclass Members, GM had the duty to

disclose not just the partial truth, but the entire truth. These omitted and concealed

facts were material because they directly impact the value of the Class Vehicles

purchased or leased by Plaintiffs and Michigan Subclass Members. Longevity,

durability, performance, and safety are material concerns to diesel truck

consumers. GM represented to Plaintiffs and Michigan Subclass Members that

they were purchasing or leasing vehicles that were free from defect, when in fact a

plugged PCV system could lead to a rear seal leak and catastrophic loss of oil,

damaging the engine, and it is only a matter of time before catastrophic failure

occurs.

234.   Defendant's conduct proximately caused injuries to Plaintiffs and the

Michigan Subclass Members.

235.   Plaintiffs and the Subclass Members were injured and suffered

ascertainable loss, injury in fact, and/or actual damage as a proximate result of

Defendant's conduct, Plaintiffs and the Michigan Subclass Members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

236.   Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest as their actions offend public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

237.   Plaintiffs and the Michigan Subclass Members seek injunctive relief to enjoin GM from continuing their unfair and deceptive acts; monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under MICH. COMP. LAWS § 445.911.

238.   Plaintiffs also seek punitive damages because GM carried out despicable conduct with willful and conscious disregard of the rights of others. GM's conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON MICHIGAN LAW)

239.   Plaintiffs incorporate by reference all allegations as though fully set forth herein.

240.   Plaintiffs bring this count individually and on behalf of the Nationwide Class or, in the alternative, on behalf of the Michigan State Subclass, against Defendant GM.

241.   The law of fraudulent concealment is substantially similar in each state such that this claim can be brought nationwide based upon the common law in each state.

242.   As set forth above, Plaintiffs and the putative Class have suffered from a defect that existed in the Class Vehicles at the time of purchase.

243.   GM intentionally concealed that the Class Vehicles are defective.

244.   As alleged above, GM further affirmatively misrepresented to Plaintiffs, in advertising and other forms of communication, including standard and uniform material provided with each Class Vehicle and on its website, that the Class Vehicles they were selling had no significant defects, that the Class Vehicles were safe, reliable, durable, and of high quality, and that the Class Vehicles would perform and operate in a safe manner.

- 101 -

245.   Defendant knew about the defect in the Class Vehicles when these representations were made.

246.   The Class Vehicles purchased by Plaintiffs and Class Members contained defective PCV systems.

247.   Defendant had a duty to disclose that the Class Vehicles contained a fundamental defect, as alleged herein, because Plaintiffs and Class Members relied on Defendant's material representations.

248.   As alleged herein, at all relevant times, Defendant has held out the Class Vehicles to be free from defects such as the PCV system defect. Defendant touted and continues to tout the many benefits and advantages of the Class Vehicles, but nonetheless failed to disclose important facts related to the defect. This made Defendant's other disclosures about the Class Vehicles deceptive.

249.   The truth about the defective Class Vehicles was known only to Defendant; Plaintiffs and Class Members did not know of these facts and Defendant actively concealed these facts from Plaintiffs and Class Members. Plaintiffs and Class Members reasonably relied upon Defendant's deception. They had no way of knowing that Defendant's representations were false, misleading, or incomplete. As consumers, Plaintiffs and Class Members did not, and could not, unravel Defendant's deception on their own. Rather, Defendant intended to

- 102 -

deceive Plaintiffs and Class Members by concealing the true facts about the presence of a defect in the Class Vehicles.

250.   Defendant's false representations and omissions were material to consumers because they concerned the safety and durability of the Class Vehicles, which played a significant role in the value of the Class Vehicles.

251.   Defendant had a duty to disclose the PCV system defect with respect to the Class Vehicles, as well as the lack of a remedy, because it concerned the safety and durability of the Class Vehicles, the details of the true facts were known and/or accessible only to Defendant, because Defendant had exclusive knowledge as to such facts, and because Defendant knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members.

252.   Defendant also had a duty to disclose because it made general affirmative representations about the safety and dependability of the Class Vehicles without telling consumers that the Class Vehicles had a fundamental system defect that would affect the safety, quality, and reliability of the Class Vehicles.

253.   Defendant's disclosures were misleading, deceptive, and incomplete because it failed to inform consumers of the additional facts regarding the PCV system defect and recall as set forth herein. These omitted and concealed facts

were material because they directly impact the safety and value of the Class

Vehicles purchased by Plaintiffs and Class Members.

254.   Defendant has still not made full and adequate disclosures and

continues to defraud Plaintiffs and Class Members by concealing material

information regarding the defect and recall of the Class Vehicles.

255.   Plaintiffs and Class Members were unaware of the omitted material

facts referenced herein, and they would not have acted as they did if they had

known of the concealed and/or suppressed facts in that they would not have

purchased or paid as much for the Class Vehicles with the PCV system defect,

and/or would have taken other affirmative steps in light of the information

concealed from them. Plaintiffs' and Class Members' actions were justified.

Defendant was in exclusive control of the material facts, and such facts were not

generally known to the public, Plaintiffs, or Class Members.

256.   Because of the concealment and/or suppression of facts, Plaintiffs and

Class Members sustained damage because they own Class Vehicles that are

diminished in value as a result of Defendant's concealment of the true safety and

quality of the Class Vehicles. Had Plaintiffs and Class Members been aware of the

PCV system defect, and Defendant's disregard for the truth, Plaintiffs and Class

Members would have paid less for their Class Vehicles or would not have

purchased them at all.

257.   The value of Plaintiffs' and Class Members' Class Vehicles have diminished as a result of Defendant's fraudulent concealment of the PCV system defect, which has made any reasonable consumer reluctant to purchase a Class Vehicle, let alone pay what otherwise would have been fair market value for the Class Vehicle.

258.   Accordingly, Defendant is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

259.   Defendant's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and the representations that Defendant made to them, in order to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (MICH. COMP. LAWS § 440.2314)

260.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

261.   Plaintiffs bring this Count on behalf of the Michigan Subclass Members against GM.

262.   GM is a merchant with respect to motor vehicles within the meaning of the Mich. Comp. Laws § 440.2314.

263.   Under Mich. Comp. Law § 440.2314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

264.   The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the PCV systems were defective as they can lead to catastrophic oil loss, which can cause loss of engine power and expensive vehicle repairs (a condition GM knew would occur prior to the design and sale of the Class Vehicles), thereby causing an increased likelihood of serious injury or death.

