UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELISSA KIRIACOPOULOS, et al.,

                                                     Civil Case No. 22-10785

       Plaintiffs,

vs.                                         HON. MARK A. GOLDSMITH

GENERAL MOTORS LLC,

       Defendant.

_____/

## OPINION & ORDER
### (1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS (Dkt. 30) AND (2) GRANTING DEFENDANT'S MOTION TO FILE NOTICE OF SUPPLEMENTAL AUTHORITY (Dkt. 38)

Before the Court is Defendant General Motors LLC's (GM's) motion to dismiss Plaintiffs' putative class action. For the reasons that follow, the Court grants GM's motion in part and denies GM's motion in part.[1]

## I. BACKGROUND

Plaintiffs purport to bring this class action under federal law and the laws of six states asserting a defect in the engines of certain GM vehicles. Their claims spring from GM's alleged knowledge of this defect, and its omissions and misrepresentations regarding the same.

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to GM's motion, the briefing includes Plaintiffs' response (Dkt. 34) and GM's reply (Dkt. 37). The Court also grants GM's motion for leave to file a notice of supplemental authority (Dkt. 38), and it takes into consideration the authorities identified in that filing.

### A.  Alleged Defect

Plaintiffs allege that the 2.4L internal combustion engine of certain GM vehicles contains a defective positive crank ventilation (PCV) system.  Am. Compl. ¶ 1 (Dkt. 22).[2]  The PCV system plays a role in regulating the amount of air and gas that is pumped through the engine.  Id.  The PCV system contains a fixed orifice that can become plugged with ice, sludge, and water during operation of the vehicle in cold weather.  Id. ¶ 114.  Plaintiffs submit that the plugging may increase pressure in the crankshaft, causing the engine's rear main seal to rupture.  Id. ¶¶ 1, 115.  In Plaintiffs' view, this rupture may lead to oil loss, power loss, and permanent damage to the engine. Id.

### B.  Plaintiffs

Plaintiffs consist of nine individuals who purchased vehicles allegedly affected by the defect in the states of Massachusetts, Minnesota, Michigan, New York, Wisconsin, and Illinois. Id. ¶ 7.  Plaintiffs allege that they purchased the GM vehicles at issue "because they reasonably relied upon GM's claims touting the Class Vehicles as free of defect and as durable and reliable, with no reference to the PCV defect," through "media marketing campaigns and other forms of advertisement."  Id. ¶ 106.

Six Plaintiffs allege that they purchased vehicles from GM-authorized dealerships.  Id. ¶¶ 8, 24, 36, 61, 77, 91.  Alleging that they purchased vehicles from non-GM-affiliated dealerships are Sarah Burns, the only New York Plaintiff, see id. ¶ 50; Wisconsin resident Steve Fiene, who purchased his vehicle in Michigan, id. ¶ 69; and Minnesota Plaintiff Thomas Graham, id. ¶ 85.

---

[2] Specifically, the vehicles at issue are the Buick Lacrosse (including Hybrid and eAssist), model year (MY) 2010–2016; Buick Regal, MY 2011–2017; Buick Verano, MY 2012–2017; Chevrolet Captiva, MY 2010–2015; Chevrolet Equinox, MY 2010–2017; Chevrolet Malibu, MY 2013–2014; and GMC Terrain, MY 2010–2017.  Am. Compl. ¶ 2 n. 2.

### C.  GM Statements in Relation to Alleged Defect

GM regularly issues technical service bulletins (TSBs) to dealerships with information on GM vehicles, and Plaintiffs identify a series of GM bulletins which, in Plaintiffs' view, "acknowledg[e]" that the PCV system was "vulnerable to cold weather."  Id. ¶ 118.  Plaintiffs assert that these TSBs "demonstrate that GM knew about the defect, but did not make any substantive changes to the PCV system," and instead "continued to sell and manufacture vehicles with the defective system up through model year 2017."  Id.  In particular, Plaintiffs point to:

- a February 2013 bulletin titled "PIP5093" identifying complaints of an "'oil leak . . . coming from the rear main oil seal of the engine'" in certain class vehicles that "'may be the result of a frozen PCV system and excessive crankcase pressure,'" and in response to which, technicians could clean out the PCV system, and "'the customer may . . . consider changing their engine oil right before winter starts,'" id. ¶¶ 119–121 (quoting Feb. 2013 Bulletin (Dkt. 22-14));

- a January 2014 bulletin superseding the PIP5093 bulletin and expanding the vehicles impacted, also recommending that customers consider changing their oil before winter and advising that technicians clean out the PCV system using a 1/16 inch drill bit, id. ¶¶ 122–124 (citing Jan. 2014 Bulletin (Dkt. 22-15));

- a January 2016 update to the PIP5093 bulletin again expanding the list of vehicles affected, id. ¶¶ 125–126 (citing Jan. 2016 Bulletin (Dkt. 22-18));

- a January 2019 update to the PIP5093 bulletin, also expanding the vehicles affected, id. ¶¶ 127–128 (citing Jan. 2019 Bulletin (Dkt. 22-19)); and

- a February 2019 update to the PIP5093 bulletin, identified as a "diagnostic tip," continuing to recommend the use of a drill bit to clear the PCV orifice, id. ¶¶ 3, 129 (citing Feb. 2019 Bulletin (Dkt. 22-23)).

Plaintiffs emphasize that these bulletins failed to identify the risk of loss of motor power, recommended only a stop-gap solution, and communicated the issue only to dealers rather than directly to customers.  See id. ¶¶ 118, 121–129.  GM submits that only the February 2019 update identifies and applies to all proposed class vehicles, Br. in Supp. Mot. at 4–6, though each of the bulletins covers at least some of the vehicles Plaintiffs allege are affected by the PCV defect.

Plaintiffs also allege that GM made affirmative misrepresentations when it touted the reliability, safety, and high quality of its vehicles in advertisements, public statements, and other media.  See, e.g., Am. Compl. ¶¶ 157–165, 205, 214.

### D.  Basis for GM's Earlier Knowledge of Alleged Defect

Plaintiffs further allege that "GM has known since at least 1985 of the PCV system's vulnerability to cold weather and clogging, as it has repeatedly advised dealers (but not customers) on how to attempt to address the problem."  Id. ¶ 4.  According to Plaintiffs, GM has "continue[d] to conceal this defect from consumers at the point of sale" and to sell vehicles containing the PCV defect.  Id.  Plaintiffs refer to another series of older bulletins:

- a June 1985 bulletin advising Chevrolet dealers of accumulated oil in the PCV systems of newly imported vehicles caused by condensation in cold, damp climates, id. ¶ 131 (citing June 1985 Bulletin (Dkt. 22-10));

- a January 1994 bulletin noting that PCV system hoses could "'freeze-up'" in cold weather and result in oil leaks, id. ¶ 132 (quoting Jan. 1994 Bulletin (Dkt. 22-11));

- a March 2003 bulletin noting a freezing issue in the PCV system that could occur in "'extreme cold weather'" and result in oil leaks, id. ¶¶ 133 (quoting Mar. 2003 Bulletin (Dkt. 22-12));

- a February 2005 bulletin covering certain Chevrolet vehicles and stating that oil leaks could be caused by "'the engine PCV system'" being "'frozen or restricted with ice,'" id. ¶¶ 134–135 (quoting Feb. 2004 Bulletin (Dkt. 22-13));

- a March 2014 bulletin expanding the vehicles impacted by the PCV system's propensity to suffer oil leaks in cold weather, id. ¶ 136 (citing Mar. 2014 Bulletin (Dkt. 22-16)); and

- a March 2015 bulletin identifying an issue in certain models equipped with a 2.4L Ecotec engine that concerned "'a frozen and/or plugged PCV . . . during cold weather operation'" that increased pressure and presented a risk of oil seal leaks and engine damage, id. ¶¶ 137–140 (quoting Mar. 2015 Bulletin (Dkt. 22-2)).