265.   Plaintiffs and Michigan Subclass Members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable.

266. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Michigan Subclass Members have been damaged in an amount to be proven at trial.

## COUNT IV

## UNJUST ENRICHMENT

267. Plaintiffs incorporate all paragraphs as though fully set forth herein.

268. Plaintiffs bring this Count on behalf of the Michigan Subclass Members against GM.

269. This claim is pleaded in the alternative to any contract-based claim brought on behalf of Plaintiffs and Michigan Subclass Members.

270. As a result of its wrongful and fraudulent acts and omissions, as set forth herein, pertaining to the defects in the PCV system and the Class Vehicles and the concealment thereof, GM charged a higher price for the Class Vehicles than the Class Vehicles' true value and GM, therefore, obtained monies that rightfully belong to Plaintiffs and Michigan Subclass Members.

271. GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and Michigan Subclass Members, who paid a higher price for their vehicles that actually had lower values.

272. GM has received and retained unjust benefits from the Plaintiffs and Michigan Subclass Members, and inequity has resulted.

273.   Thus, all Plaintiffs and Michigan Subclass Members conferred a benefit on GM.

274.   It would be inequitable and unconscionable for GM to retain these wrongfully obtained benefits.

275.   Because GM concealed its fraud and deception, Plaintiffs and Michigan Subclass Members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

276.   GM knowingly accepted and retained the unjust benefits of its fraudulent conduct.

277.   As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and Michigan Subclass Members in an amount to be proven at trial. Plaintiffs and Michigan Subclass Members, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

**D.     Claims brought on behalf of the Minnesota Subclass**

## COUNT I

### VIOLATIONS OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT (MINN. STAT. §§ 325F.68, *ET SEQ.* AND MINN. STAT. § 8.31, SUBD. 3A)

278.   Plaintiffs (for purposes of all Minnesota Subclass Member Counts) incorporate by reference all paragraphs as though fully set forth herein.

279.    Plaintiffs bring this Count on behalf of the Minnesota Subclass Members against GM.

280.    The Class Vehicles constitute "merchandise" within the meaning of MINN. STAT. § 325F.68(2).

281.    The Minnesota Prevention of Consumer Fraud Act (Minnesota CFA) prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." MINN. STAT. § 325F.69(1).

282.    In the course of Defendant's business, it willfully failed to disclose and actively concealed that the PCV system was defective, such that normal use of the Class Vehicles could cause engine damage. Particularly in light of Defendant's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be durable. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission in connection with the sale of the Class Vehicles.

283.   In purchasing or leasing the Class Vehicles, Plaintiffs and the Minnesota Subclass Members were deceived by Defendant's failure to disclose that normal use of the Class Vehicles could lead to catastrophic oil loss and engine damage.

284.   Plaintiffs and Minnesota Subclass Members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and the Minnesota Subclass Members did not, and could not, unravel Defendant's deception on their own as the Class Vehicle's PCV system is an internal part in the Class Vehicles and Plaintiffs were not aware of the defective nature of the PCV system prior to purchase or lease.

285.   Defendant's actions as set forth above occurred in the conduct of trade or commerce.

286.   Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to, and did in fact, deceive reasonable consumers.

287.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Minnesota Subclass Members.

288.   Defendant knew or should have known that its conduct violated the Minnesota law regarding unfair or deceptive acts in trade or commerce.

289.   Defendant owed Plaintiffs and Minnesota Subclass Members a duty to disclose the truth about the PCV system defect because Defendant:

a.   Possessed exclusive knowledge of the design of the Class Vehicles and the tendency of the PCV system to become plugged, including warranty claims relating to plugged PCV systems and resulting oil seal leaks;

b.   Intentionally concealed the foregoing from Plaintiffs and the Minnesota Subclass Members; and/or

c.   Made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Minnesota Subclass Members that contradicted these representations. Due to its specific and superior knowledge that the PCV systems in the Class Vehicles can crack, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and Minnesota Subclass Members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and Minnesota Subclass Members that the PCV systems were defective, that Class Vehicles do not have the expected durability over other vehicles or of their namesake predecessor engines, that failure of the PCV system will cause damage to Class Vehicles' engines and engine systems and could pose a safety hazard due

- 111 -

to unexpected loss of engine power, and that Class Members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Minnesota Subclass Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Minnesota Subclass Members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and Minnesota Subclass Members that they were purchasing or leasing vehicles that were free from defect, when in fact a plugged PCV system could lead to a rear seal leak and catastrophic loss of oil, damaging the engine, and it is only a matter of time before catastrophic failure occurs.

290. Defendant's conduct proximately caused injuries to Plaintiffs and the Minnesota Subclass Members.

291. Plaintiffs and the Subclass Members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct, Plaintiffs and the Minnesota Subclass Members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

292.   Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest as their actions offend public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

293.   Pursuant to MINN. STAT. § 8.31(3a), Plaintiffs and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

294.   Plaintiffs and the Class also seek punitive damages under MINN STAT. § 549.20(1)(a) given the clear and convincing evidence that GM's acts show deliberate disregard for the rights of others.

## COUNT II

## VIOLATION OF THE MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT (MINN. STAT. § 325D.43. *ET SEQ.*)

295.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

296.   Plaintiffs bring this Count on behalf of the Minnesota Subclass Members against GM.

297.   The Minnesota Deceptive Trade Practices Act (Minnesota DTPA) prohibits deceptive trade practices, which include "[t]he act, use, or employment

by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." MINN. STAT. § 325F.69(1).

298.   GM's actions as set forth herein occurred in the conduct of trade or commerce.

299.   In the course of Defendant's business, it willfully failed to disclose and actively concealed that the PCV system was defective, such that normal use of the Class Vehicles could cause engine damage. Particularly in light of Defendant's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be durable. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission in connection with the sale of the Class Vehicles.

300.   In purchasing or leasing the Class Vehicles, Plaintiffs and the Minnesota Subclass Members were deceived by Defendant's failure to disclose that normal use of the Class Vehicles could lead to catastrophic oil loss and engine damage.