Plaintiffs further allege that GM "must have known" about the alleged defect based on pre-release testing and post-release monitoring data; dealership repair records and warranty claims; consumer complaints made to the National Highway Traffic Safety Administration (NHTSA),

4

several of which Plaintiffs excerpt to demonstrate consumers' issues with loss of power following oil leaks from frozen PCV systems; and other public complaints.  Id. ¶¶ 116–117, 141, 143–150.

## II.  ANALYSIS[3]

Plaintiffs assert claims based in (i) fraud, including fraudulent concealment and violations of state consumer protection acts; (ii) breach of the implied warranty of merchantability and violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq. (MMWA); (iii) breach of contract; and (iv) unjust enrichment.  Am. Compl. ¶¶ 184–524.

Plaintiffs purport to bring this suit as a class action, representing (i) a nationwide class consisting of all persons who purchased or leased a class vehicle from a GM dealer, on whose behalf Plaintiffs assert MMWA and breach of contract claims; and (ii) six state-specific classes—consisting of residents of Illinois, Massachusetts, Michigan, Minnesota, New York, or Wisconsin who purchased or leased a class vehicle in that state—on whose behalf Plaintiffs assert state-specific common law and statutory claims.  Id. ¶¶ 172, 184–524.

The Court proceeds by addressing each category of claims.

### A.  Common Law and Statutory Fraud-Based Claims

Based on GM's alleged omissions and misrepresentations regarding the alleged defect, Plaintiffs assert (i) common law fraudulent concealment claims under Massachusetts, Michigan, Minnesota, New York, and Wisconsin law, id. ¶¶ 210, 247, 279, 352, 426, 485; and (ii) claims under the consumer protection laws of Illinois, Minnesota, New York, and Wisconsin, id. ¶¶ 209–

---

[3] To survive a motion to dismiss, a plaintiff must allege "facts that state a claim to relief that is plausible on its face and that, if accepted as true, are sufficient to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The Court is required to "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007).  The defendant has the burden of showing that the plaintiff has failed to state a claim for relief.  Id.

228, 317–350, 390–424, 465–483.  The Court first considers whether these claims survive the Federal Rule of Civil Procedure 9(b) pleading standard, and it then turns to GM's claim-specific arguments.

### i.  Alleged Omissions Under Rule 9

"In federal court, allegations of fraud must be pleaded with particularity pursuant to Rule 9(b), whether under common law or consumer-protection statutes."  Elliott v. Gen. Motors LLC, 605 F. Supp. 3d 937, 944 (E.D. Mich. 2022).[4]  Under this standard, Plaintiffs alleging fraudulent omission must specify "the who, what, when, where, and how" of the alleged omission.  Republic Bank & Tr. Co. v. Bear Stearns & Co., 683 F.3d 239, 255–256 (6th Cir. 2012) (punctuation modified).  Specifically, Plaintiffs must allege: "(1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [GM] obtained as a consequence of the alleged fraud."  Id. at 256.

The parties dispute the sufficiency of Plaintiffs' pleadings on multiple factors.  For the following reasons, the Court finds that Plaintiffs have adequately pleaded fraudulent omissions under Rule 9.

---

[4] Plaintiffs cite case law from other circuits to argue that Rule 9(b) applies only to common law fraudulent concealment claims, not to statutory claims.  See Br. in Supp. Resp. at 10, 10 n. 5. Under the law of the United States Court of Appeals for the Sixth Circuit, however, the Rule 9(b) standard applies to state statutory fraud claims.  See Smith v. Gen. Motors LLC, 988 F.3d 873, 876 (6th Cir. 2021) (affirming dismissal of claims brought by plaintiffs from 25 states including under consumer protection statutes because "Plaintiffs did not meet their burden" under Rule 9(b)); Elliott, 605 F. Supp. 3d at 944 (applying Rule 9(b) standard to fraudulent concealment claim brought under Virginia Consumer Protection Act).

### a. What Was Omitted and How It Was Misleading

GM asserts that Plaintiffs "have not alleged with particularity precisely what was omitted or the content of the alleged omission."  Br. in Supp. Mot. at 11.  GM states that Plaintiffs have alleged "a small, fixed orifice that is 'prone to plugging and clogging' in extremely cold weather, creating the potential for sudden oil loss from the rear main seal."  Id.  In GM's view, however, the bulletins identified by Plaintiffs do not address main seal leaks caused by a frozen or plugged orifice; rather, they address main seal leaks caused by a "frozen PCV system."  Br. in Supp. Mot. at 11–12 (emphasis added).  GM states: "Plaintiffs never allege what, specifically, GM should have disclosed about that orifice."  Reply at 2.  They suggest that, under Plaintiffs' theory, GM would have to disclose all possible causes of oil leaks directly to consumers.  See Br. in Supp. Mot. at 12–13.

GM presents as a comparable case Sims v. Kia Motors Am., Inc., No. SA-cv-131791AGDFMX, 2014 WL 12558251 (C.D. Cal. Oct. 8, 2014).  See id. at 13.  In that action, the plaintiff alleged that design defects in the fuel system increased "the risk that the gas tank will dislodge and ignite in a major collision."  Sims, 2014 WL 12558251, at *1 (punctuation modified). The court found:

> [B]y alleging that Defendants had a duty to disclose "[t]he gas tank defects described herein," without describing more specifically what Defendants had to disclose, Plaintiffs fail to make clear the specifics of the omission. . . .  The [complaint] never states, for example, whether Defendants might have discharged their duty by disclosing the described design choices (e.g., the use of a plastic fuel pump service cover), whether Defendants also had to disclose that these design choices created certain risks, or whether some other specific disclosure was required.  The lack of precision in the [complaint] leaves Defendants to guess exactly what information [they] was obliged to disclose.

Id. at *4.

Referencing <u>Sims</u>, GM considers it imprecise whether Plaintiffs are "claiming that GM should have disclosed its design choice (the small orifice between the runners), the risks created by this design choice, or something else entirely." Br. in Supp. Mot. at 13.

Plaintiffs respond that the defect articulated by GM is precisely what they allege should have been disclosed. Br. in Supp. Resp. at 10. Plaintiffs assert that they have adequately alleged (i) what was omitted, i.e., the defective PCV system, Am. Compl. ¶ 106; (ii) the contents of the alleged omission, i.e., the PCV system is prone to freezing because of the fixed orifice, <u>id.</u> ¶¶ 114–115; and why it was misleading, i.e., GM advertised safe, durable, reliable cars with superior engines, <u>id.</u> ¶¶ 157–165. <u>See</u> Br. in Supp. Resp. at 11.

As Plaintiffs observe, their pleadings are distinguishable from those in <u>Sims</u>. <u>See</u> Br. in Supp. Mot. at 20 n.11. Plaintiffs here describe in substantial detail the defective nature of the "fixed-orifice design of the PCV system" which they assert that GM should have disclosed. Am. Compl. ¶¶ 114–115. They explain that the omission was misleading because GM customers were led to expect a reliable vehicle with a functioning engine. <u>Id.</u> ¶¶ 157–165.

Plaintiffs note, <u>see</u> Br. in Supp. Mot. at 20 n.11, and the Court agrees, that this case is less like <u>Sims</u> and more like <u>Villanueva v. Am. Honda Motor Co.</u>, No. CV191390MWFMAAX, 2019 WL 8112467 (C.D. Cal. Oct. 10, 2019). That case distinguished <u>Sims</u> and allowed plaintiffs' pleadings to survive a Rule 9 challenge where Plaintiffs "allege[d] that Defendant must disclose that the automated braking systems [were] defective and may malfunction" and "provide[d] an example" in that the systems could "abruptly brake when there is otherwise no risk of a collision." <u>Villanueva</u>, 2019 WL 8112467, at *12. The court determined that, "unlike the proposed description in . . . <u>Sims</u>, the proposed description here does not leave Defendants guessing as to what information [they] was supposed to disclose." <u>Id.</u>

GM does not have to guess here, either.  Plaintiffs have sufficiently alleged what GM omitted and how it was misleading.  See Republic Bank, 683 F.3d at 256.