301.   Plaintiffs and Minnesota Subclass Members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and the Minnesota Subclass Members did not, and could not, unravel Defendant's deception on their own as the Class Vehicle's PCV system is an internal part in the Class Vehicles and Plaintiffs were not aware of the defective nature of the PCV system prior to purchase or lease.

302.   Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to, and did in fact, deceive reasonable consumers.

303.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Minnesota Subclass Members.

304.   Defendant knew or should have known that its conduct violated the Minnesota law regarding unfair or deceptive acts in trade or commerce.

305.   Defendant owed Plaintiffs and Minnesota Subclass Members a duty to disclose the truth about the PCV system defect because Defendant:

a.      Possessed exclusive knowledge of the design of the Class

Vehicles and the tendency of the PCV system to become plugged, including

warranty claims relating to plugged PCV systems and resulting oil seal leaks;

b.      Intentionally concealed the foregoing from Plaintiffs and the

Minnesota Subclass Members; and/or

c.      Made incomplete representations regarding the quality and

durability of the Class Vehicles, while purposefully withholding material facts

from Plaintiffs and the Minnesota Subclass Members that contradicted these

representations.

306.   Due to its specific and superior knowledge that the PCV systems in

the Class Vehicles can crack, its false representations regarding the increased

durability of the Class Vehicles, and Plaintiffs' and Minnesota Subclass Members'

reliance on these material representations, GM had a duty to disclose to Plaintiffs

and Minnesota Subclass Members that the PCV systems were defective, that Class

Vehicles do not have the expected durability over other vehicles or of their

namesake predecessor engines, that failure of the PCV system will cause damage

to Class Vehicles' engines and engine systems and could pose a safety hazard due

to unexpected loss of engine power, and that Class Members would be required to

bear the cost of the damage to their vehicles. Having volunteered to provide

information to Plaintiffs and Minnesota Subclass Members, GM had the duty to

- 116 -

disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Minnesota Subclass Members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and Minnesota Subclass Members that they were purchasing or leasing vehicles that were free from defect, when in fact a plugged PCV system could lead to a rear seal leak and catastrophic loss of oil, damaging the engine, and it is only a matter of time before catastrophic failure occurs.

307.   Defendant's conduct proximately caused injuries to Plaintiffs and the Minnesota Subclass Members.

308.   Plaintiffs and the Subclass Members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct, Plaintiffs and the Minnesota Subclass Members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

309.   Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest as their actions offend public policy and are

immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

310.   Pursuant to MINN. STAT. § 8.31(3a), Plaintiffs and the Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

311.   Plaintiffs and the Class also seek punitive damages under MINN. STAT. § 549.20(1)(a) given the clear and convincing evidence that GM's acts show deliberate disregard for the rights of others.

## COUNT III

## FRAUDULENT CONCEALMENT (BASED ON MINNESOTA LAW)

312.   Plaintiffs incorporate by reference all allegations as though fully set forth herein.

313.   Plaintiffs bring this count individually and on behalf of the Nationwide Class or, in the alternative, on behalf of the Minnesota State Subclass, against Defendant GM.

314.   The law of fraudulent concealment is substantially similar in each state such that this claim can be brought nationwide based upon the common law in each state.

315.   As set forth above, Plaintiffs and the putative Class have suffered from a defect that existed in the Class Vehicles at the time of purchase.

316.   GM intentionally concealed that the Class Vehicles are defective.

317.   As alleged above, GM further affirmatively misrepresented to Plaintiffs, in advertising and other forms of communication, including standard and uniform material provided with each Class Vehicle and on its website, that the Class Vehicles they were selling had no significant defects, that the Class Vehicles were safe, reliable, durable, and of high quality, and that the Class Vehicles would perform and operate in a safe manner.

318.   Defendant knew about the defect in the Class Vehicles when these representations were made.

319.   The Class Vehicles purchased by Plaintiffs and Class Members contained defective PCV systems.

320.   Defendant had a duty to disclose that the Class Vehicles contained a fundamental defect, as alleged herein, because Plaintiffs and Class Members relied on Defendant's material representations.

321.   As alleged herein, at all relevant times, Defendant has held out the Class Vehicles to be free from defects such as the PCV system defect. Defendant touted and continues to tout the many benefits and advantages of the Class Vehicles, but nonetheless failed to disclose important facts related to the defect. This made Defendant's other disclosures about the Class Vehicles deceptive.

322.   The truth about the defective Class Vehicles was known only to Defendant; Plaintiffs and Class Members did not know of these facts and Defendant actively concealed these facts from Plaintiffs and Class Members.

323.   Plaintiffs and Class Members reasonably relied upon Defendant's deception. They had no way of knowing that Defendant's representations were false, misleading, or incomplete. As consumers, Plaintiffs and Class Members did not, and could not, unravel Defendant's deception on their own. Rather, Defendant intended to deceive Plaintiffs and Class Members by concealing the true facts about the presence of a defect in the Class Vehicles.

324.   Defendant's false representations and omissions were material to consumers because they concerned the safety and durability of the Class Vehicles, which played a significant role in the value of the Class Vehicles.

325.   Defendant had a duty to disclose the PCV system defect with respect to the Class Vehicles, as well as the lack of a remedy, because it concerned the safety and durability of the Class Vehicles, the details of the true facts were known and/or accessible only to Defendant, because Defendant had exclusive knowledge as to such facts, and because Defendant knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members.

326.   Defendant also had a duty to disclose because it made general affirmative representations about the safety and dependability of the Class

Vehicles without telling consumers that the Class Vehicles had a fundamental system defect that would affect the safety, quality, and reliability of the Class Vehicles.

327.   Defendant's disclosures were misleading, deceptive, and incomplete because it failed to inform consumers of the additional facts regarding the PCV system defect and recall as set forth herein. These omitted and concealed facts were material because they directly impact the safety and value of the Class Vehicles purchased by Plaintiffs and Class Members.

328.   Defendant has still not made full and adequate disclosures and continues to defraud Plaintiffs and Class Members by concealing material information regarding the defect and recall of the Class Vehicles.