### b.  When and How Disclosure Should Have Been Made

GM also challenges Plaintiffs' pleadings regarding when and how it should have disclosed the defect.  Plaintiffs allege that GM had the "opportunity" to disclose the defect to them "through its advertising, in owners' manuals, in correspondence sent to [each] Plaintiff and Class Members, through representations by GM dealerships, through vehicle brochures and other informational documents, and on GM's website."  Am. Compl. ¶¶ 10, 26, 38, 52, 63, 71, 79, 87, 93.  They allege that GM knew about the defect before Plaintiffs purchased the affected vehicles.  See, e.g., id. ¶¶ 251–253, 261–263.  Plaintiffs insist that these allegations suffice to assert that GM did not properly disclose the defect.  Br. in Supp. Resp. at 20.  GM—finding it "utterly implausible" that each individual Plaintiff saw and recalled advertisements in which GM made representations regarding their vehicles—asserts that Plaintiffs fail to "allege with particularity how or when this unspecified disclosure should have been made to them."  Br. in Supp. Mot. at 14.

The Court agrees with Plaintiffs that they have carried their burden of pleading the "how" and "when" of the disclosure GM failed to make.  Plaintiffs have suggested a host of media through which GM could have disclosed the defect in its vehicles to people who purchased those vehicles if—as alleged—GM was aware of that defect, including via statements on its website, in its advertisements, and through its authorized dealerships.  These allegations suffice to state a fraudulent omission claim under Rule 9.  See In re Chevrolet Bolt EV Battery Litig., No. 2:20-CV-13256-TGB-CI, 2022 WL 4686974, at *21 (E.D. Mich. Sept. 30, 2022) (denying motion to dismiss as to omission-based fraud claims where Plaintiffs pointed to advertisements for allegedly defective vehicle to identify where disclosure should have been made); Beck v. FCA US LLC, 273

F. Supp. 3d 735, 752 (E.D. Mich. 2017) (finding that plaintiff had adequately pleaded all required factors in omission-based claim against manufacturer FCA, including "the 'when' (from the time the vehicles were first placed on the market . . . to the present day), the 'where' (the various channels through which FCA sold the class vehicles, including the dealership . . . ), and the 'how' (if . . . class members had known of the alleged defect, they would have not purchased or leased the class vehicles, or they would have paid less . . .)").

GM also submits that it properly disclosed the PCV system issue to its dealers and to the NHTSA through its service bulletins, making the relevant information accessible to consumers. See Br. in Supp. Mot. 15–16.  Plaintiffs deny that GM's disclosures to dealerships immunize them from a suit in fraud; they assert that they did not personally receive this information from the dealerships where they purchased their cars, that it is unclear if the dealerships heeded the TSBs or discussed them with customers, and that the TSBs "expressly disavow any intent for customers to rely on them."  Br. in Supp. Resp. at 15.

The Court agrees that GM cannot escape Plaintiffs' plausibly pleaded fraud claims by insisting that it disclosed the relevant issue in a place where Plaintiffs could reasonably claim not to have accessed or relied on it.  GM identifies no case law to the contrary.  It points to Darne v. Ford Motor Co., where the court dismissed a claim for non-disclosure of an alleged car engine design flaw under the North Carolina Deceptive Trade Practices Act (NCUDTPA) because information on the alleged issue was reflected in publicly accessible TSBs.  See Br. in Supp. Mot. 15–16 (citing Darne v. Ford Motor Co., No. 13 C 03594, 2015 WL 9259455, at *11 (N.D. Ill. Dec. 18, 2015)).  But Darne depended on the premise that the NCUDTPA "require[s] a consumer to use reasonable diligence to investigate before imposing a duty on the seller . . . ."  2015 WL 9259455, at *11.  Conversely, Rule 9 does not require that vehicle purchasers investigate every statement

GM made to non-consumers if they have otherwise plausibly pleaded "the manner in which the omission was misleading." Republic Bank, 683 F.3d at 256. Plaintiffs have done so here.

### c. What GM Obtained

Plaintiffs also assert that they have adequately alleged the final factor of their omission claim—i.e., "what was obtained by GM" as a result of its alleged fraud—because Plaintiffs allege that GM gained "substantial profit from the sale of the Class Vehicles." Br. in Supp. Resp. at 11–12 (citing Am. Compl. ¶ 155). GM does not dispute this assertion.

Plaintiffs' pleadings of fraud by omission thus survive Rule 9. See Republic Bank, 683 F.3d at 256.

### ii.    Alleged Misrepresentations Under Rule 9

Plaintiffs also allege that GM made "misrepresentations," and they point the Court to statements made by GM generally touting its vehicles' "safety" and "quality." See Am. Compl. ¶¶ 157–165. For example, Plaintiffs note that marketing materials for one of the allegedly affected vehicles—the 2016 GMC Terrain—asserted that "superior safety features" were a "cornerstone attribute" of the vehicle. Id. ¶ 165. They also submit that advertising and marketing materials for each allegedly affected vehicle broadcasted its safety, reliability, durability, and quality.[5]

GM asserts that these general statements about its vehicles' benefits constitute non-actionable puffery. See Br. in Supp. Mot. at 17. However, statements trumpeting a vehicle's

---

[5] See, e.g., Am. Compl. ¶ 205 (alleging that GM made "affirmative misrepresentations touting the increased durability and performance qualities of the Class Vehicles"); id. ¶ 214 (alleging that GM "misrepresented the safety, quality, functionality, and reliability of the Class Vehicles given the existence of the PCV system defect in them"); id. ("GM further affirmatively misrepresented to Plaintiffs, in advertising and other forms of communication, including standard and uniform material provided with each Class Vehicle and on its website, that the Class Vehicles they were selling had no significant defects, that the Class Vehicles were safe, reliable, durable, and of high quality, and that the Class Vehicles would perform and operate in a safe manner.").

safety can cross the line from puffery to actionable misrepresentation when paired with plausible allegations that manufacturers had actual knowledge of a genuine safety risk.[6]

Plaintiffs have plausibly pleaded that the defect at issue here presented a safety risk to consumers. They allege that the defect is "extremely dangerous," as it "result[s] in a loss of vehicle power and control, engine shut down, and engine destruction." Am. Compl. ¶ 115. They point to examples of "sudden loss of engine power" causing consumers' vehicles to "slow[] completely down without any warning on the dashboard." Id. ¶ 116. These allegations plausibly raise a safety concern. Like the alleged defect in In re Toyota Motor Corp.—featuring "sudden, unintended acceleration"—the defect in this case allegedly affects a driver's ability to control his or her vehicle's speed mid-operation. See 2012 WL 12929769, at *18, *2 (declining to dismiss fraud claim where plaintiffs "allege[d] they were exposed to advertisements claiming that Toyota vehicles were safe and reliable"). Plaintiffs also plausibly allege that GM knew of the defect at the time GM made its statements about the safety of the affected vehicles. See, e.g., Am. Compl. ¶ 118 (asserting that GM knew about defect based on content of TSBs); id. ¶¶ 250–251 (asserting that GM knew about defect in support of fraudulent concealment claim).

---

[6] See In re Takata Airbag Prod. Liab. Litig., 464 F. Supp. 3d 1291, 1298, 1303 (S.D. Fla. 2020) (denying motion to dismiss on fraud claims based on misstatements in regard to allegedly defective airbag which could "cause significant injuries and even death" where defendant, despite superior knowledge of defect, made "incomplete representations about the safety and reliability of their vehicles" including in press releases and brochures); In re Gen. Motors LLC Ignition Switch Litig., 257 F. Supp. 3d 372, 391, 408 (S.D.N.Y. 2017) (denying motion to dismiss on Alabama fraudulent concealment claim where plaintiff (i) alleged defect "caus[ed] moving stalls and disabl[ed] critical safety systems (such as the airbag)," (ii) provided "several specific examples" where "GM made repeated statements concerning the safety of its vehicles," (iii) and alleged that "GM knew of ignition switch-related defects [before plaintiffs' purchases] and (at least arguably) took steps to conceal those defects"); In re Toyota Motor Corp., No. 810ML02151JVSFMOX, 2012 WL 12929769, at *18 (C.D. Cal. May 4, 2012) (denying motion to dismiss on New York statutory fraud claim based on manufacturer's representations that vehicles were "safe and reliable").