329.   Plaintiffs and Class Members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts in that they would not have purchased or paid as much for the Class Vehicles with the PCV system defect, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class Members' actions were justified. Defendant was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class Members.

330.   Because of the concealment and/or suppression of facts, Plaintiffs and Class Members sustained damage because they own Class Vehicles that are diminished in value as a result of Defendant's concealment of the true safety and quality of the Class Vehicles. Had Plaintiffs and Class Members been aware of the PCV system defect, and Defendant's disregard for the truth, Plaintiffs and Class Members would have paid less for their Class Vehicles or would not have purchased them at all.

331.   The value of Plaintiffs' and Class Members' Class Vehicles have diminished as a result of Defendant's fraudulent concealment of the PCV system defect, which has made any reasonable consumer reluctant to purchase a Class Vehicle, let alone pay what otherwise would have been fair market value for the Class Vehicle.

332.   Accordingly, Defendant is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

333.   Defendant's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and the representations that Defendant made to them, in order to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MINN. STAT. §§ 336.2-314 AND 336.2A-212)

334.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

335.   Plaintiffs bring this Count on behalf of the Minnesota Subclass Members against GM.

336.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Minn. Stat. §§ 336-2-314 and 336-2A-212.

337.   The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the PCV systems were defective as they can lead to catastrophic oil loss, which can cause loss of engine power and expensive vehicle repairs (a condition GM knew would occur prior to the design and sale of the Class Vehicles), thereby causing an increased likelihood of serious injury or death.

338.   Plaintiffs and Minnesota Subclass Members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable

- 123 -

and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable.

339.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Minnesota Subclass Members have been damaged in an amount to be proven at trial.

## COUNT V

## UNJUST ENRICHMENT

340.   Plaintiffs incorporate all paragraphs as though fully set forth herein.

341.   Plaintiffs bring this Count on behalf of the Minnesota Subclass Members against GM.

342.   This claim is pleaded in the alternative to any contract-based claim brought on behalf of Plaintiffs and Minnesota Subclass Members.

343.   As a result of its wrongful and fraudulent acts and omissions, as set forth herein, pertaining to the defects in the PCV system and the Class Vehicles and the concealment thereof, GM charged a higher price for the Class Vehicles than the Class Vehicles' true value and GM, therefore, obtained monies that rightfully belong to Plaintiffs and Minnesota Subclass Members.

344.   GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and Minnesota Subclass Members, who paid a higher price for their vehicles that actually had lower values.

345.   GM has received and retained unjust benefits from the Plaintiffs and Minnesota Subclass Members, and inequity has resulted.

346.   Thus, all Plaintiffs and Minnesota Subclass Members conferred a benefit on GM.

347.   It would be inequitable and unconscionable for GM to retain these wrongfully obtained benefits.

348.   Because GM concealed its fraud and deception, Plaintiffs and Minnesota Subclass Members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

349.   GM knowingly accepted and retained the unjust benefits of its fraudulent conduct.

350.   As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and Minnesota Subclass Members in an amount to be proven at trial. Plaintiffs and Minnesota Subclass Members, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

011080-11/1873557 V1

E.    **Claims brought on behalf of the New York Subclass**

## COUNT I

### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
### (N.Y. GEN. BUS. LAW § 349)

351.   Plaintiffs (for purposes of all New York Subclass Member Counts) incorporate by reference all paragraphs as though fully set forth herein.

352.   Plaintiffs bring this Count on behalf of the New York Subclass Members against GM.

353.   Plaintiffs are "persons" within the meaning of New York General Business Law ("New York GBL"). N.Y. Gen. Bus. Law § 349(h).

354.   GM is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

355.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. GM's conduct, as described in this Complaint, constitutes "deceptive acts or practices" within the meaning of New York GBL.

356.   GM's actions as set forth herein occurred in the conduct of trade or commerce. All of GM's deceptive acts or practices, which were intended to mislead consumers in a material way in the process of purchasing or leasing Class Vehicles, was conduct directed at consumers and "consumer-oriented." Further,

- 126 -

Plaintiffs and other Class members suffered injury as a result of the deceptive act or practice.

357.   In the course of Defendant's business, it willfully failed to disclose and actively concealed that the PCV system was defective, such that normal use of the Class Vehicles could cause engine damage. Particularly in light of Defendant's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be durable. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission in connection with the sale of the Class Vehicles.

358.   In purchasing or leasing the Class Vehicles, Plaintiffs and the New York Subclass Members were deceived by Defendant's failure to disclose that normal use of the Class Vehicles could lead to catastrophic oil loss and engine damage.

359.   Plaintiffs and New York Subclass Members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and the New York Subclass Members did not, and could not, unravel Defendant's

deception on their own as the Class Vehicle's PCV system is an internal part in the Class Vehicles and Plaintiffs were not aware of the defective nature of the PCV system prior to purchase or lease.

360. Defendant's actions as set forth above occurred in the conduct of trade or commerce.

361. Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to, and did in fact, deceive reasonable consumers.

362. Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the New York Subclass Members.

363. Defendant knew or should have known that its conduct violated the New York law regarding unfair or deceptive acts in trade or commerce.

364. Defendant owed Plaintiffs and New York Subclass Members a duty to disclose the truth about the PCV system defect because Defendant:

    a.    Possessed exclusive knowledge of the design of the Class Vehicles and the tendency of the PCV system to become plugged, including warranty claims relating to plugged PCV systems and resulting oil seal leaks;

    b.    Intentionally concealed the foregoing from Plaintiffs and the New York Subclass Members; and/or

- 128 -

c. Made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the New York Subclass Members that contradicted these representations.

365. Due to its specific and superior knowledge that the PCV systems in the Class Vehicles can crack, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and New York Subclass Members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and New York Subclass Members that the PCV systems were defective, that Class Vehicles do not have the expected durability over other vehicles or of their namesake predecessor engines, that failure of the PCV system will cause damage to Class Vehicles' engines and engine systems and could pose a safety hazard due to unexpected loss of engine power, and that Class Members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and New York Subclass Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and New York Subclass Members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and New York Subclass Members that

- 129 -

they were purchasing or leasing vehicles that were free from defect, when in fact a plugged PCV system could lead to a rear seal leak and catastrophic loss of oil, damaging the engine, and it is only a matter of time before catastrophic failure occurs.