Because Plaintiffs not only challenge GM's promotion of its vehicles as generally safe, but also plausibly allege that GM knew its vehicles were impacted by a defect that made its vehicles unsafe, this Court rejects Defendants' puffery argument and declines to dismiss Plaintiffs' claims based on GM's alleged affirmative misrepresentations.

### iii.  Economic Loss Rule Applied to Michigan, Wisconsin, New York, and Massachusetts Fraudulent Concealment Claims

GM argues that the economic loss rule bars recovery for Plaintiffs' common law fraudulent concealment claims in New York, Michigan, Wisconsin, and Massachusetts.  Plaintiffs dispute this argument as to New York and Michigan.[7]

### a.  New York Fraudulent Concealment

GM argues that the New York economic loss rule "bars recovery for damages for purely economic loss related to the failure or malfunction of a product in tort and limits plaintiffs to a recovery sounding in breach of contract or breach of warranty."  Br. in Supp. Mot. at 18 (punctuation modified).  However, "New York's economic loss rule does not bar fraudulent concealment claims."  In re Chevrolet Bolt, 2022 WL 4686974, at *25 (denying motion to dismiss as to these claims); see also In re Gen. Motors LLC Ignition, 257 F. Supp. 3d at 433 ("GM's motion to dismiss the New York Plaintiffs' fraudulent concealment claim on the ground that the [economic loss] doctrine does apply is denied.").  Accordingly, Plaintiffs' New York fraudulent concealment claims survive.

---

[7] As to GM's arguments that Wisconsin and Massachusetts bar Plaintiffs' fraudulent concealment claims, see Br. in Supp. Mot. at 18–20, Plaintiffs concede that the economic loss doctrine bars their claims for economic damages in these jurisdictions, see Br. in Supp. Resp. at 21 n.12. Accordingly, the Court dismisses Plaintiffs' Wisconsin and Massachusetts fraudulent concealment claims.

**b. Michigan Fraudulent Concealment**

Confronted with GM's argument that the economic loss rule bars Plaintiffs' fraudulent concealment claim under Michigan law, Plaintiffs submit that Michigan limits application of the economic loss doctrine to commercial transactions, not sales of products to consumers.  Br. in Supp. Resp. at 21 (citing Republic Ins. Co. v. Broan Mfg. Co., 960 F. Supp. 1247, 1249 (E.D. Mich. 1997) (stating that Michigan's economic loss doctrine "has no application outside the commercial realm" and does not bar tort claims in litigation concerning "'the sale of defective products to individual consumers who are injured in a manner which has [] traditionally been remedied by resort to the law of torts'") (quoting Neibarger v. Universal Cooperatives, Inc., 486 N.W.2d 612, 615 (Mich. 1992))).

Plaintiffs' case law is outdated.  The Michigan Court of Appeals has explained that the argument "that the economic loss doctrine applies only to 'commercial' or 'non-consumer' transactions, is without merit . . . ."  Sherman v. Sea Ray Boats, Inc., 649 N.W.2d 783, 788 (Mich. Ct. App. 2002).  "Michigan courts now routinely follow Sherman and extend the economic loss doctrine to consumer transactions."  In re Takata Airbag Prod. Liab. Litig., No. 14-24009-CV, 2017 WL 2406711, at *4 (S.D. Fla. June 1, 2017) (citing Phillips v. State Farm Ins. Co., No. 328309, 2016 WL 6825460, at *2 (Mich. Ct. App. Nov. 17, 2016) (explaining that economic loss "doctrine applies to consumer, as well as commercial, transactions")).

This doctrine bars Michigan fraud claims where, as here, Plaintiffs challenge the quality and character of goods and seek only economic damages.  See Shaker v. Champion Petfoods USA Inc., No. 18-13603, 2022 WL 4002889, at *7–*8 (E.D. Mich. Sept. 1, 2022) (barring fraudulent misrepresentation and fraudulent concealment claims under Michigan law based on alleged fraud "directly related to the quality and character of the [allegedly defective] dog food" where

14

"Plaintiffs' claim for damages [wa]s purely economic" and featured no allegations that dogs became sick or injured); Est. of Pilgrim v. Gen. Motors LLC, 596 F. Supp. 3d 808, 829–831 (E.D. Mich. 2022) (dismissing Michigan fraud claims based on economic loss doctrine where Plaintiffs alleged no injuries). The Court dismisses Plaintiffs' Michigan fraudulent concealment claim.[8]

### iv.    Illinois Consumer Fraud and Deceptive Business Practices Act

Plaintiffs assert a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (ICFA). Am. Compl. ¶¶ 209–228. "A consumer cannot maintain an action under the Illinois Consumer Fraud Act when the plaintiff does not receive, directly or indirectly, communication or advertising from the defendant." De Bouse v. Bayer, 922 N.E.2d 309, 316 (Ill. 2009). Under this standard, a plaintiff must identify the specific communication on which he or she relied. See Ciszewski v. Denny's Corp., No. 09 C 5355, 2010 WL 2220584, at *1–*2 (N.D. Ill. June 2, 2010) (finding that allegations that plaintiff saw "menu, signage, advertisements, and commercials" that allegedly omitted the information at issue were insufficient under ICFA because they did not allege "with any specificity what information was in those communications and when he received them"); Skeen v. BMW of N. Am., LLC, No. 2:13-CV-

---

[8] Plaintiffs separately cite case law indicating that they view their Michigan fraudulent concealment claim as one brought under the Michigan Consumer Protection Act (MCPA). See Br. in Supp. Resp. at 17 (citing In re Porsche Cars N. Am., Inc., 880 F. Supp. 2d 801, 855–856 (S.D. Ohio 2012)). Plaintiffs never cite the MCPA in their complaint or response. Their statement of their Michigan "fraudulent concealment" claim is almost identical to their statements of all their other fraudulent concealment claims, which are undisputedly brought as common law claims. See, e.g., Am. Compl. at ¶¶ 246–266 (asserting Massachusetts fraudulent concealment claim); id. ¶¶ 278–298 (asserting Michigan fraudulent concealment claim). Accordingly, the Court interprets Plaintiffs' claim as a common law fraudulent concealment claim, and it dismisses that claim for the reasons discussed.

As GM notes, see Br. in Supp. Mot. at 24; Reply at 6–7, an additional reason that Plaintiffs' Michigan common law fraud claim must be dismissed is that Plaintiffs failed to "ma[ke] any inquiries directly to [GM] regarding the safety of their vehicles or the existence of any potential defects." In re Gen. Motors LLC Ignition, 257 F. Supp. 3d at 425.

1531-WHW-CLW, 2014 WL 283628, at *12 (D.N.J. Jan. 24, 2014) ("Rule 9(b) and De Bouse require a plaintiff to allege the circumstances under which she saw or heard or read those communications and identify them with particularity.").

Plaintiffs fail to allege any specific advertisements or communications that Illinois Plaintiff Adarius Blake received from GM.  See Am. Compl. ¶ 93 (asserting that Blake "saw and recalled GM's advertising . . . such as websites, television, radio, and print and representations regarding the safety, reliability and durability of the vehicle," and "received" similar representations and omissions from a salesperson).