366.   Defendant's conduct proximately caused injuries to Plaintiffs and the New York Subclass Members.

367.   Plaintiffs and the Subclass Members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct, Plaintiffs and the New York Subclass Members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

368.   Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest as their actions offend public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

369.   Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiffs and the Class seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for GM's willful and knowing violation of N.Y.

- 130 -

Gen. Bus. Law § 349. Plaintiffs and New York Class members also seek attorneys'
fees, an order enjoining GM's deceptive conduct, and any other just and proper
relief available under the New York GBL.

## COUNT II

### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
### (N.Y. GEN. BUS. LAW § 350)

370.    Plaintiffs incorporate by reference all paragraphs as though fully set
forth herein.

371.    Plaintiffs bring this Count on behalf of the New York Class members.

372.    GM was engaged in the "conduct of business, trade or commerce"
within the meaning of the New York's General Business Law § 350.

373.    New York's General Business Law § 350 makes unlawful "[f]alse
advertising in the conduct of any business, trade or commerce[.]" False advertising
includes "advertising, including labeling, of a commodity … if such advertising
fails to reveal facts material in the light of … representations [made] with respect
to the commodity." N.Y. Gen. Bus. Law § 350-a. GM caused to be made or
disseminated throughout New York, through advertising, marketing, and other
publications, statements that were untrue or misleading, and which were known, or
which by the exercise of reasonable care should have been known to GM, to be
untrue and misleading to consumers, including Plaintiffs and other Class members.

374.   GM has violated N.Y. Gen. Bus. Law § 350 because of the misrepresentations and omissions alleged herein, including, but not limited to, GM's failure to disclose the PCV freezing defect.

375.   In purchasing or leasing the Class Vehicles, Plaintiffs and the New York Subclass Members were deceived by Defendant's failure to disclose that normal use of the Class Vehicles could lead to catastrophic oil loss and engine damage.

376.   Plaintiffs and New York Subclass Members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and the New York Subclass Members did not, and could not, unravel Defendant's deception on their own as the Class Vehicle's PCV system is an internal part in the Class Vehicles and Plaintiffs were not aware of the defective nature of the PCV system prior to purchase or lease.

377.   Defendant's actions as set forth above occurred in the conduct of trade or commerce.

378.   Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to, and did in fact, deceive reasonable consumers.

011080-11/1873557 V1

379.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the New York Subclass Members.

380.   Defendant knew or should have known that its conduct violated the New York law regarding unfair or deceptive acts in trade or commerce.

381.   Defendant owed Plaintiffs and New York Subclass Members a duty to disclose the truth about the PCV system defect because Defendant:

a.     Possessed exclusive knowledge of the design of the Class Vehicles and the tendency of the PCV system to become plugged, including warranty claims relating to plugged PCV systems and resulting oil seal leaks;

b.     Intentionally concealed the foregoing from Plaintiffs and the New York Subclass Members; and/or

c.     Made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the New York Subclass Members that contradicted these representations.

382.   Due to its specific and superior knowledge that the PCV systems in the Class Vehicles can crack, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and New York Subclass Members' reliance on these material representations, GM had a duty to disclose to Plaintiffs

and New York Subclass Members that the PCV systems were defective, that Class

Vehicles do not have the expected durability over other vehicles or of their

namesake predecessor engines, that failure of the PCV system will cause damage

to Class Vehicles' engines and engine systems and could pose a safety hazard due

to unexpected loss of engine power, and that Class Members would be required to

bear the cost of the damage to their vehicles. Having volunteered to provide

information to Plaintiffs and New York Subclass Members, GM had the duty to

disclose not just the partial truth, but the entire truth. These omitted and concealed

facts were material because they directly impact the value of the Class Vehicles

purchased or leased by Plaintiffs and New York Subclass Members. Longevity,

durability, performance, and safety are material concerns to diesel truck

consumers. GM represented to Plaintiffs and New York Subclass Members that

they were purchasing or leasing vehicles that were free from defect, when in fact a

plugged PCV system could lead to a rear seal leak and catastrophic loss of oil,

damaging the engine, and it is only a matter of time before catastrophic failure

occurs.

383.   Defendant's conduct proximately caused injuries to Plaintiffs and the

New York Subclass Members.

384.   Plaintiffs and the Subclass Members were injured and suffered

ascertainable loss, injury in fact, and/or actual damage as a proximate result of

Defendant's conduct, Plaintiffs and the New York Subclass Members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

385.   Plaintiffs and the Class are entitled to recover their actual damages or $500, whichever is greater. Because GM acted willfully or knowingly, Plaintiffs and other Class members are entitled to recover three times actual damages, up to $10,000.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON NEW YORK LAW)

386.   Plaintiffs incorporate by reference all allegations as though fully set forth herein.

387.   Plaintiffs bring this count individually and on behalf of the Nationwide Class or, in the alternative, on behalf of the New York State Subclass, against Defendant GM.

388.   The law of fraudulent concealment is substantially similar in each state such that this claim can be brought nationwide based upon the common law in each state.

389.   As set forth above, Plaintiffs and the putative Class have suffered from a defect that existed in the Class Vehicles at the time of purchase.

- 135 -

390.   GM intentionally concealed that the Class Vehicles are defective.

391.   As alleged above, GM further affirmatively misrepresented to Plaintiffs, in advertising and other forms of communication, including standard and uniform material provided with each Class Vehicle and on its website, that the Class Vehicles they were selling had no significant defects, that the Class Vehicles were safe, reliable, durable, and of high quality, and that the Class Vehicles would perform and operate in a safe manner.

392.   Defendant knew about the defect in the Class Vehicles when these representations were made.

393.   The Class Vehicles purchased by Plaintiffs and Class Members contained defective PCV systems.

394.   Defendant had a duty to disclose that the Class Vehicles contained a fundamental defect, as alleged herein, because Plaintiffs and Class Members relied on Defendant's material representations.

395.   As alleged herein, at all relevant times, Defendant has held out the Class Vehicles to be free from defects such as the PCV system defect. Defendant touted and continues to tout the many benefits and advantages of the Class Vehicles, but nonetheless failed to disclose important facts related to the defect. This made Defendant's other disclosures about the Class Vehicles deceptive.