Plaintiffs suggest that "indirect" communications suffice under De Bouse and that cases requiring greater specificity are wrongly decided.  See Br. in Supp. Resp. at 23 (citing De Bouse, 922 N.E.2d at 316 (barring ICFA action where plaintiff "does not receive, directly or indirectly, communication or advertising from the defendant") (emphasis added)).  The weight of authorities, however, establishes that it is Plaintiffs who have an incorrect read of Illinois law.  See Ciszewski, 2010 WL 2220584, at *1–*2; Skeen, 2014 WL 283628, at *12.  Because Plaintiffs have not alleged the specific advertisements and communications that Blake received, the Court dismisses their ICFA claim.

### v.    Failure to Allege Duty to Disclose for New York Claim

GM brings an additional challenge against Plaintiffs' New York omission-based fraud claims, asserting that these claims require a showing that GM had a duty to disclose material information.  See Br. in Supp. Mot. at 23–24.  Under New York law, "a duty to disclose may arise if . . . one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge, but only when it becomes apparent to the

non-disclosing party that another party is operating under a mistaken perception of material fact." Trahan v. Lazar, 457 F. Supp. 3d 323, 353 (S.D.N.Y. 2020) (punctuation modified).

Case law cited by GM itself establishes that a plaintiff properly pleads a duty to disclose under New York law under this standard if he or she has "plausibly alleged that [the manufacturer] had superior knowledge of the Defect." Cohen v. Subaru of Am., Inc., No. 120CV08442JHRAMD, 2022 WL 721307, at *23 (D.N.J. Mar. 10, 2022) (denying motion to dismiss as to New York claim). Plaintiffs have plausibly alleged that "Defendant knew about the defect in the Class Vehicles" and "intentionally concealed it," including by referring the Court to bulletins indicating that GM was aware of the PCV freezing issue at the time of Plaintiffs' purchases. Am. Compl. ¶¶ 429, 431. Because Plaintiffs have alleged that GM had "superior knowledge" of a defect which it failed to reveal to purchasers, they have adequately pleaded a duty to disclose, and their New York fraud claims survive. See Trahan, 457 F. Supp. 3d at 353; Cohen, 2022 WL 721307, at *23.[9]

### vi.   Minnesota Deceptive Trade Practices Act

The Minnesota Deceptive Trade Practices Act (DTPA) affords only prospective injunctive relief. In re Levaquin Prod. Liab. Litig., 752 F. Supp. 2d 1071, 1076 n.3 (D. Minn. 2010). Money damages are not available. Id. On this basis, GM states that the Court should dismiss the claim for damages under the Minnesota DTPA. Br. in Supp. Mot. at 24.

---

[9] Plaintiffs bring claims under not only a New York fraudulent concealment theory, but also under New York General Business Law §§ 349 and 350. See Am. Compl. ¶¶ 390–424. GM does not make any specific arguments for the dismissal of Plaintiffs' New York General Business Law claims, but the Court understands that its arguments discussed here would be applicable to those claims. Because the Court finds that none of GM's Rule 9 or New York-specific fraud arguments is meritorious, Plaintiffs' New York General Business Law claims survive GM's motion to dismiss.

Plaintiffs concede that only injunctive relief is obtainable under Minnesota's Deceptive Trade Practices Act claim.  Br. in Supp. Resp. at 22 n.14.  Because Plaintiffs do not seek prospective injunctive relief, the Court dismisses this claim.  In re Levaquin, 752 F. Supp. 2d at 1075 n.3.

### vii.   Wisconsin Deceptive Trade Practices Act

GM argues that omissions are not actionable under the Wisconsin Deceptive Trade Practices Act (WDTPA).  See Br. in Supp. Mot. at 20.  Plaintiffs concede that omission-based fraud is not actionable under this statute.  See Br. in Supp. Resp. at 22 n.14.  To the extent that Plaintiffs' claims are based on omissions, the Court dismisses those claims.

The parties make no argument in the present briefing as to claims brought under WDTPA not based on omissions.  Plaintiffs' complaint does allege violations of the WDTPA based on both omissions and misrepresentations.  See Am. Compl. ¶¶ 465–483.  Absent argument to the contrary, the Court does not dismiss any WDTPA claims based on misrepresentations.

## B.  Implied Warranty Claims

Plaintiffs bring implied warranty claims under the laws of Wisconsin, Minnesota, Illinois, Michigan, and New York.  Plaintiffs also bring a claim under the MMWA, the merits of which depends on the success of Plaintiffs' state law implied warranty claims.  See Beck, 273 F. Supp. 3d at 762.  GM makes multiple arguments that that these claims must be dismissed.

### i.   Statute of Limitations as to Michigan, Illinois, Minnesota, and New York Claims

Defendants assert that Plaintiffs' implied warranty claims under the laws of Minnesota, Illinois, Michigan, and New York have four-year statutes of limitations.  See Br. in Supp. Mot. at 25, 25 n.5 (citing 10 Ill. Comp. Stat. 5/2-725; Mich. Comp. L. § 440.2725; Minn. Stat. Ann. § 336.2-725; N.Y.U.C.C. 2-725).  GM asserts that more than four years have passed since the "'first

purchase[]'" of each applicable vehicle, and so the implied warranty claims for these states are time-barred.  Br. in Supp. Mot. at 25–26 (quoting <u>Roe v. Ford Motor Co.</u>, No. 218CV12528LJMAPP, 2019 WL 3564589, at *13 (E.D. Mich. Aug. 6, 2019) (dismissing implied warranty claims as time-barred where plaintiffs brought suit "more than four years after their vehicle[s were] first purchased")).

Plaintiffs present two arguments to avoid the statutes of limitations.  First, they argue in their complaint that the "discovery rule" tolls the statutes of limitations because Plaintiffs could not have reasonably discovered the defect within the time limit.  <u>See</u> Am. Compl. ¶ 169.  They do not expand on this argument in the present briefing or cite any relevant authorities.

Plaintiffs cannot rely on the discovery rule.  As demonstrated by GM's case law, other courts have rejected the argument that the discovery rule tolls the statute of limitations as to implied warranty claims under Michigan and Illinois law.  <u>See</u> <u>Chapman v. Gen. Motors LLC</u>, 531 F. Supp. 3d 1257, 1282, 1284, 1287 (E.D. Mich. 2021).  The discovery rule "is not applicable to implied warranty claims" under New York law.  <u>Brainard v. Freightliner Corp.</u>, No. 02-CV-0317E(F), 2002 WL 31207467, at *2 (W.D.N.Y. Oct. 1, 2002).  As to Minnesota, "Minnesota state court holdings are nonexistent or ambiguous" on the question of whether the discovery rule applies, but federal courts applying Minnesota law have tolled statutes of limitations under this doctrine in products liability suits where plaintiffs have alleged "a cognizable physical manifestation" of a "disease or injury."  <u>Rogers v. Mentor Corp.</u>, 682 F. App'x 701, 709 (11th Cir. 2017) (punctuation modified).  Not having alleged any "injuries caused by a defective product," Plaintiffs cannot rely on this rule to save their Minnesota implied warranty claims.  <u>Id.</u>

Plaintiffs next submit that GM's fraudulent concealment equitably tolled each four-year statute of limitations.  <u>See</u> Br. in Supp. Mot. at 24–25.  In their view, the statute of limitations is

tolled where a plaintiff alleges that a defendant affirmatively concealed the nature of the defect. Id.  GM counters that Plaintiffs failed to allege that GM took "affirmative steps to conceal the nature of the defect."  Reply at 7.  The Court addresses this argument as to each jurisdiction and finds that Plaintiffs' implied warranty claims are time-barred in these four states.