- 136 -

396.   The truth about the defective Class Vehicles was known only to Defendant; Plaintiffs and Class Members did not know of these facts and Defendant actively concealed these facts from Plaintiffs and Class Members.

397.   Plaintiffs and Class Members reasonably relied upon Defendant's deception. They had no way of knowing that Defendant's representations were false, misleading, or incomplete. As consumers, Plaintiffs and Class Members did not, and could not, unravel Defendant's deception on their own. Rather, Defendant intended to deceive Plaintiffs and Class Members by concealing the true facts about the presence of a defect in the Class Vehicles.

398.   Defendant's false representations and omissions were material to consumers because they concerned the safety and durability of the Class Vehicles, which played a significant role in the value of the Class Vehicles.

399.   Defendant had a duty to disclose the PCV system defect with respect to the Class Vehicles, as well as the lack of a remedy, because it concerned the safety and durability of the Class Vehicles, the details of the true facts were known and/or accessible only to Defendant, because Defendant had exclusive knowledge as to such facts, and because Defendant knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members.

400.   Defendant also had a duty to disclose because it made general affirmative representations about the safety and dependability of the Class

Vehicles without telling consumers that the Class Vehicles had a fundamental system defect that would affect the safety, quality, and reliability of the Class Vehicles.

401.   Defendant's disclosures were misleading, deceptive, and incomplete because it failed to inform consumers of the additional facts regarding the PCV system defect and recall as set forth herein. These omitted and concealed facts were material because they directly impact the safety and value of the Class Vehicles purchased by Plaintiffs and Class Members.

402.   Defendant has still not made full and adequate disclosures and continues to defraud Plaintiffs and Class Members by concealing material information regarding the defect and recall of the Class Vehicles.

403.   Plaintiffs and Class Members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts in that they would not have purchased or paid as much for the Class Vehicles with the PCV system defect, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class Members' actions were justified. Defendant was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class Members.

404. Because of the concealment and/or suppression of facts, Plaintiffs and Class Members sustained damage because they own Class Vehicles that are diminished in value as a result of Defendant's concealment of the true safety and quality of the Class Vehicles. Had Plaintiffs and Class Members been aware of the PCV system defect, and Defendant's disregard for the truth, Plaintiffs and Class Members would have paid less for their Class Vehicles or would not have purchased them at all.

405. The value of Plaintiffs' and Class Members' Class Vehicles have diminished as a result of Defendant's fraudulent concealment of the PCV system defect, which has made any reasonable consumer reluctant to purchase a Class Vehicle, let alone pay what otherwise would have been fair market value for the Class Vehicle.

406. Accordingly, Defendant is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

407. Defendant's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and the representations that Defendant made to them, in order to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

011080-11/1873557 V1

## COUNT IV

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.Y. U.C.C. § 2-314)

408.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

409.   Plaintiffs bring this Count on behalf of the New York Subclass Members against GM.

410.   GM is a merchant with respect to motor vehicles within the meaning under N.Y. U.C.C. § 2-314.

411.   Under N.Y. U.C.C. § 2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

412.   The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the PCV systems were defective as they can lead to catastrophic oil loss, which can cause loss of engine power and expensive vehicle repairs (a condition GM knew would occur prior to the design and sale of the Class Vehicles), thereby causing an increased likelihood of serious injury or death.

413.   Plaintiffs and New York Subclass Members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable.

414.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and New York Subclass Members have been damaged in an amount to be proven at trial.

## COUNT V

## UNJUST ENRICHMENT

415.   Plaintiffs incorporate all paragraphs as though fully set forth herein.

416.   Plaintiffs bring this Count on behalf of the New York Subclass Members against GM.

417.   This claim is pleaded in the alternative to any contract-based claim brought on behalf of Plaintiffs and New York Subclass Members.

418.   As a result of its wrongful and fraudulent acts and omissions, as set forth herein, pertaining to the defects in the PCV system and the Class Vehicles

and the concealment thereof, GM charged a higher price for the Class Vehicles than the Class Vehicles' true value and GM, therefore, obtained monies that rightfully belong to Plaintiffs and New York Subclass Members.

419.   GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and New York Subclass Members, who paid a higher price for their vehicles that actually had lower values.

420.   GM has received and retained unjust benefits from the Plaintiffs and New York Subclass Members, and inequity has resulted.

421.   Thus, all Plaintiffs and New York Subclass Members conferred a benefit on GM.

422.   It would be inequitable and unconscionable for GM to retain these wrongfully obtained benefits.

423.   Because GM concealed its fraud and deception, Plaintiffs and New York Subclass Members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

424.   GM knowingly accepted and retained the unjust benefits of its fraudulent conduct.

425.   As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and New York Subclass Members in an amount to be proven at trial. Plaintiffs and New York Subclass Members,

therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

**F.    Claims brought on behalf of the Wisconsin Subclass**

**COUNT I**

**VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT (WIS. STAT. § 110.18, *ET SEQ.*)**

426.   Plaintiffs (for purposes of all Wisconsin Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

427.   Plaintiffs bring this Count on behalf of the Wisconsin Class members.

428.   GM is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

429.   Plaintiffs and other Class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1).

430.   Plaintiffs and other Class Members purchased or leased one or more Class Vehicles. Class Vehicles and the defective PCV system installed in them are "merchandise" within the meaning of Wis. Stat. § 100.18(1).

431.   The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits an "assertion, representation or statement of facts which is untrue, deceptive, or misleading." Wis. Stat. § 100.18(1). By systematically concealing the defects in the Class Vehicles, GM's conduct, acts, and practices violated the Wisconsin DTPA.

- 143 -

432.   In the course of Defendant's business, it willfully failed to disclose and actively concealed that the PCV system was defective, such that normal use of the Class Vehicles could cause engine damage. Particularly in light of Defendant's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be durable. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission in connection with the sale of the Class Vehicles.

433.   In purchasing or leasing the Class Vehicles, Plaintiffs and the Wisconsin Subclass Members were deceived by Defendant's failure to disclose that normal use of the Class Vehicles could lead to catastrophic oil loss and engine damage.