### a.  Michigan

Under Michigan law, if a person potentially liable for a claim "fraudulently conceals the existence of the claim . . . from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim . . . ."  Mich. Comp. L. § 600.5855. Because the Rule 9(b) standard applies, "the acts constituting fraudulent concealment of a claim [must] be pled in the complaint."  Hennigan v. Gen. Elec. Co., No. 09-11912, 2010 WL 3905770, at *5 (E.D. Mich. Sept. 29, 2010) (punctuation modified).  "To properly toll a statute of limitations under fraudulent concealment, the plaintiff must plead in the complaint the acts or misrepresentations that comprised the fraudulent concealment and must prove that the defendant committed affirmative acts of misrepresentation that were designed to prevent subsequent discovery."  Id. at *6 (punctuation modified).  "Mere silence is insufficient."  Id. (punctuation modified).

For example, the court in Hennigan found that the plaintiff had adequately alleged that the defendant had concealed the cause of action by asserting that the defendant had (i) "provided a patently false statement to the press" specific to the potential defect, (ii) "falsely denied any problems with" the allegedly affected appliances, (iii) "falsely assured consumers that there was no risk posed by its" appliances because of safety features to counteract the alleged defects, and (iv) "prevented the disclosure of information about the defective" appliances "by objecting to

requests made through the Freedom of Information Act to the Consumer Product Safety Commission." Id. (punctuation modified).  In contrast, in Chapman, the court found that plaintiffs had not adequately pleaded affirmative concealment and thus had not tolled the statute of limitations for their Michigan implied warranty claim where the only "specific" affirmative statements cited by plaintiffs were advertising materials.  531 F. Supp. 3d at 1284–1285, 1287.

This case is more like Chapman.  Plaintiffs identify misrepresentations in the form of advertising materials touting the class vehicles' safety and reliability, see id.; however, Plaintiffs suggest no facts that would "prove" that alleged misrepresentations in GM's promotional materials "were designed to prevent subsequent discovery" of Plaintiffs' implied warranty claims. Hennigan, 2010 WL 3905770, at *6.  Plaintiffs' Michigan implied warranty claims are time-barred.

### b. Illinois

Similarly, under Illinois law, "[i]f a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action."  735 Ill. Comp. Stat. Ann. 5/13-215.  To toll a statute of limitations under this standard, the plaintiff must show "affirmative acts by the defendant which were designed to prevent, and in fact did prevent, the discovery of the claim. . . .  Mere silence of the defendant . . . do[es] not amount to fraudulent concealment. . . .  [A] plaintiff must plead and demonstrate that the defendant made misrepresentations or performed acts which were known to be false."  Cangemi v. Advoc. S. Suburban Hosp., 845 N.E.2d 792, 804 (Ill. Ct. App. 2006) (punctuation modified); see also Chapman, 531 F. Supp. 3d 1257, 1282 (E.D. Mich. 2021) (finding no tolling of Illinois claim based on affirmative concealment rule); Roe v. Ford Motor Co., No.

21

18-12528, 2021 WL 2529825, at *19 (E.D. Mich. June 21, 2021) (dismissing implied warranty claims where Plaintiffs, who brought claims under the laws of several states including Illinois, had "not adequately pled that Ford took affirmative actions to conceal the water-pump defect" and "at most, . . . alleged that Ford knew of the defect and stayed quiet about it").

Plaintiffs have made no allegations that defendant took actions "designed to prevent" Plaintiffs' discovery of their claim.  Cangemi, 845 N.E.2d at 804.  Plaintiffs' Illinois implied warranty claims are time-barred.

### c. Minnesota

In Minnesota, a statute of limitations is equitably tolled "when a defendant lulls a plaintiff into not filing suit until after the limitations period has run, for example, by promising to make the repairs" or by "stat[ing] that it was conducting an investigation that might lead to settlement"; in contrast, it does not apply where a defendant has "denied liability and responsibility and made no offers to repair the problems." In re Hardieplank Fiber Cement Siding Litig., 284 F. Supp. 3d 918, 970 (D. Minn. 2018) (punctuation modified) (finding that equitable tolling did not apply where defendant first "denied responsibility" and then "had no more contact" with plaintiff).

Plaintiffs have not made any allegations indicating that GM "lull[ed]" them into not filing suit.  Id.  They do not allege any direct contact with GM that bears on Plaintiffs' ability to bring a claim.  Plaintiffs have failed to allege that their Minnesota implied warranty claims have been equitably tolled.  Id.  These claims are dismissed.

### d. New York

"To allege fraudulent concealment sufficient to justify equitable tolling" under New York law, "a plaintiff must [] plausibly allege [either] that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be

self-concealing." De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 317 (S.D.N.Y. 2013) (punctuation modified) (citing State of N.Y. v. Hendrickson Bros., 840 F.2d 1065, 1083 (2d Cir. 1988)). "[M]ere silence or failure to disclose the wrongdoing is insufficient." Id. (punctuation modified).

Like the plaintiffs in De Sole, Plaintiffs here have "allege[d] no facts indicating that [Defendant] prevented [them] from exercising [their] rights during the limitations period," including because they do not "allege a single communication, interaction, or dealing" with GM following the sales. Id. (dismissing New York warranty claim). Plaintiffs have made no argument that the type of defect alleged here is self-concealing by its nature, and without Plaintiffs' input, the Court does not find that the PCV system defect is inherently excepted from New York statutes of limitations. See Hendrickson Bros., 840 F.2d at 1083 (explaining that "inherently self-concealing fraud[s]" include selling a "fake vase" disguised "as a real antique" and creating "a collusive bid purporting to reflect genuine competition"). Plaintiffs' New York implied warranty claim is time-barred.

The Court next addresses Plaintiffs' Wisconsin implied warranty claim.

### ii.      Privity under Wisconsin Law

GM argues that Plaintiffs' Wisconsin implied warranty claims require privity of contract. Br. in Supp. Mot. at 28–29; see also Reply at 9. GM argues that, because Wisconsin Plaintiffs Geralyn Darr and Amy Henning fail to allege that they purchased their vehicles directly from GM, their implied warranty claims fail for lack of privity. Br. in Supp. Mot. at 29. Plaintiffs allege in their complaint that they qualify as "intended third-party beneficiaries of contracts between GM and its dealers, and specifically, of GM's implied warranties" because "the warranty agreements

were designed for and intended to benefit the consumers only."  Am. Compl. ¶ 195; see also Br. in Supp. Resp. at 30.

As GM's case law demonstrates, under Wisconsin law, "manufacturers ordinarily are not parties to sales contracts that arise when dealers sell the manufacturers' products to consumers. Thus, to plead plausible claims for breach of implied warranty here, the plaintiffs must allege facts giving rise to a reasonable inference that [GM] and its dealers were involved in an unusual relationship in which either [GM] sold its products directly to consumers or [GM] and its dealers were joint sellers of the goods." T&M Farms v. CNH Indus. Am., LLC, 488 F. Supp. 3d 756, 764 (E.D. Wis. 2020) (dismissing implied warranty claims and finding that lending agreement between manufacturer and dealerships did not create privity between manufacturer and purchasers); see also Gant v. Ford Motor Co., 517 F. Supp. 3d 707, 717 (E.D. Mich. 2021) (dismissing Wisconsin implied warranty claims against manufacturer where plaintiffs alleged defects in vehicles they purchased from dealerships because "[a]bsence of privity [] is an insurmountable bar to implied warranty claims in . . . Wisconsin") (punctuation modified); Francis v. Gen. Motors, LLC, 504 F. Supp. 3d 659, 677–678 (E.D. Mich. 2020) (dismissing Wisconsin implied warranty claim because "absence of privity is an unsurmountable bar" to these claims).

Plaintiffs cite Milwaukee Area Technical College v. Frontier Adjusters, which states: "A person may enforce a contract as third-party beneficiary if the contract indicates that he or she was either specifically intended by the contracting parties to benefit from the contract or is a member of the class the parties intended to benefit."  752 N.W.2d 396, 404 (Wis. Ct. App. 2008).  That case, however, dismissed implied warranty claims where the plaintiffs failed to identify any indication in the contract or record that the parties specifically intended others to benefit from their arrangement.  Id.