434.   Plaintiffs and Wisconsin Subclass Members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and the Wisconsin Subclass Members did not, and could not, unravel Defendant's deception on their own as the Class Vehicle's PCV system is an internal part in the

Class Vehicles and Plaintiffs were not aware of the defective nature of the PCV system prior to purchase or lease.

435.   Defendant's actions as set forth above occurred in the conduct of trade or commerce.

436.   Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to, and did in fact, deceive reasonable consumers.

437.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Wisconsin Subclass Members.

438.   Defendant knew or should have known that its conduct violated the Wisconsin law regarding unfair or deceptive acts in trade or commerce.

439.   Defendant owed Plaintiffs and Wisconsin Subclass Members a duty to disclose the truth about the PCV system defect because Defendant:

      a.   Possessed exclusive knowledge of the design of the Class Vehicles and the tendency of the PCV system to become plugged, including warranty claims relating to plugged PCV systems and resulting oil seal leaks;

      b.   Intentionally concealed the foregoing from Plaintiffs and the Wisconsin Subclass Members; and/or

- 145 -

c.      Made incomplete representations regarding the quality and

durability of the Class Vehicles, while purposefully withholding material facts

from Plaintiffs and the Wisconsin Subclass Members that contradicted these

representations.

440.   Due to its specific and superior knowledge that the PCV systems in

the Class Vehicles can crack, its false representations regarding the increased

durability of the Class Vehicles, and Plaintiffs' and Wisconsin Subclass Members'

reliance on these material representations, GM had a duty to disclose to Plaintiffs

and Wisconsin Subclass Members that the PCV systems were defective, that Class

Vehicles do not have the expected durability over other vehicles or of their

namesake predecessor engines, that failure of the PCV system will cause damage

to Class Vehicles' engines and engine systems and could pose a safety hazard due

to unexpected loss of engine power, and that Class Members would be required to

bear the cost of the damage to their vehicles. Having volunteered to provide

information to Plaintiffs and Wisconsin Subclass Members, GM had the duty to

disclose not just the partial truth, but the entire truth. These omitted and concealed

facts were material because they directly impact the value of the Class Vehicles

purchased or leased by Plaintiffs and Wisconsin Subclass Members. Longevity,

durability, performance, and safety are material concerns to diesel truck

consumers. GM represented to Plaintiffs and Wisconsin Subclass Members that

011080-11/1873557 V1

they were purchasing or leasing vehicles that were free from defect, when in fact a plugged PCV system could lead to a rear seal leak and catastrophic loss of oil, damaging the engine, and it is only a matter of time before catastrophic failure occurs.

441.   Defendant's conduct proximately caused injuries to Plaintiffs and the Wisconsin Subclass Members.

442.   Plaintiffs and the Subclass Members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct, Plaintiffs and the Wisconsin Subclass Members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

443.   Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest as their actions offend public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

444.   Plaintiffs and the Wisconsin Class members seek actual damages, court costs, attorneys' fees and other relief provided for under Wis. Stat. 100.18(11)(b)(2). Because GM's conduct was committed knowingly and/or

intentionally, Plaintiffs and the Class members are entitled to treble damages and any other such relief necessary to deter GM's unlawful conduct in the future.

## COUNT II

## FRAUDULENT CONCEALMENT (BASED ON WISCONSIN LAW)

445.   Plaintiffs incorporate by reference all allegations as though fully set forth herein.

446.   Plaintiffs bring this count individually and on behalf of the Nationwide Class or, in the alternative, on behalf of the Wisconsin State Subclass, against Defendant GM.

447.   The law of fraudulent concealment is substantially similar in each state such that this claim can be brought nationwide based upon the common law in each state.

448.   As set forth above, Plaintiffs and the putative Class have suffered from a defect that existed in the Class Vehicles at the time of purchase.

449.   GM intentionally concealed that the Class Vehicles are defective. As alleged above, GM further affirmatively misrepresented to Plaintiffs, in advertising and other forms of communication, including standard and uniform material provided with each Class Vehicle and on its website, that the Class Vehicles they were selling had no significant defects, that the Class Vehicles were safe, reliable,

durable, and of high quality, and that the Class Vehicles would perform and operate in a safe manner.

450. Defendant knew about the defect in the Class Vehicles when these representations were made.

451. The Class Vehicles purchased by Plaintiffs and Class Members contained defective PCV systems.

452. Defendant had a duty to disclose that the Class Vehicles contained a fundamental defect, as alleged herein, because Plaintiffs and Class Members relied on Defendant's material representations.

453. As alleged herein, at all relevant times, Defendant has held out the Class Vehicles to be free from defects such as the PCV system defect. Defendant touted and continues to tout the many benefits and advantages of the Class Vehicles, but nonetheless failed to disclose important facts related to the defect. This made Defendant's other disclosures about the Class Vehicles deceptive.

454. The truth about the defective Class Vehicles was known only to Defendant; Plaintiffs and Class Members did not know of these facts and Defendant actively concealed these facts from Plaintiffs and Class Members. Plaintiffs and Class Members reasonably relied upon Defendant's deception. They had no way of knowing that Defendant's representations were false, misleading, or incomplete. As consumers, Plaintiffs and Class Members did not, and could not,

- 149 -

unravel Defendant's deception on their own. Rather, Defendant intended to deceive Plaintiffs and Class Members by concealing the true facts about the presence of a defect in the Class Vehicles.

455.   Defendant's false representations and omissions were material to consumers because they concerned the safety and durability of the Class Vehicles, which played a significant role in the value of the Class Vehicles.

456.   Defendant had a duty to disclose the PCV system defect with respect to the Class Vehicles, as well as the lack of a remedy, because it concerned the safety and durability of the Class Vehicles, the details of the true facts were known and/or accessible only to Defendant, because Defendant had exclusive knowledge as to such facts, and because Defendant knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members.

457.   Defendant also had a duty to disclose because it made general affirmative representations about the safety and dependability of the Class Vehicles without telling consumers that the Class Vehicles had a fundamental system defect that would affect the safety, quality, and reliability of the Class Vehicles.