24

Plaintiffs cannot escape the same result here.  They point to express warranties, and indeed, manufacturers may be liable for breaching express warranties on goods sold though dealerships. See T&M Farms, 488 F. Supp. at 764.  But Plaintiffs cannot succeed on their implied warranty claims where they have alleged no "unusual relationship" like a "joint seller[]" arrangement.  Id. Absent these circumstances, courts dismiss Wisconsin implied warranty claims against vehicle manufacturers where plaintiffs purchased vehicles from dealerships.  See Gant, 517 F. Supp. 3d at 717; Francis, 504 F. Supp. 3d at 677–678.  The Court dismisses Plaintiffs' implied warranty claims under Wisconsin law for lack of privity.

### iii.    MMWA Claims

None of Plaintiffs' state-law warranty claims survives.[10]  As GM correctly asserts, see Br. in Supp. Mot. at 25 n.4, "the MMWA provides a federal cause of action for state law warranty claims," and so "a plaintiff's MMWA claim will ultimately stand or fall" with those claims.  Beck, 273 F. Supp. 3d at 762 (punctuation modified) (dismissing MMWA claim where plaintiff had no surviving state warranty claims).  The Court dismisses Plaintiffs' claim brought under the MMWA.

## C.  Breach of Contract

Plaintiffs bring a breach of contract claim, asserting: "Each and every sale or lease of a vehicle (either new or used) constitutes a contract between GM and the purchaser or lessee.  GM breached these contracts by selling or leasing to Plaintiffs and Class Members defective vehicles and by misrepresenting or failing to disclose material facts . . . ."  Am. Compl. ¶ 207.

---

[10] Because the grounds discussed are sufficient to dismiss Plaintiffs' implied warranty claims, the Court does not reach GM's arguments that Plaintiffs' implied warranty claims should be dismissed due to (i) lack of privity under New York law, see Br. in Supp. Mot. at 28–29, (ii) the defects falling outside the periods established by the express warranties, id. at 27–28, and (iii) lack of notice under Minnesota law, id. at 31.

GM argues that Plaintiffs have failed to plead that they entered any contracts with GM and cannot identify the specific terms of any contracts GM allegedly breached, necessitating dismissal. See Br. in Supp. Mot. at 32–33.  GM is correct that courts have dismissed breach of contract claims where consumers did not have direct contractual relationships with manufacturers.  See In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig., No. 2:19-MD-02901, 2022 WL 551221, at *20 (E.D. Mich. Feb. 23, 2022); Raymo v. FCA US LLC, 475 F. Supp. 3d 680, 705 (E.D. Mich. 2020).

Plaintiffs insist that they have adequately alleged that the dealers were GM's agents—and more specifically, they plead that GM-authorized dealers are GM's agents.  Br. in Supp. Resp. at 33–34 (citing Am. Compl. ¶¶ 105, 166).[11]  In Plaintiffs' view, they can assert a breach of contract claim against GM based on their contracts with its authorized dealerships.

GM points to a body of case law supporting the proposition that dealers are not agents of manufacturers.  However, these decisions were generally not made at the motion-to-dismiss stage.[12]  As established by one of Plaintiffs' cases, whether a dealer is a manufacturer's agent is a

---

[11] In defense of their agency argument, Plaintiffs plead that GM-authorized dealerships sell cars under the GM name, disseminate vehicle information provided by GM to customers, and manage vehicle repairs and warranty issues covered by GM's manufacturer warranty.  Am. Compl. ¶ 105.  Further, they plead that "GM has the ability to control" its authorized dealerships including by terminating these relationships at will, operating in the same business (i.e., vehicle sales), providing tools and resources for vehicle sales, "supervis[ing] its dealers regularly," requiring various reporting information relating to sales and operations, promoting its brand at dealership locations, auditing dealers' sales and services departments, and providing training and consulting services.  Id. ¶ 166.

[12] See Br. in Supp. Mot. at 30–31 (citing In re Volkswagen Grp. of Am., Inc., 28 F.4th 1203, 1212–1214 (Fed. Cir. 2022) (reversing finding that venue was proper in district court and finding that plaintiffs had failed to plausibly allege that independently owned and operated dealerships were agents of car manufacturers despite the control manufacturers allegedly exercised through contractual arrangements); Zeno v. Ford Motor Co., 480 F. Supp. 2d 825, 845–846 (W.D. Pa. 2007) (noting at summary judgment stage that case law "strongly suggest[s] that automobile dealerships generally are not agents of automobile manufacturers regarding the selling of vehicles"

question of fact that is not properly resolved at this stage of the case.  See Crawford v. FCA US LLC, No. 2:20-CV-12341, 2021 WL 3603342, at *13 (E.D. Mich. Aug. 13, 2021) (declining to dismiss contract claims against car manufacturer FCA on agency theory where "FCA cited no case that served as authority for granting a motion to dismiss," explaining: "Although FCA may defeat the agency claims, it cannot do so on a motion to dismiss.  Plaintiffs adequately alleged that FCA's dealers were agents of FCA.").

Plaintiffs also refers the Court to Bledsoe v. FCA US LLC, where the court rejected the defendant truck manufacturer's agency argument and found that plaintiffs had stated plausible contract claims against the manufacturer based on contracts with dealerships.  378 F. Supp. 3d 626, 644 (E.D. Mich. 2019).  The court declined to dismiss the claims because Plaintiffs alleged that (i) each vehicle sale was a "contract"; (ii) the manufacturer breached the contract by "selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose" the defect; (iii) defendant's misrepresentations and omissions caused plaintiffs to purchase the class vehicles; and (iv) absent the misrepresentations, plaintiffs would not have purchased the vehicles, or would have paid less.  Id.

---

but "do[es] not establish a per se rule that automobile dealerships cannot be the agents of manufacturers")).

GM also cites T&M Farms v. CNH Indus. Am., LLC, which did grant in part a motion to dismiss. See No. 19-C-0085, 2020 WL 1082768, at *6 (E.D. Wis. Mar. 5, 2020).  However, differences between that case and this one minimize its persuasive value.  The T&M Farms defendant was a manufacturer of cotton-picking machinery that sold goods through "captive dealers," see id., and this Court considers case law on the automobile industry a more apt point of reference for understanding the relationships between car manufacturers and dealers.  Additionally, the question of agency in T&M Farms concerned an implied warranty claim, not a breach of contract claim, and though the court was skeptical that a "dealer's status as an 'agent' of the manufacturer could result in the creation of an implied warranty between the manufacturer and the ultimate customer," the court allowed the plaintiff to replead its argument.  Id. !

In this case, Plaintiffs have plausibly pleaded that GM-authorized dealers were agents of GM based on specific assertions relating to GM's "control" of those organizations, including allegations that GM regularly supervised dealership operations, required reports on and contributed resources to sales, and promoted its brand at dealership locations.  See Am. Compl. ¶¶ 105, 166.  Given the fact-intensive nature of agency, GM's arguments to the contrary are not properly resolved at the motion-to-dismiss stage.  See Crawford, 2021 WL 3603342, at *13.  GM's citations to In re Ford and Raymo—which did not reach any question of agency—do not conflict with this understanding.

Plaintiffs have also plausibly pleaded that their vehicle purchases constituted contracts which GM breached by failing to disclose defects.  See Bledsoe, 378 F. Supp. 3d at 645.  Plaintiffs' breach of contract claims based on purchases from GM-authorized dealerships survive GM's motion to dismiss.

However, Plaintiffs have not attempted to plead that non-GM authorized dealerships are GM's agents.  The breach of contract claims based on those purchases are dismissed.  See Am. Compl. ¶¶ 50, 69, 85; Withrow v. FCA US LLC, No. 19-13214, 2021 WL 2529847, at *21 (E.D. Mich. June 21, 2021) (dismissing breach of contract claims against manufacturer based on vehicle purchases made from non-authorized dealerships and distinguishing arguments made as to agency of authorized dealerships).