458.   Defendant's disclosures were misleading, deceptive, and incomplete because it failed to inform consumers of the additional facts regarding the PCV system defect and recall as set forth herein. These omitted and concealed facts

- 150 -

were material because they directly impact the safety and value of the Class

Vehicles purchased by Plaintiffs and Class Members.

459. Defendant has still not made full and adequate disclosures and

continues to defraud Plaintiffs and Class Members by concealing material

information regarding the defect and recall of the Class Vehicles. Plaintiffs and

Class Members were unaware of the omitted material facts referenced herein, and

they would not have acted as they did if they had known of the concealed and/or

suppressed facts in that they would not have purchased or paid as much for the

Class Vehicles with the PCV system defect, and/or would have taken other

affirmative steps in light of the information concealed from them. Plaintiffs' and

Class Members' actions were justified. Defendant was in exclusive control of the

material facts, and such facts were not generally known to the public, Plaintiffs, or

Class Members.

460. Because of the concealment and/or suppression of facts, Plaintiffs and

Class Members sustained damage because they own Class Vehicles that are

diminished in value as a result of Defendant's concealment of the true safety and

quality of the Class Vehicles. Had Plaintiffs and Class Members been aware of the

PCV system defect, and Defendant's disregard for the truth, Plaintiffs and Class

Members would have paid less for their Class Vehicles or would not have

purchased them at all.

461.   The value of Plaintiffs' and Class Members' Class Vehicles have diminished as a result of Defendant's fraudulent concealment of the PCV system defect, which has made any reasonable consumer reluctant to purchase a Class Vehicle, let alone pay what otherwise would have been fair market value for the Class Vehicle.

462.   Accordingly, Defendant is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

463.   Defendant's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and the representations that Defendant made to them, in order to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (WIS. STAT. §§ 402.314 AND 411.212)

464.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

465.   Plaintiffs bring this Count on behalf of the Wisconsin Subclass Members against GM.

466.   GM was a "merchant" with respect to motor vehicles under Wis. Stat. §§ 402.104(3) and 411.103(1)(t), and "seller" of motor vehicles under § 402.103(1)(d).

467.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Wis. Stat. § 411.103(1)(p).

468.   All Class members who purchased a Class Vehicle in Wisconsin are "buyers" within the meaning of Wis. Stat. § 402.103(1)(a).

469.   All Class members who leased a Class Vehicle in Wisconsin are "lessees" within the meaning of Wis. Stat. § 411.103(1)(n).

470.   The Class Vehicles were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

471.   Under Wis. Stat. §§ 402.314 and 411.212, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and Wisconsin Subclass Members purchased or leased their Class Vehicles from GM.

472.   The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the PCV systems were defective as they can lead to catastrophic oil loss, which can cause loss of engine power and expensive vehicle repairs (a condition GM knew would occur prior to the design and sale of

the Class Vehicles), thereby causing an increased likelihood of serious injury or death.

473.   Plaintiffs and Wisconsin Subclass Members did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Subclass. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable.

474.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Wisconsin Subclass Members have been damaged in an amount to be proven at trial.

## COUNT IV

## UNJUST ENRICHMENT

475.   Plaintiffs incorporate all paragraphs as though fully set forth herein.

476.   Plaintiffs bring this Count on behalf of the Wisconsin Subclass Members against GM.

477.   This claim is pleaded in the alternative to any contract-based claim brought on behalf of Plaintiffs and Wisconsin Subclass Members.

- 154 -

478.    As a result of its wrongful and fraudulent acts and omissions, as set forth herein, pertaining to the defects in the PCV system and the Class Vehicles and the concealment thereof, GM charged a higher price for the Class Vehicles than the Class Vehicles' true value and GM, therefore, obtained monies that rightfully belong to Plaintiffs and Wisconsin Subclass Members.

479.    GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and Wisconsin Subclass Members, who paid a higher price for their vehicles that actually had lower values.

480.    GM has received and retained unjust benefits from the Plaintiffs and Wisconsin Subclass Members, and inequity has resulted.

481.    Thus, all Plaintiffs and Wisconsin Subclass Members conferred a benefit on GM.

482.    It would be inequitable and unconscionable for GM to retain these wrongfully obtained benefits.

483.    Because GM concealed its fraud and deception, Plaintiffs and Wisconsin Subclass Members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

484.    GM knowingly accepted and retained the unjust benefits of its fraudulent conduct.

485.   As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and Wisconsin Subclass Members in an amount to be proven at trial. Plaintiffs and Wisconsin Subclass Members, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

## PRAYER FOR RELIEF

486.   WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and Subclasses respectfully request that the Court enter judgment in his/her/their favor and against GM as follows:

A.      Certification of the proposed Nationwide Class and Massachusetts, Michigan, Minnesota, New York, and Wisconsin Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B.      An order temporarily and permanently enjoining GM from continuing unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.      Injunctive relief in the form of a vehicle recall, free replacement, or buy-back program;

D.      An order establishing GM as a constructive trustee over profits wrongfully obtained, plus interest;

011080-11/1873557 V1

E.      Costs, restitution, damages, including punitive damages, exemplary damages, and treble damages, and disgorgement in an amount to be determined at trial;

F.      An order requiring GM to pay both pre- and post-judgment interest on any amounts awarded;

G.      Rescission of all Class Vehicle purchases or leases, including reimbursement and/or compensation of the full purchase price of all Class Vehicles, including taxes, licenses, and other fees;

H.      An order requiring GM's disgorgement of all profits wrongfully received;

I.      A determination that Defendant is financially responsible for all Class notice and administration of Class relief;

J.      Any and all applicable statutory and civil penalties;

K.      An award of costs and attorneys' fees;

L.      Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

M.      Such other or further relief as the Court may deem appropriate, just, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

- 157 -

Dated:  April 12, 2022       Respectfully submitted,

THE MILLER LAW FIRM PC

By   */s/ E. Powell Miller*
      E. POWELL MILLER (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
950 W. University Dr., Ste. 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile:  (248) 652-2852
Email:  epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

Steve W. Berman
Jerrod C. Patterson
Anthea D. Grivas
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email:  steve@hbsslaw.com
jerrodp@hbsslaw.com
antheag@hbsslaw.com

*Attorneys for Plaintiffs*