### D.  Unjust Enrichment

Plaintiffs bring unjust enrichment claims under Illinois, Massachusetts, Michigan, Minnesota, New York, and Wisconsin law, and Plaintiffs also submit that they plead unjust enrichment as an alternative to any contract-based claims.  See Am. Compl. ¶¶ 236–245, 267–277, 306–316, 379–389, 454–464, 514–524.

GM asserts that Plaintiffs' unjust enrichment claims fail because Plaintiffs have adequate remedies at law under alternate theories, see Br. in Supp. Mot. at 33–34—though GM also challenges Plaintiffs' ability to obtain relief under those doctrines.

Several courts have found that the potential availability of relief under alternate claims does not foreclose an unjust enrichment claim at the pleading stage. This Court agrees, especially because GM insists that those other routes to relief are unmeritorious. "[A]lternative pleading of contract and quasi-contract claims routinely is permitted, and particularly is appropriate, where the defendant explicitly disclaims the availability of a contractual remedy . . . ." Francis, 504 F. Supp. 3d at 694 (denying motion to dismiss as to unjust enrichment claims brought under the laws of several states in purported automobile defect class action). This Court is in accord with the principle that "'unjust enrichment claims routinely are allowed to proceed when pleaded in the alternative to other viable claims for relief.'" Id. (quoting In re FCA US LLC Monostable Elec. Gearshift Litig., 280 F. Supp. 3d 975, 1009 (E.D. Mich. 2017) (denying motion to dismiss unjust enrichment claims brought under laws of states including New York, Massachusetts, and Wisconsin in purported motor vehicle defect class action)); see also In re Polaris Mktg., Sales Pracs., & Prod. Liab. Litig., 364 F. Supp. 3d 976, 985 (D. Minn. 2019) (denying motion to dismiss as to unjust enrichment claims, explaining: "A party may plead alternative or inconsistent claims or defenses. . . .  For this reason, courts routinely decline to dismiss unjust-enrichment claims when pled in the alternative."). This Court declines to dismiss Plaintiffs' unjust enrichment claims at this stage of the case merely because Plaintiffs may ultimately be able to rely on alternate theories of relief.

GM also argues that an unjust enrichment claim requires allegations of a benefit or enrichment to the defendant. See Br. in Supp. Mot. at 35–36.  GM asserts that the purchase of a

used car does not confer such a benefit, requiring the dismissal of all claims based on used vehicle purchases.  Id.

Plaintiffs allege that "GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs . . . , who paid a higher price for their vehicles that actually had lower values," that GM knowingly concealed the deception, and that "it would be inequitable and unconscionable for GM to retain these wrongfully obtained benefits."  Am. Compl. ¶¶ 310–315.

The Court finds that Plaintiffs have "'adequately . . . pleaded that the defendant received a benefit (the inflated prices paid by them for their cars), that it knew it received it, and that it would be unfair for the defendant to retain it (because of its wrongful concealment of the [defect], which all of the plaintiffs alleged would have led them to reconsider the purchase of their car, or to have paid less for it'"—which is "all that they are required to allege in order to sustain a typical unjust enrichment claim at the pleading stage."  Francis, 504 F. Supp. 3d at 693 (quoting In re FCA, 280 F. Supp. 3d at 1008).  This allegation is buttressed by Plaintiffs' claim that they purchased vehicles from GM-affiliated dealerships; "under the laws of several states, a direct benefit is conferred on an automotive manufacturer where a plaintiff purchases or leases his vehicle from a dealership affiliated with the automotive manufacturer."  In re Takata Airbag, 462 F. Supp. 3d 1304, 1326 (S.D. Fla. 2020) (allowing unjust enrichment claims that were based on vehicle purchases from dealerships affiliated with defendant manufacturer to survive motion to dismiss upon application of several state laws including those of Illinois, Massachusetts, Michigan, New York, and Wisconsin); see also In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d 618, 671 (E.D. Mich. 2000) (declining to dismiss unjust enrichment claims based on lack of privity under laws of states including Illinois, Minnesota, New York, and Wisconsin, and Michigan, explaining: "Plaintiffs here have alleged that they conferred a benefit, in the form of overpayments and increased profits,

on Defendants, that Defendants accepted that benefit and that it would be unjust under the alleged

circumstances for Defendants to retain that benefit.").[13]

The Court denies GM's motion to dismiss as to Plaintiffs' unjust enrichment claims.

**E. Nationwide Class**

GM argues that Plaintiffs, who are domiciled in only six states, cannot bring their asserted

claims on behalf of a nationwide class.  Br. in Supp. Mot. at 37.  In GM's view, this assertion of a

nationwide class "rests on an implausible uniformity of both fact and law."  Id.

As Plaintiffs correctly argue, see Br. in Supp. Resp. at 39, GM's argument is properly

suited for consideration at the Rule 23 class certification stage, not the pleading stage.  See Johnson

v. FCA US LLC, 555 F. Supp. 3d 488, 495 (E.D. Mich. 2021) (holding that plaintiffs, who alleged

warranty claims under various states' laws, could assert claims on behalf of a nationwide class

under the laws of states other than their own at the motion-to-dismiss stage, stating: "[A]s long as

the named plaintiffs have standing to sue the named defendants, any concern about whether it is

proper for a class to include out-of-state, nonparty class members with claims subject to different

state laws is a question of predominance under Rule 23(b)(3) . . . .").  The Court declines to address

---

[13] GM is correct that unjust enrichment claims do not always withstand motions to dismiss.  For example, the court in Hall v. Gen. Motors, LLC found that plaintiffs who had purchased used GM cars from third parties had "not sufficiently pleaded that they conferred a benefit on GM."  No. 19-cv-10186, 2020 WL 1285636, at *10 (E.D. Mich. Mar. 18, 2020).  That court, however, made clear that it was "not suggesting that a used-car purchaser may never bring an unjust enrichment claim against an automotive manufacturer"; rather, it found only that plaintiffs in that case had not "sufficiently explained how they conferred a benefit upon GM."  Id. at *11 n.6.  The Court finds that Plaintiffs have met that standard here.  GM also points to Harrison v. Gen. Motors, LLC, No. 21-12927, 2023 WL 348962, at *16–*17 (E.D. Mich. Jan. 19, 2023).  See Notice at 11.  But in dismissing unjust enrichment claims, Harrison distinguished Francis by noting that, in Francis, GM had "denied that its express warranty covered the alleged defect," while in Harrison, GM "recognize[d] that an express-warranty govern[ed] its obligations."  Harrison, 2023 WL 348962, at *17.  This Court has made no finding as to the availability of any express warranty claims.  The Court finds it proper that Plaintiffs' unjust enrichment claims survive the pleadings stage.

GM's argument as to a nationwide class at this time—a conclusion not undermined by the supplemental authorities cited by GM.

### III. CONCLUSION

In sum, for the reasons explained above, the Court grants in part and denies in part GM's motion to dismiss (Dkt. 30).  The Court dismisses:

- Common law fraudulent concealment claims brought under the laws of Wisconsin, Michigan, and Massachusetts;

- Claims brought under the Illinois Consumer Fraud and Deceptive Business Practices Act;

- Claims brought under the Minnesota Deceptive Trade Practices Act;

- Claims brought under the Wisconsin Deceptive Trade Practices Act, to the extent those claims are based on omissions;

- All implied warranty claims including Magnuson-Moss Warranty Act claims; and

- Breach of contract claims based on contracts with dealerships not authorized by GM.

The following claims survive:

- Claims brought under New York and Minnesota fraudulent concealment theories;

- Claims brought under New York General Business Law §§ 349 and 350;

- Claims brought under the Wisconsin Deceptive Trade Practices Act, to the extent those claims are not based on omissions;

- Breach of contract claims based on contracts with GM-authorized dealerships; and

- Unjust enrichment claims.

SO ORDERED.

Dated:  April 5, 2023                                    s/Mark A. Goldsmith
      Detroit, Michigan                           MARK A. GOLDSMITH
                                                United States District Judge